**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

United States of America

v.

313 South Royal Street, Alexandria, VA

Case No. 1:26-sw-54

**MEMORANDUM OF LAW IN SUPPORT OF THE WASHINGTON POST'S AND**
**HANNAH NATANSON'S MOTION TO INTERVENE**
**AND FOR RETURN OF PROPERTY**

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................3

I.     The Government Arrests Perez-Lugones. ..................................................................3

II.    The Government Raids a Washington Post Journalist's Home and Seizes a Trove of Newsgathering Materials That Are Protected by the First Amendment and Materials Protected by the Attorney-Client Privilege. ..........................................3

III.   The Government Issues an Overlapping Grand Jury Subpoena to The Post. .....................6

IV.   The Government Refuses to Return the Protected Materials. ...............................6

V.    The Federal Government Historically Has Prohibited the Search and Seizure of Materials from Journalists. ...................................................................................8

ARGUMENT .......................................................................................................................11

I.     All the Materials Should Be Returned Because the Seizure Was an Unconstitutional Prior Restraint and Any Government Interest Can Be Protected by a Subpoena or Other Less Invasive Legal Process. ...................................12

II.    At the Very Least, Materials Beyond the Scope of the Warrant Should Be Returned and the Court Should Oversee the Return Process. .............................17

     A.    The Government Seized an Enormous Volume of Data Beyond the Scope of the Warrant. .............................................................................18

     B.    The Seized Data Is Protected by the First Amendment. ...........................19

           1.    Continued withholding of the non-responsive data is an unconstitutional prior restraint. ...............................................19

           2.    The seized data is protected by a First Amendment privilege. .................19

           3.    The non-responsive data is protected by the Privacy Protection Act. ............................................................................22

     C.    The Data Beyond the Scope of the Warrant Includes Items Protected by the Attorney-Client Privilege. ..........................................................22

     D.    The Data Sought by the Warrant Is Being Preserved. ............................23

     E.    Continuing Judicial Oversight Will Protect the Government's Access to Data Within the Scope of the Warrant and Use of That Data in Other Proceedings. ...................................................................................23

CONCLUSION....................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000)....................................................................20

*Branzburg v. Hayes*, 408 U.S. 665 (1972)............................................................................ 20-21

*Channel 10, Inc. v. Gunnarson*, 337 F. Supp. 634 (D. Minn. 1972) ............................................13

*Chestnut v. Kincaid*, 2022 WL 350117 (D. Md. Feb. 4, 2022) ....................................................20

*Church of Scientology Int'l v. Daniels*, 992 F.2d 1329 (4th Cir. 1993)....................................20

*United States v. Dennis*, 183 F.2d 201 (2d Cir. 1950), *aff'd*, 341 U.S. 494 (1951).....................16

*Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989).............................................................13

*Garcia v. Montgomery County*, 145 F. Supp. 3d 492 (D. Md. 2015) ..................................... 12-13

*Guest v. Leis*, 255 F.3d 325 (6th Cir. 2001).............................................................................22

*Horne v. WTVR, LLC*, 893 F.3d 201 (4th Cir. 2018)..................................................................20

*In re Grand Jury Subpoenas*, 438 F. Supp. 2d 1111 (N.D. Cal. 2006)................................. 16-17

*In re Multi-Jurisdictional Grand Jury*, 64 Va. Cir. 423 (Va. Cir. Ct. 2004) ..............................17

*In re Murphy-Brown, LLC*, 907 F.3d 788 (4th Cir. 2018) ...........................................................16

*In re Search Warrant Dated November 5, 2021*, 2023 WL 8868371
    (S.D.N.Y. Dec. 21, 2023)......................................................................................................24

*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) ........................ *passim*

*In re Special Counsel Investigation*, 338 F. Supp. 2d 16 (D.D.C. 2004).......................................17

*In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000) ......................................................16

*Meyer v. City of Marion*, 776 F. Supp. 3d 991 (D. Kan. 2025) ....................................................13

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) ...........................................................13

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ..........................................................12, 16

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976).......................................................... 2, 12, 15-16

*Riley v. California*, 573 U.S. 373 (2014) ...................................................................................19

*Roaden v. Kentucky*, 413 U.S. 496 (1973) .................................................................................17

*Robinson v. Fetterman*, 378 F. Supp. 2d 534 (E.D. Pa. 2005).......................................................13

*Stanford v. State of Tex.*, 379 U.S. 476 (1965) ..............................................................9, 16

*United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980) ..................................................18

*United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013)..............................................21

*United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999) ...............................................23

*United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010)
    (en banc)..............................................................................................................18

*United States v. Jennings*, 1999 WL 438984 (N.D. Ill. June 21, 1999)..........................17

*United States v. Rayburn House Office Bldg.*, 497 F.3d 654 (D.C. Cir. 2007) ...............11, 17, 25

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013)..................................................21

*United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982)..................................................18

*United States v. Treacy*, 603 F. Supp. 2d 670 (S.D.N.Y. 2009) ....................................16

*United States v. Wilson*, 540 F.2d 1100 (D.C. Cir. 1976)...............................................11

*Upjohn Co. v. United States*, 449 U.S. 383 (1981).........................................................23

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ............................................... *passim*

## CONSTITUTION

U.S. Const. amend. I ................................................................................. *passim*

## RULES, STATUTES, AND REGULATIONS

Fed. R. Crim. P. 41 .................................................................................. *passim*

18 U.S.C. § 793..............................................................................................3

42 U.S.C. § 2000aa ......................................................................................22

42 U.S.C. § 2000aa-7 ...................................................................................22

D.C. Code § 16-4701 ...................................................................................20

28 C.F.R. § 50.10 ............................................................................................9

## INTRODUCTION

The federal government's wholesale seizure of a reporter's confidential newsgathering materials violates the Constitution's protections for free speech and a free press and should not be allowed to stand.  It is a prior restraint and a violation of the reporter's privilege that flouts the First Amendment and ignores federal statutory safeguards for journalists.  The seizure chills speech, cripples reporting, and inflicts irreparable harm every day the government keeps its hands on protected materials.  The government cannot meet its heavy burden to justify this intrusion, and it has ignored narrower, lawful alternatives.  The Court should order the immediate return of all seized materials.  Anything less would license future newsroom raids and normalize censorship by search warrant.

