# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| |
|---|
| United States of America |
| v. |
| 313 South Royal Street, Alexandria, VA |

Case No. 1:26-sw-54

## DECLARATION OF HANNAH NATANSON

I, Hannah Natanson, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.

2. I am currently a reporter at The Washington Post ("The Post"), where I cover President Trump's reshaping of the federal government and its effects. Before that, I covered education for four years.

3. I won a George Foster Peabody Award in 2024 for a podcast series on school gun violence. I was also part of a team of Post journalists awarded the 2022 Pulitzer Prize for Public Service for coverage of the January 6, 2021 insurrection at the U.S. Capitol.

4. My additional honors include being a 2020 Finalist for the Pulitzer Prize for Breaking News Reporting (part of a team); a 2020 National First-Place Award for News Reporting from the Education Writers Association, as well as a four-time finalist for various other national awards from the Education Writers Association between 2020 and 2024; a 2024 finalist for the Poynter Journalism Prizes First Amendment Award; a 2023 Society of Professional Journalists Dateline Award for Investigative Journalism; and a 2024 Eli M. Oboler Memorial Award from the American Library Association.

1

5. On December 24, 2025, The Post published a story about my own reporting over the past year. That story noted that my efforts to show how President Trump has transformed government had brought me 1,169 new sources.

6. These sources included federal employees from more than 120 government agencies or subagencies. This included multiple sources from every Cabinet-level agency.

7. During the past year, relying heavily on these sources, I authored or co-authored more than 200 articles across roughly twenty news desks. That is an unusually high publication volume and variety, which speaks to the breadth of the sources I worked with and covered.

8. The materials seized from me also include information about my colleagues' sources. I shared a byline with approximately 130 reporters during the past year alone.

9. Most of these sources ultimately communicated with me through Signal, a messaging app that I could access either on my phone or computer.

10. I took steps to protect the identity of those sources.

11. On Wednesday, January 14, 2026, at approximately 6:00 AM, FBI agents showed up at my house to execute a search warrant.

12. The agents provided me a copy of the search warrant and forbade me from moving freely throughout my residence.

13. I understood from my interactions with the FBI agents that the relevant investigation was of Aurelio Luis Perez-Lugones.

14. FBI agents ultimately seized the following materials:

    a. A MacBook Pro that is owned by The Post and that I used for work;

    b. A second silver MacBook Pro that I personally own but also previously used for work;

  c. An iPhone that The Post owns that I used for work;

  d. A 1 TB portable hard drive;

  e. A Garmin running watch that I personally own; and

  f. A voice recorder that is owned by The Post that I used for work.

15. I used my Post computer for work. In particular, I sent and received emails and documents using Microsoft Outlook, Slack, and Signal and also communicated through text messages and phone calls.

16. I have reviewed a Post IT Department report that shows I sent and received more than 30,000 emails over the last year alone. My Post computer kept local copies of emails in Outlook.

17. When my Post computer was seized, I believe that I was logged into Proton Drive, which is a cloud-based service that I used to save sensitive information in an encrypted form, including confidential information derived from sources and notes on story concepts and ideas.

18. When my Post computer was seized, I believe that I was also logged into Google Drive. That is another cloud-based service that I used to save information, including confidential information derived from sources and notes on story concepts and ideas. In addition, my colleagues use this platform to share information for reporting with me.

19. I also used my computer to draft and edit potential stories.

20. I also used Slack on my computer. Slack is a messaging system that permits users to create various "channels," which are text conversations between different groups of users. Post reporters and editors use these channels (in addition to direct messages) to communicate about sources and stories. For example, I am a participant in numerous specific Slack channels and direct message communications regarding:

  a. Reporters sharing confidential information about sources and stories;

  b. Editors sharing confidential information about sources and stories;

  c. Ongoing lines of coverage;

  d. Special story channels; and

  e. Conferring about edits on stories, including prepublication review and legal advice, with my editors.

21. Slack is how the Post newsroom often shares information from sources, originates and debates story ideas, and discusses edits to draft stories. Thus, having access to Slack is like having access to the Post newsroom.

22. I also used Ellipsis on my computer. Ellipsis is The Post's content management system. It provides an enormous window into The Post's journalism, with all stories in progress. Thus, having access to Ellipsis is like having access to the Post newsroom.

