**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| IN RE SEARCH OF THE REAL PROPERTY & PREMISES AT 313 SOUTH ROYAL STREET, ALEXANDRIA, VA | Case No. 1:26-sw-00054 |

**PROPOSED BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF
THE PRESS AS AMICUS CURIAE IN SUPPORT OF MOVANTS
THE WASHINGTON POST AND HANNAH NATANSON**

Mara Gassmann
Va. Bar No. 82131
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
mgassmann@rcfp.org

Lisa Zycherman
Gabe Rottman
Adam A. Marshall
Grayson Clary
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310

*Counsel for Amicus Curiae the
Reporters Committee for Freedom of
the Press*

# TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Andresen v. Maryland*,
   427 U.S. 463 (1976)..................................................................................... 11

*Ashcraft v. Conoco, Inc.*,
   218 F.3d 282 (4th Cir. 2000) ............................................................. 1, 9, 10

*Bonnell v. Beach*,
   408 F. Supp. 3d 733 (E.D. Va. 2019) ........................................................ 14

*Boyd v. United States*,
   116 U.S. 616 (1886),
   *overruled on other grounds*, *Warden v. Hayden*, 387 U.S. 294 (1967).................................... 4

*Branzburg v. Hayes*,
   408 U.S. 665 (1972)................................................................................... 2, 8

*Carpenter v. United States*,
   585 U.S. 296 (2018)....................................................................................... 3

*Commonwealth v. Dana*,
   43 Mass. (2 Met.) 329 (1841) ..................................................................... 4

*Entick v. Carrington*,
   19 How. St. Tr. 1029 (C.P. 1765) ............................................................... 4

*Gonzalez v. Trevino*,
   602 U.S. 653 (2024)....................................................................................... 8

*Marcus v. Search Warrants*,
   367 U.S. 717 (1961)................................................................................. 4, 13

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995)....................................................................................... 3

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025)..................................................................... 8

*Meyer v. City of Marion*,
   776 F. Supp. 3d 991 (D. Kan. 2025)........................................................ 9, 11

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971).............................................................................. 13, 15

*Reyes v. City of Austin*,
   No. 1:21-cv-992, 2025 WL 1931954 (W.D. Tex. June 6, 2025) ............................................. 15

*Rossignol v. Voorhaar*,
   316 F.3d 516 (4th Cir. 2003) .................................................................................... 8, 9

*Stanford v. Texas*,
   379 U.S. 476 (1965).............................................................................................. 1, 11

*Stanley v. Bocock*,
   160 F.4th 573 (4th Cir. 2025) ..................................................................................... 2, 8

*United States v. Almonte*,
   No. 2:21-cr-00160, 2022 WL 662318 (S.D. W. Va. Mar. 4, 2022)......................................... 12

*United States v. Cobb*,
   970 F.3d 319 (4th Cir. 2020) ..................................................................................... 11

*United States v. Comey*,
   No. 1:25-cr-272, 2025 WL 3202693 (E.D. Va. Nov. 17, 2025) ......................................... 12, 15

*United States v. Nasher-Alneam*,
   399 F. Supp. 3d 579 (S.D. W. Va. 2019)........................................................................ 15

*United States v. Sterling*,
   724 F.3d 482 (4th Cir. 2013) ..................................................................................... 10

*Zurcher v. Stanford Daily*,
   436 U.S. 547 (1978).............................................................................. 2, 4, 9, 10, 11

**Statutes**

18 U.S.C. § 793.............................................................................................................. 14

42 U.S.C. § 2000aa-11.................................................................................................... 6

Privacy Protection Act of 1980,
   42 U.S.C. § 2000aa ..................................................................... 6, 13, 14, 15, 16

**Other Authorities**

28 C.F.R. § 50.10 ...................................................................................................... 6, 7

Alexander M. Bickel, *The Morality of Consent* (1975) ............................................... 3

Br. for Amici Curiae Reps. Comm. for Freedom of the Press et al.,
   *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) (Nos. 76-1484, 76-1600),
   1977 WL 189749 ...................................................................................................... 4, 5

Chris Young & Emily Vespa, *The FBI Search of a Washington Post Reporter's Home: What We Know and Why It Matters*, Reps. Comm. for Freedom of the Press (Jan. 16, 2026), https://perma.cc/2FUC-3S6F ............................................................................... 5

