**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

In the Matter of the Search of the Real Property
and Premises of Hannah Natanson

Case No. 1:26-sw-54-WBP

**REPLY IN SUPPORT OF THE WASHINGTON POST'S AND HANNAH NATANSON'S
<u>MOTION TO INTERVENE AND FOR RETURN OF PROPERTY</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    The Seizure Was an Unconstitutional Prior Restraint and Any Government
      Interest Can Be Protected by a Subpoena or Other Less Invasive Legal Process. ............ 2

II.   At the Very Least, Materials Beyond the Scope of the Warrant Should Be
      Returned and the Court Should Oversee the Return Process. ................................................ 7

      A.    The Seized Data Is Protected by a First Amendment Privilege and by
            Statute. ................................................................................................................. 8

      B.    The Government's Refusal to Return *Non-Responsive* Data and Its
            Objection to Judicial Oversight Are Unreasonable and Contrary to
            Binding Precedent. ............................................................................................. 10

III.  Movants' Proposal. ........................................................................................................ 19

CONCLUSION ................................................................................................................ 20

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Alexander v. United States*, 509 U.S. 544 (1993) .......................................................................3

*Andresen v. Maryland*, 427 U.S. 463 (1976) ...........................................................................14

*Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000)................................................................10

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)........................................................................6

*Branzburg v. Hayes*, 408 U.S. 665 (1972)..................................................................................10

*Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159 (2d Cir. 1992)...............18

*Freedman v. Maryland*, 380 U.S. 51 (1965)............................................................................ 2-3

*Guest v. Leis,* 255 F.3d 325 (6th Cir. 2001)..................................................................................10

*Heller v. New York*, 413 U.S. 484 (1973) .....................................................................................4

*Horne v. WTVR, LLC*, 893 F.3d 201 (4th Cir. 2018)....................................................................8

*In re Gen. Motors Corp.*, 153 F.3d 714 (8th Cir. 1998) ..............................................................18

*In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006).............................................. 15-16, 19

*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019)
  ("*Baltimore Law Firm*") ............................................................................................ *passim*

*In re Shain*, 978 F.2d 850 (4th Cir. 1992)......................................................................................9

*Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955 (3d Cir. 1984) ........................................19

*Meyer v. City of Marion, Kan.*, 776 F. Supp. 3d 991 (D. Kan. 2025) .............................................4

*Miami Herald Pub'g Co. v. Tornillo*, 418 U.S. 241 (1974)........................................................3, 6

*Near v. Minnesota*, 283 U.S. 697 (1931) ................................................................................. 2-3

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ..........................................................................6

*NLRB v. Interbake Foods, LLC*, 637 F.3d 492 (4th Cir. 2011) ....................................................17

*Roark v. United States*, 2015 WL 2085193 (D. Or. May 4, 2015) ........................................ 11-12

*Search Warrant for the Person of John F. Gill and the Premises Located at
  28 West Side Drive*, 2014 WL 1331013 (E.D.N.C. Mar. 31, 2014) ........................................11

*Spolar v. Discovery Commc'ns, LLC*, 2020 WL 7222807 (C.D. Cal. Oct. 2, 2020) ......................3

*State v. I, A Woman-Part II*, 191 N.W.2d 897 (Wis. 1971) ............................................................2

*State v. J-R Distribs., Inc.*, 765 P.2d 281 (Wash. 1988) ...........................................................2, 4

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) ...........................................................19

*United States v. Avenatti*, 559 F. Supp. 3d 274 (S.D.N.Y. 2021) ........................................... 18-19

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983) ...................................................................10

*United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013) ...........................................................10

*United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980) .........................................................10

*United States v. Elbaz*, 396 F. Supp. 3d 583 (D. Md. 2019) .......................................................16

*United States v. Hoffman*, 2018 WL 5973763 (E.D. Va. Nov. 14, 2018) ............................... 11-12

*United States v. Montgomery*, 2021 WL 615401 (S.D. Ohio Feb. 17, 2021) ...............................11

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997) ........................................................ 16-17

*United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991) ....................................................16

*United States v. Rayburn House Off. Bldg.*, 497 F.3d 654 (D.C. Cir. 2007) ..............10, 12, 15, 19

*United States v. Raymond*, 656 F. Supp. 3d 236 (D.D.C. 2023) ...................................................13

*United States v. Salad*, 779 F. Supp. 2d 509 (E.D. Va. 2011) .....................................................13

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013) ..........................................................8-10

*United States v. Trs. of Bos. Coll.*, 718 F.3d 13 (1st Cir. 2013) ..................................................10

*United States v. Zolin*, 491 U.S. 554 (1989) .................................................................................17

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ...................................................................1, 4, 6

## CONSTITUTION

U.S. Const. amend I ................................................................................................ *passim*

U.S. Const. amend IV ........................................................................................................4

U.S. Const. amend VI .......................................................................................................16

# RULES

Fed. R. Civ. P. 41 ................................................................................................................1, 7, 10

## INTRODUCTION

The government's opposition brief further reinforces that its seizure of reporter Hannah Natanson's devices constitutes an unconstitutional prior restraint that froze ongoing newsgathering and severely chilled future communications with government sources. The government's cramped conception of "prior restraint" in effect argues that a "verdict first, trial later" process does not violate the First Amendment. But this view conflicts with Supreme Court and other authority recognizing that the government cannot impose restraints that foreclose expression *before* a final adjudication. Indeed, the Supreme Court in *Zurcher v. Stanford Daily* expressly contemplated that a newsroom seizure can constitute a prior restraint when it interferes with publication or the communication of ideas—precisely the effect here. The government apparently thinks that because this is a criminal case, it has the right to trample over Movants' First Amendment rights as it sees fit, reviewing whatever seized records it wants, on its way to find a needle in a haystack full of privileged, confidential sources. The First Amendment demands more.