In the early morning before dawn on Wednesday, January 14, the government executed a search warrant at the home of Washington Post reporter Hannah Natanson because of her newsgathering activities.  It seized a massive volume of her electronic data, capturing years of her newsgathering materials across hundreds of stories, including communications with confidential sources.  Natanson is an award-winning investigative journalist who covers a wide range of news about the federal government.  Three weeks before the FBI's raid, she published an article about her more than 1,100 sources within the federal government who have helped The Post break dozens of stories in the last year.[1]

The search warrant says that it seeks records relating to a defense contractor named Aurelio Luis Perez-Lugones, who was arrested roughly a week earlier.  But the FBI seized Natanson's newsgathering materials, stored on devices including her Post-issued laptop and cellphone, that

---

[1] Hannah Natanson, *I am The Post's 'federal government whisperer.' It's been brutal*, Wash. Post, Dec. 24, 2025, https://wapo.st/3LSRR1i.

contain years of information about past and current confidential sources and other unpublished newsgathering materials, including those she was using for current reporting. Almost none of the seized data is even potentially responsive to the warrant, which seeks only records received from or relating to a single government contractor. The seized data is core First Amendment-protected material, and some is protected by the attorney-client privilege.

Pursuant to the First Amendment and Rule 41(g) of the Federal Rules of Criminal Procedure, WP Company LLC d/b/a The Washington Post ("The Post") and Natanson seek return of the seized newsgathering materials because the seizure was an unconstitutional prior restraint, which is "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The seizure had the practical effect of suppressing The Post and Natanson's current and future journalism, including because the seizure has prevented her from communicating with her more than 1,100 sources, who run the gamut of federal officials from more than 120 agencies or subagencies, and who overwhelmingly and self-evidently have nothing to do with the warrant. Nor are Natanson's confidential sources likely to work with her again, if the government is permitted to rummage through her files unchecked.

At the very least, The Post and Natanson seek return of the non-responsive data and judicial oversight of the return process as a reasonable condition "to protect access to the property and its use in later proceedings." Fed. R. Crim. P. 41(g). In other cases involving the seizure of constitutionally protected or privileged information, courts require such judicial oversight. *See, e.g.*, *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 181 (4th Cir. 2019) (holding that either "the magistrate judge (or an appointed special master)—rather than the Filter Team—must perform the privilege review of the seized materials").

## BACKGROUND

### I.    The Government Arrests Perez-Lugones.

On January 8, 2026, the government arrested Aurelio Luis Perez-Lugones, alleging that he had unlawfully retained national defense information in violation of 18 U.S.C. § 793(e).  *See* Latcovich Decl., Ex. C (Perez-Lugones Complaint and Affidavit).  The affidavit in support of the criminal complaint alleges that Perez-Lugones was a government contractor with a Top Secret security clearance.  *See id.* at ¶ 8.  It further alleges that since October 2025 (i) he copied information from a classified report and attachment to a single Microsoft Word document, which he then printed; (ii) he took possession of four pages from a yellow notepad (or pads) that may or may not contain notes about classified information; and (iii) a search of his residence and vehicle identified two documents marked secret.  *Id.* ¶¶ 16, 32, 35-36, 38-39.

The criminal complaint thus alleges that Perez-Lugones possessed a small number of documents that potentially contain classified information—three documents and four yellow notepad pages.

### II.   The Government Raids a Washington Post Journalist's Home and Seizes a Trove of Newsgathering Materials That Are Protected by the First Amendment and Materials Protected by the Attorney-Client Privilege.

On Wednesday, January 14, 2026, at approximately 6:00 AM, FBI agents executed a search warrant at the residence of Washington Post reporter Hannah Natanson, seeking records received from or relating to Perez-Lugones.  *See* Latcovich Decl., Ex. A (Search and Seizure Warrant); Natanson Decl. ¶ 11.

Natanson is an award-winning investigative journalist who covers the Trump administration's transformation of the federal government.  *See* Natanson Decl. ¶¶ 2-4.  She won a Peabody Award in 2024 and was part of a team of Post journalists who won the Pulitzer Prize for Public Service in 2022.  *See id.* ¶ 3.  Over the past year on this beat, Natanson gained 1,169

confidential sources—federal employees from more than 120 agencies or subagencies who requested anonymity because they "fear retribution from the government due to their disclosures." *Id.* ¶¶ 5-6, 39.  These sources' contributions resulted in Natanson writing or co-writing "more than 200 articles across roughly twenty news desks." *Id.* ¶ 7.

The search warrant authorized the seizure of "[a]ll digital devices, or other electronic storage media, or components of either identified during the searches that are reasonably believed to be used by Natanson."  Latcovich Decl., Ex. A (Search and Seizure Warrant).  The FBI agents ultimately seized the following items from Natanson's residence: (1) a MacBook Pro that is owned by The Post and that Natanson used for work; (2) a second MacBook Pro that Natanson personally owns but also used for work; (3) an iPhone that The Post owns that Natanson used for work; (4) a 1-terabyte portable hard drive; (5) a Garmin watch that Natanson personally owns; and (6) a voice recorder that The Post owns and that Natanson used for her reporting.  Latcovich Decl., Ex. B (Property Receipt); Natanson Decl. ¶ 14.

Although the government seized only six devices, those devices are capable of storing multiple terabytes of data.  To put this in perspective, ten terabytes could hold the entire Library of Congress's printed collection.  Natanson's devices contain essentially her entire professional universe: more than 30,000 Post emails from the last year alone, confidential information from and about sources (including her sources and her colleagues' sources), recordings of interviews, notes on story concepts and ideas, drafts of potential stories, communications with colleagues about sources and stories, and The Post's content management system that houses all articles in progress.  Natanson Decl. ¶¶ 8, 16-35.  The devices also housed Natanson's encrypted Signal messaging platform that she used to communicate with her more than 1,100 sources.  *Id.* ¶ 43.  Without her devices, she "literally cannot contact" these sources.  *Id.* ¶ 43.  Prior to the seizure,

she would receive somewhere between dozens and over 100 tips from her sources via Signal *per day*. *Id.* ¶ 39. In short, the devices are critical to her ability both to function as a journalist and to collaborate with her colleagues in the newsroom. *Id.* ¶¶ 40-41. These devices also reflect the details of her personal life, "including medical information, financial information, and even information about [her] wedding planning." *Id.* ¶ 25.