23. I similarly used my iPhone for work. My iPhone included Signal, Slack, and email apps in addition to text messages and phone calls that I used to communicate.

24. My iPhone included the Outlook app, which stored emails from my Post email account, my personal Gmail account, and a Gmail account that I use for news alerts.

25. My personal Gmail account contains personal information, including medical information, financial information, and even information about my wedding planning.

26. My phone also contains text messages, including some text messages with confidential sources.

27. My phone also contains voice recordings with confidential sources.

28. I use my other Gmail account in part to create news alerts to track potential story ideas.

29. In the last year, I communicated with sources primarily using Signal, although I also communicated with some sources via email, text, phone, and other channels.

30. I previously used my personal computer for work. I had not used that computer for work for approximately nine months, but that computer also contained Outlook, which included locally stored emails from my Post account and two Gmail accounts. I also used Slack on that computer. The messages stored locally on that computer likely date back further than those on my Post computer.

31. I regularly communicated with other reporters and editors about sources and other material and information I gathered as part of the newsgathering process. These communications would occur via email, Slack, Signal, text messages, or phone calls.

32. These communications would include information gathered from confidential sources, including sources that were not my own (i.e., my colleagues' sources), and including information that was never published.

33. These communications regarding sources and other material I gathered as part of the newsgathering process would be on my computers and phone.

34. Moreover, I would sometimes communicate with Post lawyers when I needed legal advice about sourcing or a story. That said, it was more common for my editors to consult legal counsel and receive advice in connection with my reporting, which would then be reflected in communications from the editor to me. This advice could be conveyed through all channels of communication with my editors, including but not limited to email, Signal, Slack, and text messages.

35. The voice recorder seized by the government houses recordings of interviews going back years. Many of these recorded conversations include information provided confidentially by sources.

36. The government has not returned any of the seized property.

37. The search warrant at issue references Aurelio Luis Perez-Lugones. I never communicated with him via any platform other than Signal or phone. I never used any other platform discussed above to communicate with him (e.g., email or my voice recorder).

38. Given the huge volume of materials the government seized, any government review of the materials will necessarily expose information relating to confidential sources, unpublished newsgathering, and other journalistic work product that has nothing whatsoever to do with Perez-Lugones.

39. In my experience, sources strongly prefer to communicate via secure messaging services such as Signal because they fear retribution from the government due to their disclosures. For example, I have communicated with more than 1,200 confidential sources via Signal during the first year of the Trump administration alone. Every day, on average, I would receive somewhere between dozens and over 100 tips from these sources. Since the seizure, that number has fallen to zero.

40. I need my devices back to do my job.

41. I also need my devices back to help my colleagues do their jobs. An enormous part of my role in the newsroom was to develop tips for news stories that I would then pass off to colleagues or use to partner with them on future reporting.

42. The government's seizure of all of my devices has eliminated my ability to collect information and publish news stories.

43. For example, I no longer have access to my more than 1,200 Signal contacts or communications with any of my sources. I literally cannot contact them without access to my devices. Nor can I review my past messages with them on Signal.

44. The government's seizure of my devices has restrained my ability to publish stories that I was actively working on at the time of the seizure. As a journalist, I am constantly working on dozens of potential leads and articles at any one time. At the time of the seizure, I was in particular working on three short-form stories which I expected to publish soon, along with four medium-term stories, four long-term, sensitive stories, one audio project, and two narrative/investigative story series intended to span 2026. But I have been unable to work on or publish any of those articles since the seizure.

45. In addition, the government's seizure of my devices has also further limited my ability to engage in newsgathering with future stories for publication that were not even in development at the time of the raid. I have stopped receiving tips through my Signal, which was a primary source for story ideas for myself and for the Post newsroom.

46. Without access to my devices, I cannot contact my sources. Even if I am ultimately able to reconnect with my sources, there is a substantial likelihood that they will be deterred by the government's seizure of my devices from communicating with me in the future. The longer my devices remain in possession of the government and I am not able to contact my sources, the greater the likelihood that my sources will be reluctant to speak with me in the future. If my sources become aware that the government has access to, or is reviewing, my source information, the harm to my newsgathering efforts will be even greater.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed this 20 day of January, 2026.

*Hannah Natanson*

Hannah Natanson