David A. Graham, *Does Eric Holder Want to Prosecute Journalists or Not?*, The Atlantic (Oct. 29, 2014), https://bit.ly/4jQnF3z ...................................................................................... 5

Father of Candor, A Letter Concerning Libels, Warrants, and the Seizure of Papers (2d ed. 1764, J. Almon) ............................................................................. 4

Fed. R. Crim. P. 41(g) ................................................................................................ 7

*Federal Cases Involving Unauthorized Disclosures to the News Media, 1778 to the Present*, Reps. Comm. for Freedom of the Press (last updated Dec. 8, 2019), https://perma.cc/P482-CBT9 ................................................................... 2

Gabe Rottman, *US Justice Department Rescinds Biden-Era Protections for Press*, Reps. Comm. for Freedom of the Press (Apr. 30, 2025), https://perma.cc/XZD4-V2HR ................................................................... 1

Hannah Natanson, *I am The Post's 'Federal Government Whisperer.' It's Been Brutal*, Wash. Post (Dec. 24, 2025), https://wapo.st/4qrE6pj .............................................................................. 12, 13

Ken Dilanian, *FBI Spied on Fox News Reporter, Accused Him of Crime*, L.A. Times (May 20, 2013), https://perma.cc/P33S-CUDR ................................................................... 5

Perry Stein & Jeremy Roebuck, *FBI Executes Search Warrant at Washington Post Reporter's Home*, Wash. Post (Jan. 14, 2026), https://wapo.st/4pFh6lw .......................................................................... 1, 8, 14

*Privacy Protection Act: Hearing before the S. Comm. on the Judiciary on S. 115, S. 1790, and S. 1816*, 96th Cong. 33 (1980), https://perma.cc/V5A8-LXM2 ................................................................... 5

S. Rep. No. 96-874 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3950 ...................... 4, 5, 6, 14, 15

U.S. Dep't of Justice, Report on Review of News Media Policies (2013), https://perma.cc/S8CW-9MDY ................................................................... 7

## INTRODUCTION

Last week, the Department of Justice took the unprecedented step of raiding the home of Washington Post reporter Hannah Natanson, seizing electronic devices that contain her most sensitive work product alongside confidential communications with her sources. *See* Perry Stein & Jeremy Roebuck, *FBI Executes Search Warrant at Washington Post Reporter's Home*, Wash. Post (Jan. 14, 2026), https://wapo.st/4pFh6lw. Only a fraction of the information the Department seized is even imaginably relevant to its stated basis for that intrusion: the leak investigation of a government contractor who has already been identified, charged, and arrested. But unless this Court acts, federal agents apparently intend to rummage through their haul—freely examining unrelated newsgathering material and doing irreparable damage to the confidentiality on which effective reporting depends—as soon as this litigation concludes. Sources whose communications with Natanson have nothing to do with the Department's probe, but whose disclosures may well have angered the Administration, face an imminent risk of exposure to those same officials. The clear consequence would be that "the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000).

This Court should intervene. The history of the Fourth Amendment is "largely a history of conflict between the Crown and the press," *Stanford v. Texas*, 379 U.S. 476, 482 (1965), and its safeguards must be applied with "scrupulous exactitude" when First Amendment freedoms—including the right to gather the news—are at stake, *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citation omitted). Here, the gross mismatch between any notional justification for the search and the scope of the burden imposed on First Amendment rights demonstrates why newsroom searches are categorically repugnant to a free press and raises, too, the specter of

"[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with [her] news sources." *Branzburg v. Hayes*, 408 U.S. 665, 707–08 (1972); *see Stanley v. Bocock*, 160 F.4th 573, 578 (4th Cir. 2025) (search warrant, whether or not supported by probable cause, may be retaliatory if plaintiff was searched "when otherwise similarly situated individuals not engaged in the same speech had not been" (citation omitted)).[1]

Even if the Department's tactics were 'only' overbroad rather than retaliatory, though, tolerating them here would set a precedent that fundamentally reshapes the balance of power between the federal government and the press. Before last week, not once since the nation's founding had federal agents invaded a journalist's home in pursuit of alleged national security secrets. *See* Adam Liptak, *Search of Reporter's Home Test's Law with Roots in a Campus Paper's Suit*, N.Y. Times (Jan. 19, 2026), https://perma.cc/4MNA-HFDL; *see also Federal Cases Involving Unauthorized Disclosures to the News Media, 1778 to the Present*, Reps. Comm. for Freedom of the Press (last updated Dec. 8, 2019), https://perma.cc/P482-CBT9. But if given the green light now, investigators—both those who occupy the Department of Justice today and those who exercise those powers in the future—will face an obvious temptation to deploy the warrant process against whichever news organization or reporter has angered officials that day of the week. And the press could not, faced with the constant intimidating threat of a pre-dawn raid, provide