At a minimum, Rule 41 requires immediate return of the vast trove of non-responsive material—comprised largely of privileged, unpublished newsgathering content—along with judicial supervision of any review to protect constitutional and common-law privileges. The government has no legitimate interest in withholding non-responsive materials beyond the warrant's narrow scope. Its proposal to deploy an executive-branch "filter team" to adjudicate privilege is foreclosed by Fourth Circuit authority, which holds that privilege determinations are a judicial function and that filter-team regimes risk irreparable harm. Movants' protocol—under which cleared counsel identify potentially responsive materials in a secure process—more than satisfies the government's stated interests while safeguarding core First Amendment and privilege protections.

Rather than employing a subpoena, the government's wholesale seizure and proposed review process sends a chilling message to reporters who cover the government, while at the same time eviscerating Movants' privilege with no opportunity for judicial review. With proper judicial oversight, the Court can protect the First Amendment rights of Natanson, The Post, and their more than 1,000 confidential sources.

## ARGUMENT

I.    **The Seizure Was an Unconstitutional Prior Restraint and Any Government Interest Can Be Protected by a Subpoena or Other Less Invasive Legal Process.**

The seizure of Natanson's devices was an unconstitutional prior restraint and violation of Natanson and The Post's First Amendment rights.

The government's assertion that the seizure of Natanson's devices does not violate the First Amendment rests on an erroneously narrow definition of a prior restraint. According to the government, prior restraints are only "actions *forbidding* certain communications when issued *in advance* of the time that such communications are to occur," such as a court order or government edict. Opp. 15-16 (emphasis in original). That view is wrong as a matter of law: A prior restraint occurs not only when "official restrictions [are] imposed upon speech or other forms of expression in advance of actual publication," but also when "expression is foreclosed prior to an adequate determination that it is unprotected by the First Amendment." *State v. J-R Distribs., Inc.*, 765 P.2d 281, 287-89 (Wash. 1988) (collecting U.S. Supreme Court cases and holding on return of property motion that mass seizure of obscene material without a prior adversarial determination was a prior restraint).[1] Indeed, the government's constrained definition runs afoul of the Supreme Court's

---

[1] *See also, e.g.*, *State v. I, A Woman-Part II*, 191 N.W.2d 897, 902-03 (Wis. 1971) ("[A] prohibited 'prior restraint' is *not* limited to the suppression of a thing before it is released to the public," but can also be "an infringement upon the constitutional right to disseminate matters that are ordinarily protected by the [F]irst [A]mendment without there first being a judicial determination that the material does not qualify for [F]irst-[A]mendment protection." (emphasis added) (citing *Near v.*

2

guidance that "[g]overnmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." *Miami Herald Pub'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974).

The government cites only a single case to support its mistaken understanding of a prior restraint—*Alexander v. United States*, 509 U.S. 544 (1993). But *Alexander* did not hold that a newsroom seizure following a warrant could not constitute a prior restraint, only that *a post-conviction forfeiture order* "was not a prior restraint on speech, but a punishment for past criminal conduct." *Id.* at 553; *see also id.* at 551 ("prior restraint cases" are where "the Government had seized or otherwise restrained materials"); *Spolar v. Discovery Commc'ns, LLC*, 2020 WL 7222807, at *3 (C.D. Cal. Oct. 2, 2020) (citing *Alexander* for proposition that "[s]ome speech restrictions may constitute impermissible prior restraints when imposed as interim relief but remain constitutional when imposed following a final adjudication"); *Freedman*, 380 U.S. at 58 ("[B]ecause only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint."). *Alexander* therefore is not relevant here, where the government trampled Movants' First Amendment rights with no adjudication at all, much less "a final" one.

To the extent the exceptional seizure of a Post reporter's newsgathering devices differs from "familiar or traditional patterns," *Miami Herald*, 418 U.S. at 256, that is what makes the government's actions here even more repugnant to the First Amendment. In the "traditional" context of a prior restraint highlighted by the government in its brief, a news organization facing a gag order might choose to publish and litigate the consequences in court. But here, the seizure made it impossible for Natanson to communicate with more than 1,000 sources other than Perez-

---

*Minnesota*, 283 U.S. 697 (1931), and *Freedman v. Maryland*, 380 U.S. 51 (1965)).

Lugones, or to publish stories generated by them, at all.  Mot. 14-15.  The First Amendment requires return of her materials so Movants can resume protected newsgathering activities.  *J-R Distribs.*, 765 P.2d at 289 (under *Heller v. New York*, 413 U.S. 484 (1973), government must provide copy of seized film "so that it can continue to be shown" pending adversarial determination, or "the film must be returned to the owner").