The government seized this proverbial haystack in an attempt to locate a needle. The search warrant orders that the government's search of the seized data "must be limited to all records and information . . . from the time period October 1, 2025, to the present, which constitute records received from or relating to Aurelio Luis Perez-Lugones." Latcovich Decl., Ex. A (Search and Seizure Warrant). Even the government cannot expect to find many records responsive to the warrant in this ocean of data because its criminal complaint alleges that Perez-Lugones possessed only a small number of documents potentially containing classified or secret information, which he only began collecting three months ago. Meanwhile, Natanson has thousands of communications across her more than 1,100 sources. *See* Natanson Decl. ¶ 39. And her devices contain years of data about past and current confidential sources and other unpublished materials. *See id.* ¶¶ 17-18, 20, 32-33, 35; Roberson Decl. ¶¶ 7-9, 11. At best, the government has a legitimate interest in only an infinitesimal fraction of the data it has seized. *See* Natanson Decl. ¶ 38.

Although the warrant narrowly defines what is within its scope, it does not prescribe a detailed search protocol to locate those items. Instead, the warrant authorizes a non-exhaustive list of review techniques, including opening and reading the substance of files contained on the devices, even those files that relate to newsgathering activity or confidential sources and that have nothing to do with Perez-Lugones. *See* Latcovich Decl., Ex. A (Search and Seizure Warrant). The

government's review of the data thus presents unique issues in this case. Everything included in this massive volume of data is presumptively protected by the First Amendment. The search warrant, however, includes no protocol or safeguards relating to the review of materials protected by the First Amendment. *See* Latcovich Decl., Ex. A (Search and Seizure Warrant). The data also includes privileged communications with Post attorneys. *See* Natanson Decl. ¶ 34; *see also supra* 1 n.1 (explaining that Natanson developed her sourcing system in consultation with "Post lawyers"). The warrant includes no protocol for the review of materials protected from disclosure by the attorney-client privilege, although it does state that if government agents identify documents that they deem, in their own discretion, to be potentially privileged, they are to segregate such documents to prevent further substantive review. *See* Latcovich Decl., Ex. A (Search and Seizure Warrant).

## III.    The Government Issues an Overlapping Grand Jury Subpoena to The Post.

The same day the FBI raided Natanson's residence, the government issued a grand jury subpoena to The Post seeking substantially the same items as those particularized in the search warrant—records of communications with Perez-Lugones and records received from him. *See* Latcovich Decl., Ex. D (Grand Jury Subpoena). Nothing prevented the government from issuing a subpoena to Natanson instead of executing a search warrant, which is what, historically, would have been mandated by government policy.

## IV.    The Government Refuses to Return the Protected Materials.

The same day the FBI raided Natanson's residence, undersigned counsel reached out to the government to advise that the seized items contain materials protected by the First Amendment and the attorney-client privilege. *See* Latcovich Decl., Ex. E (Email). Undersigned counsel asked the government to refrain from reviewing the documents pending a discussion. *See id.* On January 15, the parties conferred regarding the seized documents. *See* Latcovich Decl. ¶ 10. No

agreements regarding the handling of the data were reached because government counsel asserted that all issues had to be vetted with more senior government officials. *Id.* The government also represented that it was in the process of extracting data from the devices and preserving data, and that it was not reviewing content. *See id.*

On January 16, the parties conferred twice regarding the seized data. *Id.* ¶ 11. Counsel for The Post proposed a process that would involve the government's copying and preservation of the seized data, returning the seized property, and reviewing only the responsive material, if any, identified by counsel for The Post and Natanson. *See id.* ¶ 11. After conferring with the unnamed, more-senior officials, the government called back and rejected this proposal, but agreed that it would not begin a substantive review of the seized data pending further discussion on January 20. *See id.* ¶ 12. The government asked counsel to provide a list of attorney names on January 20 for the government to use as the basis for screening privileged materials. *See id.* ¶ 12. Counsel for The Post explained that a list of attorney names would be an inadequate basis to screen privileged information because editors at The Post, as opposed to reporters, generally request and receive legal advice from attorneys and then disseminate that advice to reporters. *See id.* ¶ 12; *see also* Natanson Decl. ¶ 34. Counsel for The Post also explained that a list of attorney names would not address the significant First Amendment issues and asked for further time to discuss these complex issues before the government commenced its review. *See* Latcovich Decl. ¶ 13. The government expressed doubt that the unnamed, senior officials would agree to a proposal designed to protect the significant First Amendment interests at stake here. *See id.* ¶ 13.

On January 20, the parties conferred again. Counsel for The Post and Natanson proposed that the government return the seized property and that The Post would treat the devices as covered by the grand jury subpoena served on The Post. *See* Latcovich Decl. ¶ 14. The government

rejected this proposal.  Latcovich Decl. ¶ 15.  Counsel for The Post and Natanson then informed the government that they intended to seek judicial relief and would file a motion within twenty-four hours, and asked the government to agree to refrain from beginning review until the Court could respond, noting that Judge Rushing on the Fourth Circuit had previously written in a similar Rule 41(g) matter that this was a "sensible procedure."  *See* Latcovich Decl. ¶ 16 (quoting *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 184 (2019) (Rushing, J., concurring)).  The government stated that it would not refrain from conducting a substantive review of the seized material pending judicial resolution of this dispute, notwithstanding this guidance, and that it was still in the process of preserving data and had not yet started reviewing it.  Latcovich Decl. ¶ 17.  The government also refused to take a position one way or the other on any protocol to protect either attorney-client privilege or First Amendment privileges, and it would not commit that it intended to undertake any process to protect any applicable First Amendment privileges.  Latcovich Decl. ¶¶ 18-19.