---

[1]    It bears underlining, too, that the government has justified the search only in secret because the affidavit remains under seal. The Reporters Committee has separately moved to unseal that record under the common law right of access to judicial records. *See* Application, *In re Application of Reps. Comm. for Freedom of the Press to Unseal Judicial Records*, No. 1:26-mc-0001 (E.D. Va. Jan. 14, 2026). In light of this Court's intent to hear argument on the the search by February 6, *see* Order, ECF No. 18, the Reporters Committee would respectfully urge this Court to make the affidavit public no later than that date, so that the public can meaningfully understand the consequential questions at issue and the basis for this Court's ultimate decision.

the check on government the Constitution envisions.  The First Amendment, the Fourth, and the

Privacy Protection Act all forbid that result.

For the reasons herein, amicus the Reporters Committee for Freedom of the Press urges

this Court to order the return of Natanson's devices and expungement of any information seized.[2]

## ARGUMENT

I.    **Any warrant for a journalist's records—to say nothing of a raid of a private home—poses an exceptional risk to press freedom and requires the closest judicial scrutiny.**

Since the Founding, this nation's traditions have recognized that the confidentiality of a

reporter's work and sources sits at the heart of press freedom.  *See McIntyre v. Ohio Elections*

*Comm'n*, 514 U.S. 334, 361 (1995) (Thomas, J., concurring in the judgment) (emphasizing "the

extent to which anonymity and the freedom of the press were intertwined in the early American

mind" dating back to the 1735 trial of John Peter Zenger).  After all, it was as true in the eighteenth

century as it is today that "[f]orcing reporters to divulge such confidences"—exposing sources to

the risk of discipline, a lost job, or legal consequences—"would dam the flow to the press, and

through it to the people, of the most valuable sort of information: not the press release, not the

handout, but the firsthand story based on the candid talk of a primary news source."  Alexander

M. Bickel, *The Morality of Consent* 84 (1975).  When a seizure is made pursuant to a warrant, for

that matter, damage to the newsgathering process cuts deeper even than a subpoena that attempts

to recruit the press as an arm of law enforcement.  Where a subpoena can only command the

production of material genuinely relevant to the government's needs (and only after an opportunity

---

[2]    In the event this Court concludes that the government should be permitted to preserve a copy of the data after this litigation concludes, it should be "retained for safekeeping in the custody of a court in the Eastern District of Virginia as a neutral third party" rather than in the government's own records to adequately protect Movants' rights against any improper review.  *Richman v. United States*, No. 25-cv-0170, 2025 WL 3611753, at *21 (D.D.C. Dec. 12, 2025).

to test its breadth in court), the execution of a warrant for documents affords officials an opportunity "to rifle through many other papers—potentially filled with the most intimate details of a person's thoughts and life—before they find the specific information they are seeking," *Carpenter v. United States*, 585 U.S. 296, 370 (2018) (Alito, J., dissenting), gratuitously exposing unrelated sources and lines of reporting to the prying eyes of the state.

For just those reasons, "[h]istorically the struggle for freedom of speech and press in England was bound up with the issue of the scope of the search and seizure power," *Marcus v. Search Warrants*, 367 U.S. 717, 724 (1961), and the Crown's practice of using sweeping warrants to seize the papers of dissident printers was among the abuses that inspired the design of the Constitution, *id.* at 729.  As Lord Camden objected in *Entick v. Carrington*, a case "undoubtedly familiar" to "every American statesman," *Boyd v. United States*, 116 U.S. 616, 626 (1886), *overruled on other grounds*, *Warden v. Hayden*, 387 U.S. 294 (1967), when the King's messengers invaded a publisher's home, "[h]is house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction," 19 How. St. Tr. 1029, 1064 (C.P. 1765).  Or as an (anonymous) pamphleteer well known to the Founders put the point in even stronger language, "where there is even a charge against one particular paper, to seize all, of every kind, is extravagant, unreasonable and inquisitorial."  *Marcus*, 367 U.S. at 729 n.22 (quoting Father of Candor, A Letter Concerning Libels, Warrants, and the Seizure of Papers 48 (2d ed. 1764, J. Almon)).