The government argues that *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), stands for the proposition that "executing a valid warrant to seize newsgathering materials does not create a prior restraint."  Opp. 18.  But in that case, police seized nothing.  *See Zurcher*, 436 U.S. at 551-52.  And the Supreme Court specifically acknowledged that a newsroom seizure could constitute a prior restraint if it interfered with "publication of the [news outlet] or [] its communication of ideas," which is precisely what happened here.  *Id.* at 567; *see also, e.g.*, *Meyer v. City of Marion, Kan.*, 776 F. Supp. 3d 991, 1039 (D. Kan. 2025) (recognizing that government seizure of journalists' computers and phones that had "effectively shut[] down" newspaper had "violated plaintiffs' First Amendment rights").[2]

As for other cases in which the authorities took only a single camera or cell phone, the government argues that those seizures were different because they "were directed at the content of the expression at issue," while here, "the content of [Natanson's] future expression" purportedly played no role.  Opp. 17.  But the government targeted Natanson specifically because of her reporting relating to Perez-Lugones.  The unsealed warrant affidavit highlighted that Natanson had "publicly written about her use of [the devices] to receive information" from "hundreds of Government employees and contractors," ECF No. 39 ¶¶ 24, 27, other than Perez-Lugones.  In

---

[2] The government also ignores that *Zurcher* is adamant that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with scrupulous exactitude."  *Id.* at 564 (citation omitted).

other words, the government seized Natanson's devices specifically because of her prior reporting and with full knowledge of the hundreds of confidential government sources whose sensitive messages unrelated to the criminal investigation would be found therein. The government can hardly argue that the seizure here does not run afoul of the First Amendment merely because it was *broader* and *less targeted* than seizures found to be prior restraints. The seizure here burdened even more speech with less justification—that is why it is such a flagrant constitutional violation.[3]

The undisputed facts show that this is a prior restraint in at least two ways. *First*, the seizure froze Natanson's newsgathering. The government does not contest that Natanson lost access to "more than 1,200 Signal contacts," her "communications" with those sources, or her ability to report on the information contained therein. Natanson Decl. ¶ 43. Nor does it contest that Natanson stopped receiving dozens of daily tips through her seized Signal account. *Id.* ¶ 45. The government posits only that sources can reach out to Natanson through a new Signal account and email that she created. Opp. 16. But a new Signal account does not allow Natanson to access her prior Signal communications or even Signal contacts, *see* Natanson Reply Decl. ¶¶ 3-7, and it is risible to suggest that a raid silencing 1,000 current government sources is no First Amendment infringement simply because Natanson can start over from scratch.

*Second*, the seizure was a prior restraint because it chilled both Natanson and The Post's future newsgathering and publishing activities. The government does not contest that its seizure will deter sources other than Perez-Lugones from speaking to Natanson or her colleagues, including confidential sources who are "aware that the government has access to, or is reviewing"

---

[3] Movants reject the government's hyperbolic argument that The Post might claim seizure of child pornography was a prior restraint. *See* Opp. 18-19. As the government is aware, that case involved a narrow seizure in which the government reviewed images and not troves of sensitive privileged material from confidential sources. The Post made no prior restraint argument in that case.

their information. Natanson Decl. ¶ 46. Nor does it contest that "[t]he government's seizure of [Natanson's] devices has restrained [her] ability to publish stories that [she] was actively working on at the time of the seizure." *Id.* ¶ 44; *see also id.* ¶¶ 42, 43. This suppression of newsgathering activity is exactly the kind of interference with First Amendment activity that constitutes a prior restraint. *See Zurcher*, 436 U.S. at 567; *Miami Herald*, 418 U.S. at 256.

The government does not argue that if the seizure was a prior restraint, the seizure was nevertheless constitutional. Nor could it. Prior restraints are viewed "with a heavy presumption against [their] constitutional validity." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976) (citation omitted); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (collecting cases).

The government briefly asserts that a subpoena—a narrower option than the seizure— would not have sufficed. Opp. 18. But neither of the government's reasons withstands scrutiny. *First*, the government suggests that evidence could have been lost "through a failure to preserve expiring Signal messages." *Id.* But the unsealed warrant affidavit reveals that the government determined the retention settings on the chat between Perez-Lugones and Natanson at the time of his arrest on January 8 was 24 hours. ECF No. 39 ¶¶ 14-15, 38. There was thus no good faith basis to suggest that there was *still* an urgent need for a seizure *six days later* on January 14. *Second*, the government also speculates that a subpoena might have risked "bad faith conduct." Opp. 18. Movants reject that baseless accusation against them and their counsel and note that the government presented no such justification in the warrant affidavit.[4] In any event, it is beyond

---

[4] The government's only supposed evidence of bad faith is Natanson's statement to investigators that she did not recall using biometrics on her devices. Rozhavsky Decl. ¶¶ 31-32. This is hardly a "misrepresentation." Opp. 18. Natanson did not regularly use biometrics to unlock her devices, preferring instead to use passwords, and she did not expect biometrics to work. Natanson Reply Decl. ¶¶ 10-11. When FBI agents asked her to use her finger to log into the laptop, she willingly used the correct digit even though she did not expect that doing so would unlock the laptop. *Id.* ¶¶ 12-13.

dispute that a subpoena would have triggered sufficient preservation obligations to address both of these unwarranted concerns.  Indeed, the government utilized this narrower approach with its grand jury subpoena to The Post.  There is no serious argument that this was insufficient.