## V.    The Federal Government Historically Has Prohibited the Search and Seizure of Materials from Journalists.

Searches and seizures of journalists' newsgathering materials by the federal government are nearly unprecedented.  And, even by local authorities, such actions are exceedingly rare and have been subject to public and legal repudiation.[2]  Against that backdrop, the search and seizure

---

[2] *See* Katherine Jacobsen, *"This Kind of Behavior Cannot Be Tolerated": Police Raid on Kansas Newspaper Alarms Media, Press Freedom Groups*, Comm. to Protect Journalists (Aug. 14, 2023), https://tinyurl.com/yc35d5as ("The use of search warrants against journalists remains rare in the United States.").  After local police raided a Kansas newsroom in 2023, the county ultimately agreed to pay $3 million for the wrongful search and seizure.  Caitlin Vogus, *Kansas County Pays $3M for Forgetting the First Amendment*, Freedom of the Press Found. (Nov. 12, 2025), https://tinyurl.com/4ruufb7z.  On the rare occasions when similar searches have occurred, opposition has been swift and bipartisan.  *See Justice Search Warrant Relied on "Probable Cause" of Criminal Conduct by Fox News Journalist*, Reps. Comm. for Freedom of the Press (May 22, 2013), https://tinyurl.com/yw95etvz (describing DOJ search warrant for Fox News reporter's personal email in North Korea leak probe as "downright chilling" and "appalling"); *Zurcher v.*

of devices from Natanson's home stands alone.  "This is the first time the U.S. Justice Department has raided a journalist's home in connection with a national security leak investigation."  Chris Young & Emily Vespa, *The FBI Search of a Washington Post Reporter's Home: What We Know and Why it Matters*, Reps. Comm. for Freedom of the Press (Jan. 16, 2026), https://tinyurl.com/4wfs62db.  That lack of precedent reflects that the Framers' drafting of the Fourth Amendment was informed by "a history of conflict between the Crown and the press." *Stanford v. State of Tex.*, 379 U.S. 476, 482 (1965).[3]

The virtually unprecedented search of Natanson's home and the seizure of The Post's devices coincide with a rise in federal government attacks against the independence of the press. *See* Jess Bidgood, *Trump Sharpens Attacks on a Favorite Foe: The News Media*, N.Y. Times (July 21, 2025), https://tinyurl.com/23c45uwv; Luke Broadwater, *Trump Says Critical Coverage of Him Is 'Really Illegal'*, N.Y. Times (Sept. 19, 2025), https://tinyurl.com/bddwuwaj.  This includes an earlier unprecedented move by the Defense Department—effectively evicting the Pentagon press corps for rejecting demands to pledge to refrain from seeking or publishing information that is not officially approved.  *See* David Bauder, *Journalists Turn in Access Badges, Exit Pentagon Rather than Agree to New Reporting Rules*, AP News (Oct. 15, 2025), https://tinyurl.com/mu2symvh.

---

*Stanford Daily*, 436 U.S. 547, 551 (1978) (raid of Stanford student newspaper); Privacy Protection Act of 1980 Statement on Signing S. 1790 Into Law, The Am. Presidency Project, https://tinyurl.com/pjtsvd9t (decrying raids like the one at Stanford for their "chilling effect on the ability to develop sources and pursue stories.").

[3] In April 2025, the Attorney General rescinded the previous administration's strict protections against issuing compulsory process against the news media.  *See* April 25, 2025 Atty. Gen. Mem.*,* https://tinyurl.com/mrb42msw; 28 C.F.R. § 50.10.  But even in the memorandum announcing the change, the Attorney General acknowledged that "investigative techniques relating to newsgathering are an extraordinary measure to be deployed as a last resort when essential to a successful investigation or prosecution."  *Id.*  The government's action here flouted even that principle—it chose to execute a search warrant on a journalist's home as a first resort, and apparently refuses to do anything post-seizure to protect the First Amendment interests at stake.

At a time when journalists are already under attack, this raid "is not just about one reporter, one newsroom, or one investigation," but "about whether journalists can promise confidentiality to sources without fear that federal agents will show up at their door."  Press Release, Soc'y of Pro. Journalists, *SPJ Condemns FBI Search of Washington Post Reporter's Home as a Grave Threat to Press Freedom* (Jan. 14, 2026) (available online at https://tinyurl.com/5amvsdf7); *see also* Press Release, Investigative Reps. and Eds., *IRE Statement on FBI Raid of Hannah Natanson's Home*, (available online at https://tinyurl.com/4fzvj4kv) (describing the search as "an unconscionable attack on a free press").

Such an environment not only harms journalists but also chills the whistleblowers and other sources on whom journalists rely to shine light on stories that would otherwise remain in the shadows.  Disclosures by confidential government sources have resulted in some of the most consequential investigative journalism in history.  Military analyst Daniel Ellsberg leaked portions of the Pentagon Papers to the *New York Times* and The Post, enabling the newspapers to reveal government lies "of a generational scale" about the Vietnam War.  Elizabeth Becker, *The Secrets and Lies of the Vietnam War, Exposed in One Epic Document*, N.Y. Times (June 9, 2021), https://tinyurl.com/5b4rphmj; Christopher B. Daly, *Fifty years ago the Pentagon Papers shocked America — and they still matter today*, Wash. Post (June 13, 2021), https://tinyurl.com/2pxx2b8m. And a source by the name Deep Throat, a high-ranking FBI official, "knew he was taking a monumental risk" by secretly assisting Bob Woodward and Carl Bernstein in uncovering the Watergate scandal.  David Von Drehle, *FBI's No. 2 Was 'Deep Throat': Mark Felt Ends 30-Year Mystery of The Post's Watergate Source*, Wash. Post (June 1, 2005), https://tinyurl.com/4hn6azu2. Raids like these threaten to gravely chill future whistleblowers, potentially keeping them and their stories in the shadows.

## ARGUMENT

Federal Rule of Criminal Procedure 41(g) permits any "person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to "move for the property's return." Fed. R. Crim. P. 41(g).  The rule does not set forth a standard "to govern the determination of whether property should be returned," but the test is one of "reasonableness under all of the circumstances."  Fed. R. Crim. P. 41 advisory committee's note to 1989 amendment.  "[I]f the United States' *legitimate interests* can be satisfied even if the property is returned, continued retention of the property would become unreasonable."  *United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 663 (D.C. Cir. 2007) (quoting Fed. R. Crim. P. 41 advisory committee's note to 1989 amendment) (emphasis in *Rayburn*).  Once the need for retaining property has passed, a district court "has both the jurisdiction and the duty to return the contested property . . . regardless and independently of the validity or invalidity of the underlying search and seizure."  *United States v. Wilson*, 540 F.2d 1100, 1103-04 (D.C. Cir. 1976).