No wonder, then, that warrants for a journalist's papers—to say nothing of a raid on a reporter's residence—have been exceptionally rare throughout this country's history.  As one congressional report observed, because "the right to search for and seize private papers [was] unknown to the common law," *Commonwealth v. Dana*, 43 Mass. (2 Met.) 329, 334 (1841), "a

separate need to protect press and innocent third parties did not arise" until the Supreme Court first authorized searches for "mere evidence" in *Warden v. Hayden* in 1967.  S. Rep. No. 96-874, at 6–7 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3950, 3953.  As a result, when the Supreme Court first addressed a warrant for journalistic work product in *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), the incident was "unprecedented."  Br. for Amici Curiae Reps. Comm. for Freedom of the Press et al. at 10–11, *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) (Nos. 76-1484, 76-1600), 1977 WL 189749 (emphasizing "the absence of any reported case before this one concerning such a dragnet search against the press").  And as the Justice Department testified when Congress was considering the Privacy Protection Act of 1980, in almost 200 years there had been "no recorded problems with regard to Federal searches of third parties for documentary materials" and "only a few with regard to States."  *Privacy Protection Act: Hearing before the S. Comm. on the Judiciary on S. 115, S. 1790, and S. 1816*, 96th Cong. 33 (1980), https://perma.cc/V5A8-LXM2 (testimony of Philip Heymann, Assistant Att'y Gen., Crim. Div., U.S. Dep't of Justice).

Federal leak investigations are no exception to that tradition.  As late as 1980, there was "no past history of federal searches of the media based on [the Espionage Act] or any other federal laws."  S. Rep. No. 96-874, at 11, *as reprinted in* 1980 U.S.C.C.A.N. 3950, 3958.  When the Obama Administration obtained a search warrant for then-Fox News reporter James Rosen's email in connection with a leak investigation, it "mark[ed] the first time the government ha[d] gone to court to portray news gathering as espionage," Ken Dilanian, *FBI Spied on Fox News Reporter, Accused Him of Crime*, L.A. Times (May 20, 2013), https://perma.cc/P33S-CUDR, a decision that Attorney General Eric Holder described as the greatest regret from his tenure, *see* David A. Graham, *Does Eric Holder Want to Prosecute Journalists or Not?*, The Atlantic (Oct. 29, 2014), https://bit.ly/4jQnF3z.  And last week's search, for its part, was "the first time that a reporter's

home has been raided in connection with a national security leak case."  Liptak, *supra*; *see also* Chris Young & Emily Vespa, *The FBI Search of a Washington Post Reporter's Home: What We Know and Why It Matters*, Reps. Comm. for Freedom of the Press (Jan. 16, 2026), https://perma.cc/2FUC-3S6F.  Looking from 1789 through today, in other words, the intrusion here is genuinely unparalleled.

Federal law and the Justice Department's own regulations reflect the same understanding that warrants for journalists' records are—and should be—exceptional, even in national-security leak investigations.  After a slim majority of the Supreme Court declined to outlaw newsroom searches outright in *Stanford Daily*, Congress responded by passing the Privacy Protection Act of 1980 (hereinafter, the "PPA"), which (as discussed in more detail below) generally bars searches—with or without a warrant—for the "work product materials" or "documentary materials" of journalists and others.  42 U.S.C. § 2000aa(a)–(b).  And while the PPA's so-called 'suspect exception' exempts searches where "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate," including offenses that "consist[] of the receipt, possession, or communication of information relating to the national defense," *id.* § 2000aa(a)(1), (b)(1), Congress contemplated that that exception would have little if any relevance to the press in particular, because "the suspect exception to the ban on searches would apply only if there was an allegation of an intent to injure the United States or give advantage to a foreign power," S. Rep. No. 96-874, at 12, *as reprinted in* 1980 U.S.C.C.A.N. 3950, 3958.  And the Justice Department, which had drafted the legislation, shared that understanding.  *See id.*.