Because the government's seizure was a prior restraint and not narrowly tailored, it violated the First Amendment.  Mot. 16-17.  The seized devices should be returned, with a preservation copy maintained under seal, while Movants respond to the grand jury subpoena based on the guidance provided by the Court in this matter.

## II.    At the Very Least, Materials Beyond the Scope of the Warrant Should Be Returned and the Court Should Oversee the Return Process.

There is no dispute over the applicable legal standard for return of property under Rule 41. The government agrees that the standard is one of "reasonableness under all of the circumstances." Opp. 8.  Nor is there a dispute regarding the circumstances that inform the Court's determination of reasonableness here: (1) the government seized a large volume of data belonging to the Post and Natanson; (2) an infinitesimal amount of that data is even potentially responsive to the warrant; and (3) the mass of non-responsive data consists of presumptively privileged newsgathering materials and attorney-client privileged information.

The issue here centers on what is reasonable under these circumstances: (i) Movants' alternative proposal, which provides the government with any non-privileged data responsive to the warrant, provides Movants with only the non-responsive data, and includes judicial oversight to protect the significant constitutional interests at stake, or (ii) the government's proposal, which provides the government with everything (including the non-responsive newsgathering materials in which it has no legitimate interest), withholds everything from Movants (including the non-responsive materials they need to do their jobs), and excludes the Court altogether so a federal prosecutor and law enforcement agents can rummage unrestrained through non-responsive

newsgathering materials, confidential source materials, and attorney-client privileged information of a news organization and journalist who routinely publish articles whose sources could be of great interest to the federal government?

The government's assertion that newsgathering materials are entitled to no protection, Opp. 22-24, is wrong. *See infra* Section II.A. And the government's position—that it "is entitled to search the devices in their entirety," Opp. 23, and that the Court has no business protecting non-responsive and privileged materials or making privilege determinations—is not only unreasonable under the circumstances, it is foreclosed by binding precedent. *See infra* Section II.B.

A.    **The Seized Data Is Protected by a First Amendment Privilege and by Statute.**

It is undisputed that Natanson's devices contain terabytes of information, including unpublished newsgathering materials and information about more than 1,000 confidential sources that have nothing to do with the government's criminal investigation. Those materials are privileged and protected from disclosure by the reporter's privilege and First Amendment. *See Horne v. WTVR, LLC*, 893 F.3d 201, 212-13 (4th Cir. 2018); Mot. 19-21. The government insists that it has the unbounded right to rummage through Movants' newsgathering materials simply because it is searching for evidence related to a "criminal case." Opp. 22. But the fact that there is an ongoing criminal proceeding related to *one* alleged source does not grant the government carte blanche to inspect privileged materials involving *more than one thousand* other sources.

The government overreads *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013), to support its dangerous contention that "there is no so-called 'reporter's privilege' in criminal cases." Opp. 22. That is not what *Sterling*—or any case—says. Rather, the Fourth Circuit in *Sterling* held only that journalists had "no special privilege that would allow them to withhold *relevant information about criminal conduct*." 724 F.3d at 495 (emphasis added); *see also id.* at 492 (reporters cannot withhold testimony "*regarding their personal knowledge of criminal activity*"

8

(emphasis added)). The *Sterling* Court did not hold that in a criminal case the government is permitted to trample over a reporter's privilege by reviewing unpublished newsgathering materials and confidential source information that is *irrelevant* to the criminal investigation.

Notably, in *Sterling*, the Court declined to apply the reporter's privilege only in a posture where (a) the government sought limited trial testimony that implicated only the narrow criminal conduct at issue, not other privileged material from irrelevant sources; and (b) the government used a subpoena, which ensured judicial review of any privilege dispute. *Id.* at 490; *see also In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992) (no reporter's privilege to ignore trial subpoena asking reporters to "testify for no more than five minutes each to confirm that [the defendant] had in fact made the statements they had reported"). With such a trial subpoena there was no risk the government would rifle through privileged newsgathering materials that were irrelevant to the criminal proceeding. To the contrary, the reporter in *Sterling* was assured testimony would take place before a judge, who could (and did) evaluate whether the testimony would, in fact, provide relevant evidence of criminal conduct or was protected information under the First Amendment. *Sterling*'s rule ensured room for judicial review and careful consideration of privilege. That critical element is absent in the government's proposal.[5]

The Fourth Circuit did not consider—much less bless—the proposition that all material seized pursuant to a warrant would lose the First Amendment privilege that would otherwise attach. To the contrary, in language the government ignores, the Court cautioned that the First

---

[5] Consider how a *Sterling* subpoena might work here. If Natanson were subpoenaed to testify, the Court, under *Sterling*, might allow limited questions about Perez-Lugones's alleged criminal conduct. But the Court surely would *not* require her to answer questions about her more than 1,000 confidential sources. It cannot be the case that simply because the government used a brute force seizure here, it can sidestep such judicial adjudication of Movants' privileges and scour through whatever privileged material from confidential government sources it wants.