The Post and Natanson request that the Court order return of all seized materials and allow the government to maintain, but not review, the preservation copies under seal until this matter is resolved.  The government's legitimate interests can be satisfied by issuing a subpoena to Natanson and/or The Post for the same items sought by the warrant—communications with Perez-Lugones, or records allegedly received from him.  This is the appropriate remedy because the seizure in this case was an unconstitutional prior restraint that seized materials related to more than 1,100 completely unrelated sources, and suppressed The Post and Natanson's ability to publish stories on completely unrelated topics.

At a minimum, The Post and Natanson request that the Court order return of the non-responsive data with judicial oversight of the return process as a reasonable condition "to protect access to the property and its use in later proceedings."  Fed. R. Crim. P. 41(g).  In other cases

involving the seizure of constitutionally-protected or privileged information, courts require such judicial oversight.  *See, e.g.*, *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 181 (4th Cir. 2019) (holding that either "the magistrate judge (or an appointed special master) — rather than the Filter Team — must perform the privilege review of the seized materials").

## I.    All the Materials Should Be Returned Because the Seizure Was an Unconstitutional Prior Restraint and Any Government Interest Can Be Protected by a Subpoena or Other Less Invasive Legal Process.

The First Amendment to the U.S. Constitution prohibits the government from "abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  All of the materials that the government seized should be returned because the search and seizure of Natanson's reporting materials was an unconstitutional prior restraint—government action that blocks expressive activity before it can occur.  Here, the government has commandeered Natanson's reporting records and tools, thereby preventing her from contacting her more than 1,100 sources and receiving their tips, and generally impairing her ability to publish the stories she otherwise would have published but for the raid.

Prior restraints on speech "are the most serious and the least tolerable infringement on First Amendment rights."  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see also, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) ("Both the history and language of the First Amendment support the view that the press must be left free to publish news, whatever the source, without censorship, injunctions, or prior restraints.").  Any prior restraint must be viewed "with a heavy presumption against its constitutional validity."  *Neb. Press Ass'n*, 427 U.S. at 558 (citation omitted).

Government seizure of newsgathering material is a prior restraint because it substantially impairs or prevents future publication of news.  Thus, courts have repeatedly held that such seizures are unlawful.  *See, e.g.*, *Garcia v. Montgomery County*, 145 F. Supp. 3d 492, 511 (D. Md.

2015) (seizure of reporter's recording of police activity is an unconstitutional prior restraint); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005) ("to the extent that the troopers were restraining [the plaintiff] from making any future videotapes and from publicizing or publishing what he had filmed, the defendants' conduct clearly amounted to an unlawful prior restraint upon his protected speech"); *Channel 10, Inc. v. Gunnarson*, 337 F. Supp. 634, 637 (D. Minn. 1972) ("[I]t is clear to this court that the seizure and holding of the [journalist's] camera and undeveloped film was an unlawful 'prior restraint' whether or not the film was ever reviewed."); *see also, e.g.*, *Meyer v. City of Marion*, 776 F. Supp. 3d 991, 1037 n.22 (D. Kan. 2025) ("[P]laintiffs have stated a plausible claim that defendants violated their First Amendment rights by physically invading the *Record*'s office and interfering with the *Record*'s ability to gather and publish the news.").[4]

Indeed, the Supreme Court acknowledged in *Zurcher v. Stanford Daily* that a police search of newsroom materials could constitute a prior restraint. 436 U.S. 547, 567 (1978) (considering whether the search created a "realistic threat of prior restraint or of any direct restraint whatsoever on the publication of the Daily or on its communication of ideas"). While the Court ultimately determined in that case, which involved only a limited search *and no seizure*, that there was no threat of a prior restraint, *id.* at 567, that threat has unquestionably materialized here.

In *Zurcher*, police conducted a limited search for "news photographs taken in a public place." *Id.* The search did not require them to open any "locked drawers and rooms." *Id.* at 551. And the government was *not* notified of any confidentiality concerns prior to the search. 436 U.S.

---

[4] *See also Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63-64 (1989) ("searches for and seizure of First Amendment material" create "risk of prior restraint"); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256 (1974) ("Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers.").

at 551.  In addition, there was no seizure at all in *Zurcher*: "*no materials were removed from the Daily's office*," and the reporters could continue their work.  *Id.* at 552 (emphasis added).  Given the limited scope of the search and disruption to newsgathering activities, the Court held that the Fourth Amendment adequately protected the newspaper's First Amendment interests.[5]

That is a far cry from what happened in this case.  Here, the government seized all of Natanson's reporting materials that it could through the unprecedented execution of a search warrant of her home, seizing devices that were digitally secured.  Natanson Decl. ¶ 14.  The government, unlike in *Zurcher*, was immediately put on notice by The Post and Natanson that its search and seizure raised substantial privilege and confidentiality concerns.  *See supra* pp. 7-9.  But it has nonetheless continued the seizure.

By seizing Natanson's communication devices, source and reporting information, interview notes, and unpublished drafts—not to mention internal communications with editors, newsroom colleagues, and Post lawyers—the government has restrained The Post and Natanson's future publications, in multiple respects.  First, the seizure has made it impossible for Natanson to publish the several stories she was actively working on at the time of the raid, which have nothing to do with this case.  Natanson Decl. ¶ 44.  Second, she no longer has access to her communications with her more than 1,100 confidential sources who have nothing to do with this case, which were primarily housed within her Signal app.  Natanson Decl. ¶ 43.  Prior to the raid, Natanson—a truly prolific reporter—received an average of dozens to over one hundred tips per day from these sources.  Natanson Decl. ¶ 39.  Since the raid, without access to her Signal account, that number has dropped to zero; she literally is unable to contact the overwhelming majority of her sources.

---

[5] Notably, there was such widespread criticism of this outcome that Congress subsequently passed the Privacy Protection Act, which generally prohibits such raids.  *See infra* section II.B.3.

Natanson Decl. ¶ 39. Third, and relatedly, the government's seizure has severely hampered Natanson's ability to receive tips about new topics that would have otherwise arisen in the days to come. Natanson Decl. ¶ 45.

These limitations have also hurt The Post, which relies on Natanson's vast and unique sourcing to generate and support news coverage across the newsroom. In the past year alone, Natanson authored or co-authored roughly 200 articles across more than twenty news desks, Natanson Decl. ¶ 7, an exceptionally high number. This prolific output is heavily dependent upon her deep source relationships, which have been at the very least significantly impaired, if not ended, by the government raid.