Understandably, then, the Justice Department's own regulations reflect the same view that warrants for a journalist's records are an extreme step.  The Department has long maintained

regulations restricting the circumstances under which federal agents can obtain the records of members of the news media—often referred to as the 'media guidelines.' *See generally* 28 C.F.R. § 50.10. After the Rosen case described above, Attorney General Holder revised those policies to restrict still further the availability and execution of search warrants. *See* U.S. Dep't of Justice, Report on Review of News Media Policies 3 (2013), https://perma.cc/S8CW-9MDY. In their current form, those guidelines make express that "[t]he Department views . . . search warrants to seek information from, or records of, non-consenting members of the news media as extraordinary measures," 28 C.F.R. § 50.10(a)(3), and they require—among other safeguards—the personal authorization of the Attorney General, *see id.* § 50.10(d)(1), as well as the use of "search protocols designed to minimize intrusion into potentially protected materials or newsgathering activities unrelated to the investigation" and "filter teams," *id.* § 50.10(d)(4).

As history and practice both make clear, the warrant here is an extraordinary outlier. But if it were to become the norm—if the daily work of all national-security journalists were enough to earn them an early morning raid, the seizure of their devices, and a raft of federal agents rifling through their work—the damage done to the freedom of the press would be irreparable.

## II.    These sweeping seizures of a journalist's records are unlawful.

This Court can and should intervene to remedy the harm done before the government's review of sensitive work product and confidential source communications irreparably injures the integrity of the newsgathering process. Under Federal Rule of Criminal Procedure 41(g), "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return," Fed. R. Crim. P. 41(g). This unprecedented seizure is unlawful several times over and barred—for independent if closely related reasons—by the First Amendment, the Fourth Amendment, and the Privacy Protection Act. To avoid grave damage to

press freedom, amicus respectfully urges the Court to order the return of Natanson's devices and the expungement of any information seized.

### A. The ongoing seizure of Natanson's records violates the First Amendment.

Perhaps most obviously, the mass seizure of a journalist's most sensitive documents threatens the exercise of First Amendment rights. For one, the search's breadth—and the decision to opt for a raid at all rather than a less intrusive subpoena—raises a clear concern of "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with [her] news sources." *Branzburg*, 408 U.S. at 707–08; *see also Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025) ("[B]ad faith use of investigative techniques can abridge journalists' First Amendment rights."); *Rossignol v. Voorhaar*, 316 F.3d 516, 521 (4th Cir. 2003) (sheriff's retaliatory seizure of physical newspapers "clearly contravened the most elemental tenets of First Amendment law"). In that vein, even a search warrant otherwise supported by probable cause may be impermissibly retaliatory if an individual was singled out to be searched "when otherwise similarly situated individuals not engaged in the same speech had not been." *Stanley*, 160 F.4th at 578 (citation omitted). Here, as already discussed above, the raid of a journalist's home in a national-security leak investigation is utterly without precedent. *See Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (the fact that no other individual has been targeted by law enforcement "for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding and the conduct at issue is not novel"—provides objective evidence that an investigative step was retaliatory). Other evidence points in the same direction: The government took this dramatic step even though the individual accused of leaking information was already in custody and facing charges, and even as it took the considerably less aggressive (if still troubling) step of sending a subpoena to The Post. *See* Stein & Roebuck, *supra*. The risk that the

information at issue may have been seized for improper purposes counsels close judicial scrutiny of the government's entitlement to review any of it, let alone all of it.

But even if this sweeping seizure were undertaken with spotless motives, it could not be squared with the First Amendment because of its breadth and the burden it imposes. It should go without saying, for instance, that a reporter and a news organization cannot publish work product that has been carried off by the government, and as a result this seizure operates as an open-ended prior restraint. *Rossignol*, 316 F.3d at 522 (physical seizure of newspapers "before the critical commentary ever reached the eyes of readers . . . met the classic definition of a prior restraint"); *Meyer v. City of Marion*, 776 F. Supp. 3d 991, 1037–39 (D. Kan. 2025) (newsroom raid that in practice prevented newspaper from operating violated First Amendment).[3] In the considerably less fraught context of obscenity, the Supreme Court has made clear that such a seizure that "entirely remov[es] arguably protected materials from circulation may be effected only after an adversary hearing and a judicial finding" that the things to be seized are unprotected by the First Amendment. *Zurcher*, 436 U.S. at 566–67. Here, by comparison, Natanson and The Post face the prospect of losing access to sensitive communications and work product indefinitely—even for lines of reporting unrelated to the investigation—with no prior judicial review of whether particular materials are in fact responsive to the warrant and no prior judicial finding that the government's interests outweigh the First Amendment interests at stake in any given document.