Amendment privilege may prevail when journalists are asked to "give information bearing only a remote and tenuous relationship to the subject of the [criminal] investigation," or information that "implicates confidential source relationships without a legitimate need." *Sterling*, 724 F.3d at 498-99 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 710 (1972) (Powell, J., concurring)) (emphases omitted). The government has no "need for the confidential information" about these sources that "outweighs the intrusion on the reporter's First Amendment interests." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000).[6]

As for the Privacy Protection Act (PPA), the government sidesteps Movants' argument by suggesting that the statute provides only a civil remedy for damages. Opp. 23. But Movants' argument is that the PPA's statutory prohibition on the government's search for and seizure of a journalist's work product further establishes that the government has no legitimate interest in reviewing the non-responsive data. Mot. 22. As in *Guest v. Leis*, even if there is no liability "for *seizure* of the PPA-protected materials," the government must not be permitted to "search the PPA-protected materials that were seized incidentally to [any] criminal evidence." 255 F.3d 325, 342 (6th Cir. 2001) (emphasis added). The government cannot credibly claim that a review process that intentionally transgresses statutory protections is somehow "reasonable" under Rule 41.

**B.    The Government's Refusal to Return *Non-Responsive* Data and Its Objection to Judicial Oversight Are Unreasonable and Contrary to Binding Precedent.**

1.    A refusal to return property is unreasonable when the government's "*legitimate interests* can be satisfied even if the property is returned." *United States v. Rayburn House Off. Bldg.*, 497 F.3d 654, 663 (D.C. Cir. 2007) (quoting Fed. R. Crim. P. 41 advisory committee's note

---

[6] This is in accord with several other circuits, which hold that a qualified First Amendment privilege *does* generally apply in criminal cases. *See, e.g.*, *United States v. Trs. of Bos. Coll.*, 718 F.3d 13 (1st Cir. 2013); *United States v. Burke*, 700 F.2d 70 (2d Cir. 1983); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980); *United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013).

to 1989 amendment) (emphasis in *Rayburn*).  The government cannot articulate a legitimate interest in preventing return of the *non-responsive* data, which consists of newsgathering and attorney-client privileged materials that the Post and Natanson need to do their work and that have nothing to do with the government's criminal investigation.  That "huge volume of" data, involving communications "with more than 1,200 confidential sources," Natanson Decl. ¶¶ 38, 39, must be returned.  Although the government asserts that it has two legitimate interests in any *responsive* data, Movants are only seeking return of the *non-responsive* data.  The government's two claimed interests in any *responsive* data would be satisfied even if the *non-responsive* data is returned.[7]

The government first asserts that it has an interest in retaining "evidence that may be used in the Government's prosecution of Mr. Perez-Lugones."  Opp. 8.  Any such evidence would be *responsive* to the warrant, which seeks "records received from or relating to Aurelio Luis Perez-Lugones."  Latcovich Decl., Ex. A.  Data beyond the scope of the warrant is, by definition, unrelated to Perez-Lugones, and the government has no legitimate interest in refusing to return it.  The government next asserts that it has an interest in retaining any classified information that Perez-Lugones provided to Natanson.  Opp. 11.  Again, any such information would be *responsive* to the warrant, which seeks "records and information, including classified and/or national defense information . . . . which constitute records received from or relating to" Perez-Lugones.  Latcovich Decl., Ex. A.  The government will retain such information, without returning it to Movants.[8]

---

[7] The government's dubious assertion that a seizure (as opposed to a subpoena or preservation notice) was necessary to satisfy its claimed interest in preservation, Opp. 8, has no bearing on what should happen now because the government's claimed interest in preservation has been satisfied. And under Movants' proposal, it will continue to be satisfied because the government will be permitted to maintain a preservation copy of the non-responsive data under seal.

[8] Thus, the cases cited by the government, in which movants sought return of classified documents, or devices still containing the classified data, are not relevant. *See* Opp. 12-13 (citing *United States v. Montgomery*, 2021 WL 615401 (S.D. Ohio Feb. 17, 2021); *Search Warrant for the Person of John F. Gill and the Premises Located at 28 West Side Drive*, 2014 WL 1331013 (E.D.N.C. Mar.

Because the government's legitimate interests can be satisfied even if the *non-responsive* data is returned to Movants, its continued retention would be unreasonable. *See Rayburn*, 497 F.3d at 663. The *non-responsive* data, therefore, must be returned. The only question is how the Court should ensure its return in light of the unique circumstances of this case in which the government has seized a massive volume of data, all of which implicates significant constitutional interests, and only a tiny fraction of which is potentially responsive.

2.      Judicial oversight of the return process is not only reasonable, it is required because of the undisputed circumstances of this case—the seized documents include an infinitesimal amount of potentially responsive data and a large volume of non-responsive data that is presumptively protected by the Constitution and the attorney-client privilege. The government insists, however, that the Court has no role to play in ensuring that these protections are observed or in making privilege determinations. The government lodges three objections to judicial oversight, none of which withstands minimal scrutiny.