Natanson's confidential sources chose to "communicate via secure messaging services such as Signal because they fear retribution from the government due to their disclosures" and were therefore willing to disclose information based on an expectation of confidentiality. Natanson Decl. ¶¶ 39, 46. The longer The Post and Natanson's devices remain accessible to the government, "the greater the likelihood that [her] sources will be reluctant to speak with [her] in the future." Natanson Decl. ¶ 46. In other words, if the government remains free to rummage through the seized data, the government will effectively burn 1,100 of The Post's sources and censor their untold stories. This is on top of the inevitable deterring effect that future sources may feel about communicating with Natanson or, potentially, other Washington Post reporters, if it appears to the public that the government can simply confiscate reporters' devices at will.

The seizure accordingly imposed a "prior restraint" on "the publication of [Natanson's and The Post's journalism] or on [their] communication of ideas." *Zurcher*, 436 U.S. at 567; *Neb. Press Ass'n*, 427 U.S. at 559.

Because the seizure was a prior restraint, it was unconstitutional unless the government can overcome the "heavy presumption against its constitutional validity." *Neb. Press Ass'n*, 427 U.S. at 558 (citation omitted); *N.Y. Times*, 403 U.S. at 714 (per curiam) (citation omitted). In other words, the seizure was unlawful unless the government can show the restrained material would have "inevitably, directly, and immediately" caused immense harm to the country. *N.Y. Times*, 403 U.S. at 726-27 (Brennan, J., concurring); *see Neb. Press Ass'n*, 427 U.S. at 562 (court must assess the "gravity of the 'evil'" (quoting *United States v. Dennis*, 183 F.2d 201, 212 (2d Cir. 1950) (Hand, J.), *aff'd*, 341 U.S. 494 (1951)). In addition, the restraint must be narrowly tailored to address that concern. *In re Murphy-Brown, LLC*, 907 F.3d 788, 799 (4th Cir. 2018); *Neb. Press Ass'n*, 427 U.S. at 563 (court must assess whether "other measures would not suffice"); *see also Zurcher*, 436 U.S. at 564 ("Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" (quoting *Stanford*, 379 U.S. at 485)).

The government cannot meet this burden. Even if it could somehow demonstrate some compelling risk of harm absent seizure, it could not show that the prior restraint was narrowly tailored. In particular, the government could have sought responsive records via less invasive legal process, such as a subpoena. Indeed, it served a grand jury subpoena on The Post the same day as the raid. While a search is "an immediate and substantial invasion of privacy," a subpoena is less invasive because it "commences an adversary process during which the person served with the subpoena may challenge it in court before complying with its demands." *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000).[6] At bottom, it was plainly not a narrowly tailored effort

---

[6] Law enforcement has successfully relied on subpoenas to obtain evidence that it claimed it needed from journalists in criminal proceedings. *See generally, e.g.*, *United States v. Treacy*, 603 F. Supp. 2d 670 (S.D.N.Y. 2009); *In re Grand Jury Subpoenas*, 438 F. Supp. 2d 1111 (N.D. Cal.

for the government to seize a journalist's body of newsgathering materials, including confidential records for more than 1,100 sources, when it could have simply subpoenaed the records associated with the one individual at issue.

Because the search and seizure was an unconstitutional prior restraint, all the materials should be returned.

## II.    At the Very Least, Materials Beyond the Scope of the Warrant Should Be Returned and the Court Should Oversee the Return Process.

The government has no "*legitimate interest*[]" in preventing the return of the non-responsive seized materials to The Post and Natanson. *Rayburn*, 497 F.3d at 663 (citation omitted). Its only arguably legitimate interests are in retaining and using the narrow set of materials, if any, that are responsive to the warrant. Prompt return of the non-responsive materials is especially important and reasonable here given the nature of the non-responsive materials and the context of this seizure. As the Supreme Court has acknowledged, what is "reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Zurcher*, 436 U.S. at 564 (quoting *Roaden v. Kentucky*, 413 U.S. 496, 501 (1973)). Here, we are talking about the return of materials protected by the First Amendment that have nothing to do with the government's investigation and are beyond the scope of the government's warrant, including newsgathering materials, draft stories, communications with editors and other journalists about draft stories, and materials relating to confidential sources. Also included in the non-responsive materials are communications protected by attorney-client privilege.

---

2006); *In re Special Counsel Investigation*, 338 F. Supp. 2d 16 (D.D.C. 2004); *In re Multi-Jurisdictional Grand Jury*, 64 Va. Cir. 423 (Va. Cir. Ct. 2004); *United States v. Jennings*, 1999 WL 438984 (N.D. Ill. June 21, 1999).

A. **The Government Seized an Enormous Volume of Data Beyond the Scope of the Warrant.**

Seizures of computers and other electronic storage devices to be later searched for responsive materials present unique constitutional concerns because, by definition, such seizures are overinclusive—sweeping in electronic data that the government has no probable cause to collect because it is stored with other data the government may have probable cause to collect. Allowing the government to rummage through the intermingled data without limitation "creates a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam), *overruled on other grounds by Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17 (2017).

To safeguard against this risk, and to ensure the government retains the materials in which it has a legitimate interest, courts require the government to implement reasonable procedures when it seizes electronic evidence. *See id.* at 1177 (applying procedural safeguards from *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), to electronic searches). And when the government follows the seize-everything-sort-it-out-later approach as it did here, "[t]he process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect." *Id.*; *see also Tamura*, 694 F.2d at 595 ("[T]he wholesale *seizure* for later detailed examination of records not described in a warrant . . . has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.'" (quoting *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980))).

The government seized a massive volume of data it had no probable cause to collect in the first instance. Ordering return of the beyond-the-scope data is not only reasonable, but necessary,

and it would not impair the government's legitimate interests.  Withholding that data from The Post and Natanson would be entirely unreasonable.

**B.    The Seized Data Is Protected by the First Amendment.**

The request for the government to return the beyond-the-scope data is all the more reasonable because the government's seizure of this data has constitutional implications beyond those presented by the "reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence." *Riley v. California*, 573 U.S. 373, 403 (2014).  Even if the government could somehow overcome the First Amendment as to any extremely limited responsive data, if any, the beyond-the-scope data is indisputably protected by First Amendment, reporter's privilege, and statutory protections.