---

[3] *Zurcher* rejected a prior restraint argument, but the search there turned up "only the photographs that had already been published," and "no materials were removed from the Daily's office." 436 U.S. at 551–52. As a result the search did not "actually interfere with the timely publication of a newspaper." *Id.* at 566. The scope of the seizure here, by comparison, encompasses by Movants' account tens of thousands of emails, the drafts of unfinished stories, and the messaging archive of Natanson's contact with hundreds of sources. *See* Memorandum of Law at 8, *In re Search of Real Prop. & Premises at 313 S. Royal St., Alexandria, Va.*, No. 1:26-sw-00054-WBP (E.D. Va. Jan. 13, 2026), ECF No. 9

Finally, at the risk of stating the obvious, the sweep of the seizure threatens grievous damage to the reporter-source confidentiality on which investigative reporting depends. "If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic." *Ashcraft*, 218 F.3d at 287. And while *Zurcher* rejected the prospect of chilling reporter-source communications as a basis for a *flat* ban on newsroom searches, *see* 436 U.S. at 566, the Court had no occasion to address the reporter's privilege concerns that would arise if the execution of a warrant in fact resulted in the seizure of confidential source communications and work product—including those unrelated to the government's investigation and non-responsive to the warrant—because the officers in that case ultimately seized nothing. The Fourth Circuit, too, has only had the occasion to address the application of the reporter's privilege to criminal subpoenas, which by their nature can only command the production of genuinely relevant evidence, and only after the opportunity for prior judicial review. *See United States v. Sterling*, 724 F.3d 482, 498–99 (4th Cir. 2013) (emphasizing that reporter faced with subpoena was "not being called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, and there is no reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement (citation and internal quotation marks omitted)). The balance of interests implicated by this search is fundamentally different, where genuinely responsive records are a fraction of those seized compared to those that will be exposed gratuitously. *See* Memorandum of Law, *supra*, at 4.

If sanctioned here, then, this search would offer investigators a blueprint for seizing the whole of a journalist's professional life—every source communication, every working draft—

without facing First Amendment scrutiny, based on nothing more than allegations that could describe the work of any national-security reporter.  The Constitution cannot support that result.

### B.    The ongoing seizure of Natanson's records violates the Fourth Amendment.

In addition to the independent constraints imposed by the First Amendment, the Fourth Amendment—in light of the long "history of conflict between the Crown and the press" that informed the text and structure of the Constitution, *Stanford*, 379 U.S. at 482—requires that the safeguards of the warrant procedure be administered with "scrupulous exactitude" when a search threatens to intrude on the integrity of the newsgathering process, *Zurcher*, 436 U.S. at 564 (citation omitted).  It should go without saying that there is nothing exacting about a search that would expose to federal agents reams of source identities and lines of reporting irrelevant to the underlying investigation.  *See Meyer*, 776 F. Supp. 3d at 1031 ("The Fourth Amendment categorically prohibits officers from rummaging at large in newspaper files." (citation and internal quotation marks omitted)).

As the Supreme Court has often underlined, "there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable," in light of which "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy."  *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976).  And while the Fourth Circuit has declined to require that all computer searches abide by narrow search protocols as a matter of course, the Circuit has left open the question whether "the Fourth Amendment might require more specificity as to the place to be searched or the items to be seized in some computer searches."  *United States v. Cobb*, 970 F.3d 319, 329 (4th Cir. 2020).  If ever there were such a case, this is it:  As the history

canvassed above makes clear, a search that threatens to expose a journalist's "entire professional universe" to the federal government would be without precedent. Memorandum of Law, *supra*, at 8. But the only restrictions on the search techniques to be used in this warrant are boilerplate; they ultimately leave it to the government to decide how best to sift through Natanson's data. *See* Search & Seizure Warrant at 5, *In re Search of Real Prop. & Premises at 313 S. Royal St., Alexandria, Va.*, No. 1:26-sw-00054-WBP (E.D. Va. Jan. 13, 2026), ECF No. 5 (providing "a non-exclusive list" of approaches to the search). Tellingly, for instance, the warrant does not identify Natanson as a journalist and provides for the segregation of "communications that may implicate the attorney-client privilege . . . so as to protect it from substantive review" but makes no similar provision for information protected by the First Amendment. *See id.* at 6. The result will be the needless exposure of sensitive work product and confidential source identities that goes to the heart of the right to gather news.