The government's primary objection is a straw man. The government asserts that only it (not Movants or any judicial officer) is competent to determine whether any responsive document is classified. *See* Opp. 11. But Movants do not propose that they or the Court should determine

---

31, 2014)). Nor is *United States v. Hoffman*, 2018 WL 5973763 (E.D. Va. Nov. 14, 2018), or *Roark v. United States*, 2015 WL 2085193 (D. Or. May 4, 2015), supportive of the government's refusal to return the non-responsive files. In *Roark*, the court ordered the government to *return all unclassified information* stored on a seized computer that contained four classified documents. 2015 WL 2085193, at *3. And contrary to the assertion in the government's brief that the *Roark* court refused to order return of the computer itself, Opp. 13, the government agreed to "*return the unprotected files* . . . wipe the computer hard drive, and *return the computer*." 2015 WL 2085193, at *5 (emphases added). In *Hoffman*, the Court ordered return of devices that contained no classified data and refused to return certain unclassified files on devices containing classified data because movant previously consented to forfeiture of the "devices as a whole, including all of their files and programs." 2018 WL 5973763, at *3. The Post and Natanson have not consented to forfeiture of the devices. Nor is there any basis to forfeit the devices.

whether any responsive document is classified. They agree that any non-privileged documents responsive to the warrant should be identified and released to the government. The Court and Movants are competent to identify and provide to the government "records received from or relating to" Perez-Lugones, Latcovich Decl., Ex. A, and do not need to figure out whether any such records are classified because the records would be responsive irrespective of whether they are classified. The government can later determine whether it believes any record is classified.

The government asserts, incorrectly, that judicial oversight is "unworkable" because "time is of the essence" given the Speedy Trial Act rights of Perez-Lugones. Opp. 22. The return process will move more than quickly enough to accommodate the Speedy Trial Act. Movants' proposal will be faster than the government rummaging through the massive amount of data on the devices without direction or oversight because Movants are better positioned to identify any responsive records. *See* Ex Parte Decl. ¶¶ 6-9. The Court is well equipped to set deadlines to ensure appropriate diligence. Finally, the government overstates the Speedy Trial Act concerns because courts regularly designate cases involving classified documents as complex matters justifying Speedy Trial clock tolling. *See, e.g.*, *United States v. Salad*, 779 F. Supp. 2d 509, 514 (E.D. Va. 2011); *United States v. Raymond*, 656 F. Supp. 3d 236, 240 (D.D.C. 2023). Moreover, considering the median time from felony indictment to trial in the District of Maryland (where the Perez-Lugones case is pending) is 26 months, there is no reason to think that a diligent search of the seized devices would cause a Speedy Trial Act violation. *See* 2025 Fed. Jud. Caseload Stat., Table D-6A: Median Time Intervals from Commencement to Termination for Criminal Felony Defendants, available at https://tinyurl.com/chavxjxt.

The government's other objection to judicial oversight underscores why such oversight is required. Notwithstanding the substantial First Amendment and privilege issues at stake, the

government asserts that it is entitled to "open each file on the computer and view its contents" to determine whether it is "related to Perez-Lugones's violations."  Opp. 10; *see also id.* at 9 ("It is also reasonable and lawful for the Government to search the entirety of the devices . . . .").  The government strangely relies upon *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976), but that case did not involve seized electronic data, and the Supreme Court there warned of the "grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers" as opposed to a "search for physical objects whose relevance is more easily ascertainable." *Id.*  Courts "must take care to assure that" such searches "are conducted in a manner *that minimizes unwarranted intrusion upon privacy*." *Id.* (emphasis added).  The government's insistence on a license to conduct an unlimited substantive review of every document in the massive volume of non-responsive, presumptively privileged data flies in the face of this Supreme Court admonition and is contrary to Fourth Circuit precedent involving the review of seized electronic data. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) (*Baltimore Law Firm*).

The government cannot distinguish *Baltimore Law Firm*, which prohibits the government's filter team proposal because it allows one litigation party to review an opposing party's privileged documents to make privilege determinations in lieu of the Court. *See id.* at 175-77.  Here, the government proposes using a "filter team" comprised of a single federal prosecutor and multiple FBI agents to review the Post and Natanson's privileged information. *See* Opp. 20.  Prior to any judicial determination of privilege, the filter team would review the seized data to identify "potentially responsive" documents, including by "opening to files to scan for" responsive information. *Id.* at 20-21.  The potentially responsive documents identified through this search would be segregated. *Id.* at 21.  The filter team would then review the segregated documents to determine, in its own unreviewable discretion, without any review or input from Movants or the

14

Court, whether any documents are protected from disclosure by the "attorney-client privilege and work product privilege." *Id.* The filter team also would review the segregated documents to determine, again in its own unreviewable discretion, whether any are protected by "the First Amendment or subject to the PPA." *Id.* The filter team would then release any "clean information," whatever that means, to the prosecution team, without any prior opportunity for Movant or judicial review of the filter team's inherently judicial rulings. *Id.* The government's proposal runs afoul of the binding principles set forth in *Baltimore Law Firm*.