**1.    Continued withholding of the non-responsive data is an unconstitutional prior restraint.**

As set forth in Section I, *supra*, depriving The Post and Natanson of access to her essential reporting tools is an unconstitutional prior restraint.  Even if the government could make an argument as to why it should not return the limited materials, if any, that are responsive to the warrant ("records received from or relating to Aurelio Luis Perez-Lugones"), it has no legitimate interest in withholding materials that are beyond the scope of the warrant.  Continued withholding of this vast trove of information is unreasonable.

**2.    The seized data is protected by a First Amendment privilege.**

Return of the beyond-the-scope data also would be reasonable and consistent with the government's legitimate interests because this information is *unrelated* to the government's criminal investigation and, therefore, is protected from disclosure by the First Amendment.

The Fourth Circuit "recognizes a qualified 'journalist's privilege,'" also known as a reporter's privilege, "that protects the media" from compelled disclosure of confidential sources

19

and unpublished newsgathering materials. *Horne v. WTVR, LLC*, 893 F.3d 201, 212-13 (4th Cir. 2018). Such compelled disclosure "restrain[s]" the "free flow of newsworthy information" and "hamper[s]" the "public's understanding of important issues and events . . . in ways inconsistent with a healthy republic." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000). Courts in this Circuit have repeatedly applied the reporter's privilege to prevent disclosure of the kinds of records at issue here. *See, e.g.*, *Horne*, 893 F.3d at 212-13 (identity of confidential source); *Ashcraft*, 218 F.3d at 287-88 (confidential sources); *Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1335 (4th Cir. 1993) (editors' notes, tapes, and draft articles); *Chestnut v. Kincaid*, 2022 WL 350117, at *1, 3-4 (D. Md. Feb. 4, 2022) ("audio or video recordings of statements provided or interviews conducted" for an article).[7]

Although the reporter's privilege is not absolute, the government has no plausible argument here that "society's need for the confidential information" contained on Natanson's devices—outside what is responsive to the warrant—"outweighs the intrusion on the reporter's First Amendment interests." *Ashcraft*, 218 F.3d at 287 (citing *Branzburg v. Hayes*, 408 U.S. 665, 690 (1972) (discussing privilege in criminal context)). In assessing whether the privilege is overcome, the Fourth Circuit considers "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." *Id.* Any attempt to defeat the reporter's privilege would be stalled at the first prong. The government executed a search warrant seeking "records received from or relating to Aurelio Luis Perez-Lugones." Latcovich Decl., Ex. A (Search and Seizure Warrant). But the non-

---

[7] The Post's and Natanson's sources and unpublished information are protected not only by the Fourth Circuit's reporter's privilege, but also by qualified common law protections and overlapping state shield laws, such as Washington D.C.'s shield law, which offers absolute protection to confidential sources, as well as qualified protection to unpublished newsgathering material. D.C. Code § 16-4701 *et seq.*

responsive data contained on Natanson's devices, including information about her 1,100 sources, conversations with sources, notes, recordings, draft articles, and similar materials have nothing to do with that criminal investigation and are categorically *irrelevant*. So too are the materials related to her *colleagues'* sources. Natanson Decl. ¶ 8.

That the government seized these materials as part of a criminal investigation does not erase Natanson's privilege to protect confidential sources *unrelated* to its criminal investigation. Although the Fourth Circuit has held that "reporters have no privilege different from that of any other citizen not to testify about knowledge *relevant* to a criminal prosecution," *United States v. Sterling*, 724 F.3d 482, 497 (4th Cir. 2013) (citation omitted and emphasis added), that does not mean the government can use criminal process to trample a journalist's privilege over material that is *irrelevant* to the prosecution. The Fourth Circuit has cautioned that journalists cannot be compelled to "give information bearing only a remote and tenuous relationship to the subject of the investigation," or information that "implicates confidential source relationships without a legitimate need." *Id.* (quoting *Branzburg*, 408 U.S. at 709-10 (Powell, J., concurring)). That is precisely what the government has taken here with its sweeping seizure of privileged, beyond-the-scope data. And the Fourth Circuit has further warned that the privilege will protect against efforts to "to disrupt a reporter's relationship with his news sources," *id.* at 494 (quoting *Branzburg*, 408 U.S. at 707-08 (Powell, J., concurring)), which must prevent the government from threatening to burn 1,200 confidential government sources because it has a criminal case against one individual. *See supra*.[8]

---

[8] The Post and Natanson preserve for later proceedings, including possible appellate proceedings, that the privilege should apply in federal criminal cases. *See, e.g.*, *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013) (information may only be compelled if highly relevant, necessary to the proper presentation of the case, and unavailable from other sources).

### 3.    The non-responsive data is protected by the Privacy Protection Act.

Returning the non-responsive data is also reasonable because much of it is protected by the Privacy Protection Act (or PPA), which makes it "unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials." 42 U.S.C. § 2000aa(a). "Work product materials" are materials intended for publication that contain the author's "mental impressions, conclusions, opinions, or theories." *See* 42 U.S.C. § 2000aa-7(b).

The PPA exempts searches and seizures of work product related to alleged crimes committed under the Espionage Act, *see* 42 U.S.C. § 2000aa(1). The only data that even arguably could fall into that category would be any work product relating to Perez-Lugones. The seized work product that is outside the scope of the warrant remains protected. The Sixth Circuit flagged the risks relating to the search of intermingled information that includes both PPA-protected and non-PPA protected material. *Guest v. Leis*, 255 F.3d 325, 341-42 (6th Cir. 2001). In that case, the court did "not find liability under the PPA for seizure of the PPA-protected materials," but emphasized "that *police may not then search the PPA-protected materials that were seized incidentally to the criminal evidence*." *Id.* at 342 (emphasis added). Critical to the court's finding of no PPA liability was the fact that *no* protected materials had been searched when the claim was filed. *See id.* Here, the government has no legitimate interest in refusing to return the PPA-protected materials.

### C.    The Data Beyond the Scope of the Warrant Includes Items Protected by the Attorney-Client Privilege.

Return of the beyond-the-scope data also would be reasonable and consistent with the government's legitimate interests because it includes privileged attorney-client communications, as well as privileged communications between Natanson and her physician. *See* Natanson Decl.