Just as troubling, though, is the fact that the warrant makes no apparent provision for the segregation or return of nonresponsive data and devices, apparently contemplating instead that the government will retain "a complete copy of the disclosed electronic data." *See id.* Even where the government can demonstrate a basis to *search* an electronic device in its entirety—a phone, say—the same showing does not earn the government the right to "a wholesale *seizure* of everything on the phone." *United States v. Almonte*, No. 2:21-cr-00160, 2022 WL 662318, at *13 (S.D. W. Va. Mar. 4, 2022) (emphasis added); *see also United States v. Comey*, No. 1:25-cr-272, 2025 WL 3202693, at *5 & n.6 (E.D. Va. Nov. 17, 2025) (Fourth Amendment separately regulates "prolonged retention and continued access to materials that are non-responsive to a search warrant"). As a magistrate judge in this District recently found, in high-profile recent cases the government—having first seized electronic devices for one purpose ostensible—has felt itself free

12

"to rummage through all of the information seized . . . and apparently, in the government's eyes, to do so again anytime they chose" for other goals. *Comey*, 2025 WL 3202693, at \*5. It should go without saying that that "cavalier attitude" would have disastrous consequences in this case, *id.*, where the retention of Natanson's data would provide federal officials with what Movants have identified as a staggeringly large store of information on her confidential sources, individuals whose disclosures to the press may have angered high officials or contradicted the public positions of the government, *see* Memorandum of Law, *supra*, at 8 (explaining that the seized devices contain "more than 30,000 Post emails" alongside "recordings of interviews," "drafts of stories," and the Signal application Natanson "used to communicate with her more than 1,100 sources"); Hannah Natanson, *I am The Post's 'Federal Government Whisperer.' It's Been Brutal*, Wash. Post (Dec. 24, 2025), https://wapo.st/4qrE6pj (describing 1,169 sources who have spoken with Natanson about their experiences working for the federal government).

At base, if the bald allegation that a reporter did what every national-security reporter does—"bare the secrets of government and inform the people," *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring)—were enough to justify an invasion of a journalist's records on this scale, that "unrestricted power of search and seizure" would once again become, as it was in the days of the Crown, "an instrument for stifling liberty of expression," *Marcus*, 367 U.S. at 729. The Fourth Amendment demands better when First Amendment interests are also at stake.

### C.    The seizure of Natanson's records violates the Privacy Protection Act.

Finally, the threat of federal agents seizing and rummaging freely through a journalist's papers is the quintessential harm that Congress adopted the Privacy Protection Act to outlaw. The PPA generally makes it "unlawful for a government officer or employee, in connection with the

investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper . . . or other similar form of public communication" subject to narrowly defined exceptions. 42 U.S.C. § 2000aa(a); *see also id.* § 2000aa(b) (same with respect to "documentary materials"). Only one of those exceptions is even imaginably relevant here: where the government can show "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate" and "the offense consists of the receipt, possession, or communication of information relating to the national defense." *Id.* § 2000aa(a)(1).[4] But as the unprecedented nature of this search should underline, investigators cannot fit classic national-security reporting into a provision intended for spies and foreign agents with an intent to harm the United States.

As for probable cause, the government has already represented to Natanson "that she is not the focus of the probe." Stein & Roebuck, *supra*. But even if investigators misled The Post and public on that front, they could not satisfy the suspect exception regardless. "Any warrant devoid of support for an element lacks probable cause," including the intent necessary to commit the offense. *Bonnell v. Beach*, 408 F. Supp. 3d 733, 753 (E.D. Va. 2019). And as the statute makes clear, the suspect exception requires not just probable cause to believe that evidence of someone else's offense will be found in the place to be searched—as the Fourth Amendment would—but "probable cause to believe *that the person possessing such materials* has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. § 2000aa(a)(1), (b)(1) (emphasis added). The Senate report that accompanied the Privacy Protection Act is explicit that,

---

[4]    18 U.S.C. § 793 is the only offense identified as a basis for the search in the government's application. *See* Application for a Warrant, *In re Search of Real Prop. & Premises at 313 S. Royal St., Alexandria, Va.*, No. 1:26-sw-00054-WBP (E.D. Va. Jan. 13, 2026), ECF No. 1.