*First*, the government's proposal "erroneously authorize[s] the executive branch—that is, the Filter Team—to make decisions on attorney-client privilege and the work-product doctrine," *Baltimore Law Firm*, 942 F.3d at 177, as well as First Amendment and PPA protections. The resolution of privilege disputes, however, "is a judicial function." *Id.* at 176. "[A] court simply cannot delegate responsibility to decide privilege issues to another government branch," *id.* at 177, "especially when the executive branch is an interested party in the pending dispute," *id.* at 176. The proper procedure, particularly where a constitutional privilege is at stake, is to afford the privilege holder "an opportunity to assert the privilege," and obtain a judicial determination of privilege, "prior to disclosure of privileged materials to the Executive." *Rayburn*, 497 F.3d at 663. The government's proposal provides no opportunity for judicial review, either before or after disclosure to an executive branch filter team.

*Second*, a filter team cannot be entrusted with this review because filter teams have conflicting interests and lack institutional competence to adjudicate the privileges at stake, and history proves that filter teams do not work. A filter team "possesses a conflicting interest in pursuing the investigation, and . . . some [filter] team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that [filter] teams pose a serious risk to holders of

privilege." *Baltimore Law Firm*, 942 F.3d at 177 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006)) (alterations in *Baltimore Law Firm*).  Filter team members "'might have a more restrictive view of privilege' than the subject of the search, given their prosecutorial interests in pursuing the underlying investigations," which could "cause privileged documents to be misclassified and erroneously provided to an investigation or prosecution team." *Id.* (quoting *In re Grand Jury Subpoenas*, 454 F.3d at 523).

Particular caution is appropriate in the present case, as the government suggests that the First Amendment and the PPA provide no protection for the non-responsive newsgathering information.  Opp. 22-23.  This suggestion is flat wrong, *see supra* Section II.A, and begs the question: If the filter team will be reviewing for "anything that might be related to the First Amendment or subject to the PPA," Opp. 21, but denies that such privileges even exist, how can it be trusted to designate such materials as privileged?  The Fourth Circuit recognized in *Baltimore Law Firm* that filter teams "have been implicated . . . in leaks of confidential information to prosecutors," 942 F.3d at 177 (quoting *In re Grand Jury Subpoenas*, 454 F.3d at 523), and it cited the notorious examples in the *Noriega* and *Elbaz* cases.  *Id.* at 177-78 (citing *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991), and *United States v. Elbaz*, 396 F. Supp. 3d 583, 165-67 (D. Md. 2019)).  Filter teams do not work because they leave "the government's fox in charge of guarding the [privilege holder's] henhouse," *id.* at 178—in this case a henhouse populated with hundreds of confidential sources critical of the government's fox.

*Third*, allowing a filter team to review potentially privileged documents disregards the privileges at stake.  *Id.* at 179 (allowing "government agents and prosecutors to rummage through" potentially privileged files, many of which were non-responsive, was in "disregard of the attorney-client privilege, the work-product doctrine, and the Sixth Amendment"); *see also United States v.*

*Neill*, 952 F. Supp. 834, 840-41 (D.D.C. 1997) (government agent's reading of materials during execution of a search warrant was a "deliberate and intentional" violation of the attorney-client privilege). "[A]n adverse party's review of privileged materials seriously injures the privilege holder." *Baltimore Law Firm*, 942 F.3d at 175.[9] "And that harm is plainly irreparable, in that the Filter Team's review of those privileged materials cannot be undone." *Id.*

The harm is particularly significant here, because, as in *Baltimore Law Firm*, the potentially responsive documents constitute a small fraction of the overall data. *Compare* Natanson Decl. ¶¶ 16, 37 (sent and received more than 30,000 emails last year and never emailed with Perez-Lugones) *with Baltimore Law Firm*, 942 F.3d at 168 (116 of 52,000 emails were responsive). And because the government seized data belonging to a newspaper and its journalist, as in the case of a law firm/lawyer seizure, much of the non-responsive data will be privileged. *See, e.g.*, Natanson Decl. ¶¶ 37, 39 (any communications with Perez-Lugones as well as more than 1,200 irrelevant confidential sources occurred via Signal). Finally, because this is a very public matter, allowing a filter team to review the Post's newsgathering materials will cause an additional significant harm—it will discourage confidential sources from confiding in The Post and in Natanson. *See Baltimore Law Firm*, 942 F.3d at 175 n.16 (stating that "adverse publicity about the search of the Law Firm, the Filter Team, and its Protocol could make potential clients less likely to seek out and retain the Firm. Additionally, potential and current clients might be reluctant

---

[9] Even *in camera* judicial review of potentially privileged materials is not permitted absent a threshold showing that review is appropriate because "'examination of the evidence, even by the judge alone, in chambers' might in some cases 'jeopardize the security which the privilege is meant to protect.'" *United States v. Zolin*, 491 U.S. 554, 570 (1989) (quoting *United States v. Reynolds*, 345 U.S. 1, 10 (1953)); *see also NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 502 (4th Cir. 2011) (opposing party must make sufficient showing to "justify *in camera* inspection").

to candidly communicate with the Law Firm attorneys because they fear government review of their communications and breaches of confidentiality.").