22

¶¶ 25, 34; Latcovich Decl. ¶¶ 9, 12-14.  "[T]he attorney-client privilege is 'the oldest of the privileges for confidential communications known to the common law.'"  *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 172-73 (4th Cir. 2019) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  The government has no legitimate interest in rummaging through The Post's or Natanson's privileged information and has no legitimate interest in preventing its return to them.  *See, e.g.*, *id.* at 183 (enjoining post-seizure review protocol that authorized government review of potentially privileged materials because "[f]ederal agents and prosecutors rummaging through law firm materials that are protected by the attorney-client privilege and the work-product doctrine is at odds with the appearance of justice").

## D.    The Data Sought by the Warrant Is Being Preserved.

The government has seized the data already.  It has represented that it is in the process of preserving the seized data.  Its legitimate interest in preserving potential evidence, therefore, will be satisfied.  *See United States v. Carey*, 172 F.3d 1268, 1275-76 (10th Cir. 1999) ("Because in Mr. Carey's case, officers had removed the computers from his control, there was no exigent circumstance or practical reason to permit officers to rummage through all of the stored data regardless of its relevance or its relation to the information specified in the warrant." (citation omitted)).

## E.    Continuing Judicial Oversight Will Protect the Government's Access to Data Within the Scope of the Warrant and Use of That Data in Other Proceedings.

Rule 41(g) expressly provides that if a court grants a motion for return of property, it "may impose reasonable conditions to protect access to the property and its use in later proceedings." Fed. R. Crim. P. 41(g).  The government will no doubt assert that it has an interest in retaining possession of the materials within the scope of the warrant for use in other proceedings. Continuing judicial oversight of the return process is a reasonable condition that would vindicate

23

the government's claimed interest in retaining and using data within the scope of the warrant and protect The Post and Natanson's interests as well. Indeed, Rule 41(g) "contemplates judicial action that will respect both possessory and law enforcement interests." Fed. R. Crim. P. 41(g) advisory committee's note to 1989 amendment. Several leading cases have required judicial oversight, particularly where, as here, the seized documents include documents protected by the Constitution or the attorney-client privilege.

In the context of a warrant authorizing the search of a student news organization, for example, the Supreme Court acknowledged that "[t]he hazards of such warrants can be avoided by a neutral magistrate carrying out his responsibilities under the Fourth Amendment, for he has ample tools at his disposal to confine warrants to search within reasonable limits." *Zurcher*, 436 U.S. at 567; *see also, e.g.*, *In re Search Warrant Dated November 5, 2021*, 2023 WL 8868371, at *1 (S.D.N.Y. Dec. 21, 2023) (appointing special master to review seized materials potentially protected by First Amendment and attorney-client privilege and to issue report and recommendation to district court regarding disclosure of responsive, non-privileged documents to government investigators).

The Fourth Circuit has required judicial oversight of the review and return process when potentially privileged or constitutionally protected materials are at issue. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019). In that case, the government raided a law firm and seized documents protected by the attorney-client privilege and the work product doctrine, including privileged materials relating to indicted clients. The law firm sought "return of the seized property, pursuant to Rule 41(g)." *Id.* at 168. The district court approved a procedure that allowed a government filter team to review potentially privileged documents prior to return to the law firm. *Id.* at 166, 169. The Fourth Circuit rejected this procedure, which "authorized government agents

24

and prosecutors to rummage through" "client communications and lawyer discussions" in disregard of "the attorney-client privilege, the work-product doctrine, and the Sixth Amendment." *Id.* at 179. The Fourth Circuit held that either "the magistrate judge (or an appointed special master) — rather than the Filter Team — must perform the privilege review of the seized materials." *Id.* at 181.

Similarly, following the raid of a congressional office, a congressman moved for return of property pursuant to Rule 41(g), and the D.C. Circuit ordered return with judicial oversight of the return process to protect the constitutional interests at stake. *See United States v. Rayburn House Off. Bldg.*, 497 F.3d 654 (D.C. Cir. 2007). First, the district court was required to provide "copies of all the seized documents to the Congressman." *Id.* at 658. Thereafter, the district court, "using the copies of computer files[,]" was to "search for the terms listed in the warrant, and provide a list of responsive records to [the] Congressman"; the Congressman then had "an opportunity to review the records and, within two days, to submit, *ex parte*, any claims that specific documents are legislative in nature"; and, finally, the district court was to "review *in camera* any specific documents or records identified as legislative and make findings regarding whether the specific documents or records are legislative in nature." *Id.* As to responsive materials covered by the Speech or Debate Clause, "the Congressman [wa]s entitled, as the district court may in the first instance determine pursuant to the Remand Order, to the return of all materials (including copies)." *Id.* at 665. As to responsive materials not covered by the Speech or Debate Clause, the government was permitted to retain them "absent any claim of disruption of the congressional office by reason of lack of original versions." *Id.*

These cases and the circumstances of this seizure dictate that judicial oversight is not only reasonable, it is necessary.  The supervising judicial officer can implement the details of the return process with input from the parties.

## CONCLUSION

For the reasons set forth above, to remedy the unconstitutional prior restraint, The Post and Natanson respectfully request return of all seized materials and an order instructing the government to maintain, but not review, the preservation copies under seal until this matter is resolved.  The Post and Natanson have an undeniable interest in, and need for, the seized data.  Withholding this data would harm them irreparably, violate their constitutional rights, and constitute an unlawful prior restraint.  Return is the only adequate remedy.  At the very least, The Post and Natanson request return of the materials that are not responsive to the warrant, with judicial oversight of the return process.  Given the important interests at stake, judicial oversight of the return process is necessary as the Fourth Circuit has recognized in analogous circumstances.

Dated: January 21, 2026

Respectfully submitted,

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)
Sean M. Douglass (VSB No. 83835)
Thomas G. Hentoff (*pro hac vice* forthcoming)
Tobin J. Romero (*pro hac vice* forthcoming)
Nicholas G. Gamse (*pro hac vice* forthcoming)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
slatcovich@wc.com
sdouglass@wc.com
thentoff@wc.com
tromero@wc.com
ngamse@wc.com

*Counsel for Movant The Washington Post*

/s/ Amy Jeffress
Amy Jeffress (VSB No. 36060)
Trisha Anderson (*pro hac vice* forthcoming)
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
ajeffress@heckerfink.com
tanderson@heckerfink.com

*Counsel for Movant Hannah Natanson*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2026, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Virginia, using the electronic case filing system of the court.

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)

*Counsel for the Washington Post*