as lawmakers and the Department of Justice both understood, the need to demonstrate *intent* to make that probable-cause showing would generally prevent investigators from satisfying the suspect exception where a journalist is alleged to have received or transmitted national defense information. *See* S. Rep. No. 96-874, at 12, *as reprinted in* 1980 U.S.C.C.A.N. 3950, 3958–59 ("[T]o the extent that S. 1790 provides a suspect exception related to the national security statutes which are stated, it is the intent of the Committee that with regard to 18 U.S.C. § 793 the suspect exception to the ban on searches would apply only if there was an allegation of an intent to injure the United States or give advantage to a foreign power."); *see also id.* (noting that the Justice Department, which drafted the PPA, acquiesced in that reading and had "never employed a search warrant procedure in such cases"). As a result, the PPA will generally bar even searches for offenses related to national defense information unless the government can put forward evidence that a journalist acted in bad faith. Here, though, there can be no serious argument that Natanson and The Post acted with anything but "the purpose that the Founding Fathers saw so clearly" for the press—to "reveal[] the workings of government" and "inform the people." *N.Y. Times Co.*, 403 U.S. at 717 (Black, J., concurring).

Even if the government could demonstrate probable cause with respect to some fraction of the information seized, though, the suspect exception also requires that the materials searched or seized "relate" to the offense for which the government has probable cause. 42 U.S.C. § 2000aa(a)(1), (b)(1); *see also Reyes v. City of Austin*, No. 1:21-cv-992, 2025 WL 1931954, at *8 (W.D. Tex. June 6, 2025) ("[T]he PPA requires not only probable cause, but probable cause *related* to the materials at issue, an additional element for the [government] to prove."). Here the government seized Natanson's devices wholesale, and there is no dispute that the vast majority of the information they contain—including unrelated source identities and lines of reporting,

15

protected by the First Amendment but threatened with gratuitous exposure when the government combs through its windfall—has no relationship to the underlying criminal investigation. *See* Memorandum of Law, *supra*, at 5. Whatever the legality of the initial device seizure, any review or retention of *that* work product and documentary material is a separate search or seizure. *See United States v. Nasher-Alneam*, 399 F. Supp. 3d 579, 591–94 (S.D. W. Va. 2019) (separate Fourth Amendment event "when law enforcement personnel obtain a warrant to search for a specific crime but later, for whatever reason, seek to broaden their scope to search for evidence of another crime"); *Comey*, 2025 WL 3202693, at *5 & n.6 (emphasizing that "continued access to materials that are non-responsive to a search warrant may violate the Fourth Amendment"). The government would therefore need to separately demonstrate that it has probable cause to believe Natanson "has committed or is committing [a] criminal offense to which" the vast pool of *unrelated* materials "relate," 42 U.S.C. § 2000aa(a)(1), which it definitionally cannot do.

In that respect, the PPA reinforces what the First and Fourth Amendments likewise make clear: national security leak investigation or no, the government cannot seize a reporter's most sensitive records and confidential source communications *en masse* and sift through them freely for anything that catches an official's interest. To hold otherwise would eviscerate the protections of the Privacy Protection Act, making routine the same searches that Congress believed it had outlawed. On that independent ground, too, amicus respectfully urges that the Court grant Movants' motion to intervene and for return of property.

## CONCLUSION

For the reasons given herein, amicus respectfully urges the Court to order the return of Natanson's devices and expungement of any information seized.

Dated: January 21, 2026                    Respectfully submitted,

/s Mara Gassmann
Mara Gassmann
Va. Bar No. 82131
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
mgassmann@rcfp.org

Lisa Zycherman
Gabe Rottman
Adam A. Marshall
Grayson Clary
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310

*Counsel for Amicus Curiae the Reporters Committee for Freedom of the Press*

17

**CERTIFICATE OF SERVICE**

I, Mara Gassmann, hereby certify that on January 21, 2026, I filed the foregoing

memorandum of law using the Court's CM/ECF system, which effected service on all parties.

Dated: January 21, 2026                          Respectfully submitted,

                                                 */s/ Mara Gassmann*
                                                 Mara Gassmann
                                                 REPORTERS COMMITTEE FOR
                                                  FREEDOM OF THE PRESS

                                                 *Counsel for Amicus Curiae the Reporters*
                                                 *Committee for Freedom of the Press*