The only case the government cites in support of its filter team proposal, Opp. 20, is entirely distinguishable because the defendant there had both "an opportunity to review all communications before" the filter team "turned [them] over to the prosecution team" and an "opportunity to seek judicial review before materials [were] turned over," and yet the defendant "raised zero objections, either to the review procedures, or to the filter team's conclusions," until after the filter team reviewed his entire iCloud account. *United States v. Avenatti*, 559 F. Supp. 3d 274, 278, 283 (S.D.N.Y. 2021). The government's proposal here provides no opportunity for Movants to review the documents or seek judicial review before release to the prosecution team, and Movants have very clearly and promptly objected to use of a filter team.

Moreover, the district judge in *Avenatti* dismissed *Baltimore Law Firm* as "not binding." *Id.* at 283. That decision is binding here, and *Avenatti* contravenes two critical underpinnings of *Baltimore Law Firm*, which require rejection of any modified filter team process the government might later propose. Allowing "government agents and prosecutors to rummage through" potentially privileged files disregards the privileges at issue. *Baltimore Law Firm*, 942 F.3d at 179. The court in *Avenatti* absolved the privilege intrusion because "filter team" members were supposedly walled off from the "prosecution team," 559 F. Supp. at 282, but no matter what label the government puts on it—"filter team," "taint team," or "privilege protection team"—that team is composed of the privilege holder's litigation adversaries, and their review of privileged documents violates the privilege. *See Baltimore Law Firm*, 942 F.3d at 179.[10] To the extent

_____

[10] *See also Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 166 (2d Cir. 1992) ("[R]equiring a litigant to turn over documents subject to a claim of attorney-client privilege to opposing counsel, without a judicial ruling on the merits of the claim, will undermine the

*Avenatti* suggests the basic rules of privilege should apply differently in criminal cases, the Supreme Court squarely rejected that notion. *See Swidler & Berlin v. United States*, 524 U.S. 399, 408-09 (1998) ("there is no case authority for the proposition that the privilege applies differently in criminal and civil cases"). Furthermore, *Avenatti* ignores the filter team's conflicting interests, lack of institutional competence, and history of failures. Those were important reasons the Fourth Circuit rejected the use of a filter team.[11] *See Baltimore Law Firm*, 942 F.3d at 177-80.

Under binding Fourth Circuit precedent, a government filter team cannot conduct the privilege review or make the privilege determinations. *See id.* Return to the privilege holders is required, as is judicial oversight to protect the privileges at stake.

## III. Movants' Proposal.

Movants respectfully suggest the following review protocol, which is consistent with the governing caselaw and accommodates the relevant equities for both the government and the Movants:

- Counsel for The Post and Natanson with appropriate security clearances will identify and review potentially responsive documents in a secure environment in coordination with the

---

attorney-client privilege."); *In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998) ("Until it is established that the crime/fraud exception applies, the district court may not compel disclosure of allegedly privileged documents to the party opposing the privilege.").

[11] Most other circuits that have adjudicated a privilege holder's objection to filter team review before the review took place have similarly rejected the use of a filter team. *See Rayburn*, 497 F.3d at 665-66 (rejecting use of a "filter team" to review documents seized pursuant to a warrant); *In re Grand Jury Subpoenas*, 454 F.3d at 516 (rejecting use of "taint team" to review documents obtained by subpoena); *see also Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3d Cir. 1984) (ordering government to return documents seized from law firm and suggesting appointment of a special master "to examine *in camera* any material that the law firm objects to producing").

Department of Justice's Litigation Security Group, with any other security measures the government believes necessary to protect potential classified information.

- Responsive, unprivileged documents (or portions thereof) will be released to the government.

- Responsive, privileged documents will be logged as appropriate.

- The government will maintain a copy of all the devices for preservation purposes until the review process is complete.

- At the end of the review process, counsel for The Post and Natanson will confer with the government about the best process for the appropriate return of any non-responsive materials.

- The Court will continue to supervise this process, and any disputes between the parties will be promptly brought to the Court's attention, including any disputes about whether the logged documents are privileged.

Although the government uses the specter of classified information to try to exclude the Court and Movants' counsel from any review, multiple lawyers for both The Post and Natanson have had (or currently have) TS/SCI clearances. Here, there is a need for counsel to review these documents—to facilitate as officers of the court all necessary compliance with the warrant while protecting the important privileges at stake. Moreover, it is hard to imagine how allowing Movants' counsel to identify responsive documents, in a secured environment, presents any risk to national security given the government's allegations that most of the purportedly classified information has been disclosed already. *See* Rozhavsky Decl. ¶¶ 5, 6, 12, 13, 15, 17, 22.

## CONCLUSION

For the reasons stated above and in Movants' opening brief, the Motion should be granted.

Dated: February 6, 2026                    Respectfully submitted,

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)
Sean M. Douglass (VSB No. 83835)
Thomas G. Hentoff (*pro hac vice*)
Tobin J. Romero (*pro hac vice*)
Nicholas G. Gamse (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
slatcovich@wc.com
sdouglass@wc.com
thentoff@wc.com
tromero@wc.com
ngamse@wc.com

*Counsel for Movant The Washington Post*

/s/ Amy Jeffress
Amy Jeffress (VSB No. 36060)
Trisha Anderson (*pro hac vice*)
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
ajeffress@heckerfink.com
tanderson@heckerfink.com

*Counsel for Movant Hannah Natanson*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2026, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Virginia, using the electronic case filing system of the court.

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)

*Counsel for The Washington Post*