**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

IN THE MATTER OF THE SEARCH OF      )
THE REAL PROPERTY AND PREMISES    )          Case No. 1:26-sw-00054 (WBP)
OF HANNAH NATANSON                        )

<u>**MEMORANDUM OPINION AND ORDER**</u>

Movants Hannah Natanson and the WP Company's (collectively, "Movants" or "the

Washington Post") have moved to intervene in this search warrant matter and for return of

property under Federal Rule of Criminal Procedure 41(g). For the reasons below, the Court

GRANTS the Motion to Intervene and GRANTS in part and DENIES in part the Motion for

Return of Property.

**I.**

**A.**

Hannah Natanson is a reporter for the Washington Post and the self-proclaimed "federal

government whisperer." Hannah Natanson, *I Am The Post's 'Federal Government Whisperer.'*

*It's Been Brutal.*, WASH. POST (Dec. 25, 2025) A03, https://perma.cc/UQJ5-9493. According to a

first-person article she published on December 25, 2025, shortly after the presidential

inauguration in January 2025 and following the early days of the Department of Government

Efficiency ("DOGE"), she shared her contact information on the Reddit[1] subreddit[2] "r/fednews,"

a forum she describes as one "where some 300,000 federal employees were posting every few

---

[1] Reddit is a social news aggregation, web content rating, and discussion platform that "aspires to be the heart of the internet" and "gives people tools to build community, creating space for genuine discussion." *Reddit Brand*, https://perma.cc/52UJ-PRP9 (last visited Feb. 23, 2026).

[2] A subreddit is a web forum within Reddit focusing on specific hobbies, topics, or interests. Anyone can make a subreddit on any topic and users can subscribe and unsubscribe at will. *See r/help*, REDDIT, https://perma.cc/XPN7-2FJS (last visited Feb. 23, 2026).

seconds to commiserate about their fates under a president determined to downsize the bureaucracy." *Id.* Ms. Natanson posted on r/fednews that she wanted to "speak with anyone willing to chat," and listed her Signal[3] contact information. *Id.* Over the next 11 months, Ms. Natanson developed almost 1,200 confidential sources drawn from federal employees at more than 120 agencies who, in her words, requested anonymity because they "fear retribution from the government due to their disclosures." (ECF No. 9-1 ¶¶ 5–6, 39.) On average, she received between dozens and more than 100 tips per day from these sources. (*Id.* ¶¶ 7, 39.) These tips led her to write or co-write "more than 200 articles across roughly twenty news desks." (*Id.*)

Most sources communicated through Signal, which she accessed on her phone and computer, and she worked to protect their identities. (*Id.* ¶¶ 9–10.)

### B.

Since early 2025, the administration has attempted to identify federal employees who disclose government information to the press. That campaign has spanned multiple departments, employed tools ranging from internal investigations to polygraph examinations, and culminated in formal changes to federal regulations governing the press.

The scope of the administration's efforts has extended beyond classified or sensitive national security information. *See* Marisa Taylor *et al.*, *Trump Officials Are Using Polygraph Tests to Flush Out Even Minor Leaks*, REUTERS (May 23, 2025, at 03:33 EDT), https://perma.cc/VF79-QXBC. For example, when reports that the Office of Personnel

---

[3] Signal is a fee, open source, and privacy-focused messaging app that enables secure text, voice, and video communication. It uses end-to-end encryption to ensure that only the sender and recipient can read messages or hear calls, making it highly secure against third-party interception. *See* Kelvin Chan, *Here's What to Know about Signal, the Messaging App Used in Apparent Leak of War Plans to a Journalist*, ASSOCIATED PRESS (Mar. 25, 2025, at 11:09 EST), https://perma.cc/YQ49-AP5W.

Management ("OPM") was considering hiring a driver for agency directors hit the news, OPM officials immediately launched an investigation to identify the source. *Id.* Current and former federal employees told Reuters that the administration has conducted "a concerted effort to expose leaks of all kinds," and that the investigations pursue two goals: stopping unauthorized disclosures and purging employees perceived as disloyal to the administration's agenda. *Id.* The Department of Defense, the Department of Homeland Security, and the Department of Justice ("DOJ") have pursued their own investigations and have administered polygraph examinations to employees to identify leakers. *Id.*

At the DOJ, the administration formalized its approach to leak investigations in April 2025. Attorney General Pam Bondi rescinded a Biden-era regulation broadly prohibiting compulsory process against journalists in leak investigations and replaced it with regulations, effective May 1, 2025, that expressly permit the DOJ to use search warrants for leaks of both classified and unclassified information. *See* Pam Bondi Memo, *Updated Policy Regarding Obtaining Information From, or Records of, Members of the News Media* (Apr. 25, 2025), https://perma.cc/S4K7-GW9B, *reported in* Ryan Lucas, *Justice Department Revokes Biden-Era Protections for Reporters in Leak Investigations*, NPR (Apr. 25, 2025, at 8:26 ET), https://perma.cc/UZ8M-V37V. In her memo, Attorney General Bondi cited the leak of intelligence assessments about the Venezuelan gang Tren de Aragua and the leak concerning the placement of a high-ranking DOD official on leave as examples warranting the policy change. *Id.* at nn.6–7.

## C.

On January 8, 2026, the government arrested Aurelio Luis Perez-Lugones on a criminal complaint issued out of the District of Maryland, charging him with unlawfully retaining national

defense information in violation of 18 U.S.C. § 793(c). *See United States v. Perez-Lugones*, No. 1:26-cr-00030-MJM (D. Md. 2026).

As part of its investigation of Mr. Perez-Lugones, on the evening of January 12, 2026, an assistant United States attorney ("AUSA") for the Eastern District of Virginia applied on an expedited basis for a search warrant seeking information the government believed Ms. Natanson possessed. The AUSA filed the application in this Court because Ms. Natanson lives in the Eastern District of Virginia. The affidavit in support of the search warrant cited Ms. Natanson's first-person article. Upon review of the article, the Court became concerned about both the scope of the proposed search warrant and the government's apparent attempt to collect information about Ms. Natanson's confidential sources. That evening, the Court rejected the government's proposed search warrant and explained its concerns to the AUSA and the Principal Deputy Assistant Attorney General of the National Security Division.

Late in the afternoon of January 13, 2026, the AUSA submitted another proposed search warrant, which the Court also rejected. Over the next five hours, the Court held multiple in-person and telephone conferences with the AUSA, who presented successive versions of the proposed warrant, until the Court ultimately approved a search warrant "limited to all records and information, including classified and/or national defense information, from the time period October 1, 2025, to the present, which constitute records received from or relating to Aurelio Luis Perez-Lugones, as evidence of violations of 18 U.S.C. § 793." (ECF No. 4 at 4.) The Court signed the warrant just before 10:00 p.m. after an FBI special agent swore to the truth of the supporting affidavit. (*Id.* at 1.)

The Court's probable cause finding rested principally on three allegations: (i) on multiple occasions, Mr. Perez-Lugones had provided Ms. Natanson with top secret and other classified

information that appeared in her published articles days later; (ii) they had exchanged this classified information using Signal; and (iii) they had set their messages to auto-delete after one day. (ECF No. 39 ¶¶ 5–6, 8–11, 13, 15.)

At 6:05 a.m. the next morning, January 14, 2026, the FBI executed the search warrant at Ms. Natanson's home. (ECF No. 5.) The government seized two laptops, one mobile phone, a portable drive, a recording device, and an exercise watch. (*Id.*) At or around the same time, the government issued a grand jury subpoena to the Washington Post requesting substantially the same information it sought with the search warrant served on Ms. Natanson. (ECF No. 9-8.)

In a declaration, Ms. Natanson states that, since the government seized her devices, her sources have gone silent, and she has been unable to gather information or publish stories. (ECF No. 9-1 ¶¶ 39, 41–43.) She states that she needs her devices to do her job and to help her colleagues do theirs. (ECF No. 9-1 ¶¶ 40–41.)

### D.

The same day the FBI executed the search warrant, counsel for the Washington Post contacted the government, advised that the seized items contained materials protected by the First Amendment and the attorney-client privilege, and asked that the government refrain from reviewing any of the material. (ECF No. 9-4 at 2.) Over the next six days, counsel for the Washington Post conferred multiple times with the government and proposed multiple frameworks that would involve the government preserving the seized data but not reviewing it until the parties could agree on a process to protect Ms. Natanson's and the Washington Post's First Amendment rights and the attorney-client privilege. (*Id.* at 2–3.) The parties reached no agreement because government counsel stated that all decisions required approval from more senior officials. (*Id.*) Eventually, the government agreed not to begin a substantive review of the

5

seized material until counsel could confer on January 20, 2026. (*Id.* at 2.) During that discussion, counsel for the Washington Post reiterated its concerns about the First Amendment and the attorney-client privilege. (*Id.* at 3.) To resolve those issues, the Washington Post proposed that the government return the seized property and allow it to produce information in response to the grand jury subpoena. (*Id.* at 3.) The government rejected this proposal. (*Id.*)

Counsel for the Washington Post informed the government that it intended to seek judicial relief within 24 hours. Relying on the Fourth Circuit's decision *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) ("*Baltimore Law Firm*"), counsel asked the government not to review the seized material and to preserve the status quo until a court could address its arguments. (*Id.*) The government refused and declined to take any position on a protocol to protect either the attorney-client or the First Amendment privileges. (*Id.* at 3–4.)

On January 21, 2026, Movants moved to intervene and for return of property (ECF No. 8) and for a standstill order while the parties briefed the issues (ECF No. 10). That same day, the Court granted Movants' Motion for a Standstill Order and ordered the government to preserve but not review any of the seized materials. (ECF No. 18.) The government is complying with this order. (ECF No. 35 at 7.)

The parties briefed the motions and argued them on February 20, 2026. (ECF No. 55.) During oral argument, the Court asked the government whether it would agree to foreswear reliance on the plain-view doctrine if the Court permitted it to review the seized materials. (Feb. 20, 2026, Tr. at 32–33.) The government refused. (*Id.*)

## II.

This case sits at the intersection of the government's compelling interest in prosecuting the unlawful disclosure of classified national security information and a working journalist's

First Amendment rights. These are not easy issues. In the 1971 case involving the Pentagon Papers, the Supreme Court decided the foundational modern case on First Amendment prior restraint in the national security context, *New York Times Co. v. United States*, 403 U.S. 713 (1971). In a terse *per curiam* opinion, the Supreme Court held that the government "carries a heavy burden of showing justification for the imposition of such a restraint" and determined that the government had not met that burden. *Id.* at 714. But each Justice wrote separately. Nine Justices, nine separate opinions. Hardly doctrinal completeness.

But this is not purely a prior restraint case, and the Pentagon Papers case does not address criminal prosecution under the Espionage Act. The government has an ongoing criminal investigation and has established probable cause to believe Movants possess evidence needed to prosecute it.

The question presented is twofold. First, if the government believes a reporter possesses classified national security evidence provided by a third party charged with violating the Espionage Act, and at least some of that evidence could be destroyed automatically by modern messaging applications, may the government seize that information to prevent its destruction, even if doing so restrains the reporter's work? Second, if so, and if that classified evidence is stored among thousands of unrelated electronic files subject to the reporter's First Amendment rights and the attorney-client privilege, who should locate and extract it?

### A.

Movants argue that *all* the devices seized and *all* the data contained in them must be returned. In Movants' view, the seizure constitutes an unconstitutional prior restraint because seizing a broad swath of information unrelated to the search warrant substantially impairs or prevents their current and future ability to publish the news, including their ability to

communicate with sources. (*See* ECF No. 9 at 16.) Movants argue that the government's interest can be protected by quashing the search warrant, returning the devices and data to them, and allowing them to respond to the subpoena issued to the Washington Post. (*Id.*)

Alternatively, Movants argue that the government has no legitimate interest in the vast quantity of non-responsive material on the devices and that, at best, the government has a legitimate interest only in a narrow set of material relating to Mr. Perez-Lugones. (*See id.* at 21–23.) Allowing the government to search through their devices without limitation, Movants contend, would amount to an unlawful general warrant. (*Id.* at 22.) They ask the Court to order the government to return the non-responsive data and to oversee the review process. (*Id.* at 21.)

## B.

For its part, the government argues that the Court should allow it to retain all of Movants' property because it needs certain evidence on the devices to prosecute Mr. Perez-Lugones. (ECF No. 35 at 8.) The government also argues that no "journalist exception" applies to search warrants and that Movants' devices contain government secrets of the most sensitive type, the disclosure of which risks exceptional harm to the United States. (*See id.* at 18.)

The government dismisses Movants' First Amendment argument on the ground that no prior restraint exists here because no law or court order blocks Movants' speech "in advance of its actual expression" and that nothing prevents Movants from contacting sources or publishing stories. (*Id.* at 22–23.)

The government argues that it has developed an appropriate filter team protocol, including experts trained in identifying national security information, and that it alone should be permitted to search all of Movants' data. (*Id.* at 26–29.)

### III.

### A.

Before reaching the merits, the Court addresses a matter of significant concern: the government's failure to identify and analyze the Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa *et seq.* ("PPA"), in its search warrant application. As the judge who found probable cause and approved the search warrant, the Court acknowledges that it did not independently identify the PPA when reviewing the warrant application. As far as this Court knows, courts have approved search warrants directed at members of the press in only a handful of instances. This Court had never received such an application and, at the time it approved the warrant, was unaware of the PPA. This Court's review was limited to probable cause, and the Court accepts that gap in its own analysis. But the government's failure to identify the PPA as applicable to a request for a search warrant on a member of the press—and to analyze it in its warrant application—is another matter. This omission has seriously undermined the Court's confidence in the government's disclosures in this proceeding.

The PPA is directed at government lawyers, and its terms require the Attorney General to issue regulations outlining the procedures the government must employ when seeking information from the press. *See* 42 U.S.C. §2000aa-11. These DOJ regulations, found in 28 C.F.R. Part 50, confirm that subpoenas and search warrants targeting the press are "extraordinary measures, not standard investigatory practices." 28 C.F.R. § 50.10(a)(3). Recognizing the extraordinary nature of these devices, the regulations require approval at all levels up to the Attorney General when the government seeks a search warrant targeting the press. So does DOJ's Justice Manual, which is issued to every AUSA throughout the country. *See* U.S. Dep't of Just., Just. Manual § 9-13.400. The Court's communications with the government over two days

were not limited to the local AUSA. Counsel from the highest levels of the DOJ participated in at least one of those calls. Many government lawyers had multiple opportunities to identify the PPA as controlling authority and to include an analysis of it in the warrant application. None of them did.

Among other responsibilities, magistrate judges serve as probable cause gatekeepers for search warrants. We communicate with government attorneys multiple times a day during our criminal duty weeks, assessing probable cause for search warrant applications. These requests come in a fast-paced environment. The search warrant the Court approved in this case was one of 46 the government requested that week.

In its day-to-day workings, this Court affords government attorneys a presumption of regularity, including by assuming that federal prosecutors have satisfied their obligation to disclose controlling and relevant authority. The Court extends this latitude to prosecutors because:

> [T]hey are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.

*United States v. Venable*, 769 F. Supp. 2d 976, 984–85 (E.D. Va. 2011) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996) and U.S. CONST., art. II, § 3)), *aff'd*, 666 F.3d 893 (4th Cir. 2012).

The government's conduct has disturbed that baseline posture of deference.

## B.

The PPA is far from a model of clarity. Congress enacted it in response to *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), and it contains prohibitions, exceptions, and counter-

10

exceptions. Within the same statute, the PPA defines the press differently depending on whether work product materials or documentary materials are at issue. *Compare* 42 U.S.C. § 2000aa(a) ("*a person reasonably believed to have* a purpose to disseminate to the public a newspaper" (emphasis added)) *with id*. § 2000aa(b) ("*a person in connection with* a purpose to disseminate to the public a newspaper" (emphasis added)). The subsection addressing documentary materials also contains the stray clause "other than work product materials," *id*., which read literally, might seem to give the government broader access to work product—a reading that is presumably mistaken. In short, the statute's structure is complex and its drafting leaves interpretive questions unresolved.

At its core, however, the PPA prohibits any government officer from searching for or seizing "work product materials" or "documentary materials" possessed by a person "reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C. § 2000aa(a)–(b). The PPA's coverage extends to anyone engaged in First Amendment-protected communication activities, not just professional journalists. *Id.*

The PPA creates two categories of protected materials. "Work product materials," defined in § 2000aa-7(b), include materials created, prepared, or possessed for the purpose of communicating to the public, such as notes, drafts, photographs, and recorded impressions. These receive the PPA's strongest protection. "Documentary materials," defined in § 2000aa-7(a), encompass all other materials possessed in connection with a public communication purpose and receive somewhat lesser, though still significant, protection.

The PPA embeds a structural preference for subpoenas over search warrants. *See* 42 U.S.C. §§ 2000aa-11, 2000aa-12 (requiring "the least intrusive method or means of obtaining

11

such materials"). A subpoena provides the recipient advance notice and the opportunity to challenge or negotiate production before any materials are seized. A search warrant is unannounced, coercive, and disruptive, potentially exposing confidential sources and chilling newsgathering even where the search yields nothing relevant.

Exceptions permitting a search warrant over a subpoena are narrow. For work product materials, a warrant is permissible only if: (1) there is probable cause to believe the person possessing the materials has committed or is committing the criminal offense to which the materials relate (*i.e.*, the "suspect exception," when the press entity is itself the suspect rather than a third-party holder of evidence); or (2) immediate seizure is necessary to prevent death or serious bodily injury. *Id*. § 2000aa(a)(1)–(2). Notably, the destruction-of-evidence exception does not apply to work product materials—a deliberate congressional choice reflecting the heightened protection work product commands. For documentary materials, the exceptions are somewhat broader and permit a warrant when the materials relate to the destruction of documents. *Id*. § 2000aa(b)(3).

## C.

While the government did not identify or discuss the PPA in its search warrant application, the Court cannot definitively conclude that it would not have authorized a warrant regardless. The Court bases this after-the-fact assessment on the following factors. First, the search warrant application did not state that Ms. Natanson was *not* a target of the criminal investigation—although the Court acknowledges the unresolved legal question of whether the Espionage Act can be applied to a journalist who receives and publishes classified information. The government expressly alleged that Ms. Natanson received classified information from Mr. Perez-Lugones, and its intent towards her was unclear. The Court learned that Ms. Natanson was

not a focus of the investigation only through press reports published the day the warrant was executed.[4] *See, e.g.*, Benjamin Savage et al., *F.B.I. Searches Home of Washington Post Journalist in a Leak Investigation*, N.Y. TIMES (Jan. 14, 2026), https://perma.cc/G93W-XSFS. Second, the Court was persuaded by the allegations in the supporting affidavit that classified national security information had been unlawfully exchanged and that—because the parties had communicated using disappearing messages—evidence could be destroyed. Those facts bear on applicable PPA exceptions, particularly the national security exception for documentary materials. 42 U.S.C. § 2000aa(b)(1)(A).

Even so, had the government disclosed the PPA, the Court may well have rejected the search warrant application and directed the government to proceed by subpoena instead. At the very least, it would have asked more questions.

The government deprived the Court of the opportunity to make those real-time decisions.

---

[4] Clouding the issue, at the February 20, 2026, hearing, the AUSA who submitted the search warrant stated that he did not identify the PPA in the application because he believed the "suspect exception applied," and that he had been "advised between 2013 and 2020 that the PPA did not apply when there was a reason to believe that the individual who maintained the information was involved in the offense." (Feb. 20, 2026, Tr. at 39-41.) The Court finds this explanation inadequate and only highlights why the AUSA should have analyzed the PPA in the application. The government cannot pretextually label a reporter a suspect simply to gather evidence against the actual target. DOJ's governing guidelines between 2013 and 2020 prohibited invoking the suspect exception "if the sole purpose is to further the investigation of a person other than the member of the news media." *See* 28 C.F.R. § 50.10(d)(5) (2016), https://perma.cc/S52Q-BKGD. Such a rule would mean that any invocation of the Espionage Act's receipt provision, *see* 18 U.S.C. § 793(c), would automatically strip a reporter of PPA protection—an interpretation that would render the statute a nullity and cannot be reconciled with Congress's purpose in enacting it. That the AUSA claims to have received contrary advice during the very period when DOJ policy reflected this limitation only underscores the inadequacy of the government's analysis here.

**IV.**

The Court grants the Motion to Intervene. Federal Rule 41(g) provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." FED. R. CRIM. P. 41(g). In the Fourth Circuit, courts have recognized that Rule 41(g) motions provide an appropriate vehicle for challenging government seizures of property, even when a criminal prosecution is pending. *See Baltimore Law Firm*, 942 F.3d 159 (4th Cir. 2019).

Movants timely moved to intervene and have a direct interest in the seized property. The government obtained the property pursuant to a search warrant, making this an appropriate vehicle for a Rule 41(g) challenge. Permitting Movants to intervene also satisfies the Fourth Circuit's guidance in *Baltimore Law Firm* that—in circumstances involving search warrants seeking protected information—the Court should conduct adversarial rather than *ex parte* proceedings. 942 F.3d at 175–76.

**V.**

Having allowed them to intervene, the Court turns to Movants' request for return of property. Rule 41(g) does not set forth a standard "to govern the determination of whether property should be returned," but the test is one of "reasonableness under all the circumstances." FED. R. CRIM. P. 41 advisory committee's note to 1989 amendment.

 Movants argue that the return of their devices is reasonable because the seizure was an unconstitutional prior restraint, or because the government has no legitimate interest in non-responsive material. Movants propose that they or the Court should conduct any review to preserve their First Amendment and attorney-client privileges.

The government argues that no prior restraint has occurred here because the government has not prevented Movants from engaging in any expressive activities in the future. According to the government, "If [Ms. Natanson] wishes to publish a story tomorrow, nothing stops her from doing so." (ECF No. 35 at 16.) The government also argues that it must retain the devices because they contain information that may be used in the prosecution of Mr. Perez-Lugones. It asserts that, "[d]uring the pendency of an ongoing criminal investigation or proceeding, the [movant] bears the burden of demonstrating that the government's retention of the seized property is unreasonable." (*Id*. at 15 (citing *Allen v. Grist Mill Cap. LLC*, 88 F.4th 383, 396 (2d Cir. 2023).) The government proposes that its filter team, with an appropriate protocol, should be permitted to search all of Movants' data because it has a legitimate reason for doing so.

A.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. amend. I. Prior restraints on speech carry a "heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). A prior restraint is "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

The Court rejects the government's argument that its seizure of Ms. Natanson's devices does not implicate the First Amendment simply because no law or court order blocks her speech before its actual expression. In *Zurcher v. Stanford Daily*, the Supreme Court held that the First and Fourth Amendments do not categorically bar search warrants directed at newsrooms. 436 U.S. at 567. But the government reads *Zurcher* too narrowly.

At issue was the validity of a *per se* rule requiring subpoenas rather than warrants whenever press entities hold evidence the government seeks, a rule the Supreme Court declined

to adopt. *Id.* at 565–66. The Supreme Court held, "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude,'" and "a seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Id.* at 564 (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965) and *Roaden v. Kentucky*, 413 U.S. 496, 501 (1973)).

This holding applies with even greater force in today's technological landscape.

*Zurcher* involved a search—not a seizure—of a newspaper office for a handful of photographs. 436 U.S. at 551. The Supreme Court found no prior restraint in those circumstances precisely because the newspaper retained its materials and its ability to publish. The government has seized the entirety of Ms. Natanson's work product: her active stories, her notes on future investigations, and her background and confidential source material that, once compromised, cannot be replaced. (*See* ECF No. 9 at 5.) The government's suggestion that she can simply start from scratch fails to recognize the realities of modern journalism and the value of confidential source relationships cultivated over time.

The Court finds that seizing the totality of a reporter's electronic work product, including tools essential to ongoing newsgathering, constitutes a restraint on the exercise of First Amendment rights. The current "setting" of this case is meaningfully different from *Zurcher*; the Court therefore applies "scrupulous exactitude" in evaluating the competing interests. *Zurcher*, 436 U.S. at 564.

## B.

While Movants' First Amendment rights have been restrained, the inquiry does not end there because the Supreme Court has never recognized absolute press immunity from legal

constraints. *See, e.g.*, *New York Times Co.*, 403 U.S. at 726 (Brennan, J., concurring) (military/national security exception); *Haig v. Agee*, 453 U.S. 280, 308–09 (1981) (private citizen's disclosure of intelligence operations and names of intelligence personnel) (quoting *Near v. Minn. ex rel. Olson*, 283 U.S. 697, 716 (1931) ("[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.")).

The Court must therefore determine whether some restraint is reasonable given the government's compelling interest in collecting evidence of the alleged unlawful disclosure of classified information and in preventing further disclosure of such information.

The government cites several cases in its brief supporting the position that the government may retain property if it has a legitimate reason. *See, e.g.*, *Lavin v. United States*, 299 F.3d 123, 127–28 (2d Cir. 2002). The government's legitimate reason here is twofold. First, the government argues that it needs to obtain evidence for the prosecution of Mr. Perez-Lugones. *See Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir. 1993); *United States v. Pierre*, 484 F.3d 75, 78 (1st Cir. 2007) ("[A] Rule 41(g) motion is properly denied if . . . the government's need for the property as evidence continues." (internal quotations omitted)); *United States v. Garcon*, 406 F. App'x 366, 370 (11th Cir. 2010). The Rule 41 advisory notes confirm that such a purpose is generally reasonable. *See* FED. R. CRIM. P. 41 advisory committee's note to 1989 amendment ("If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable.") Second, the government argues that Movants' devices may contain classified information that cannot be returned. This reason, also, is reasonable, as discussed below.

Movants recognize the government's legitimate interest in retaining responsive information but argue that retaining all seized data is unreasonable because the government has no legitimate interest in non-responsive materials—newsgathering and attorney-client privileged material unrelated to the Perez-Lugones prosecution. (ECF No. 41 at 11.)

Balancing Movants' First Amendment rights and newsgathering rights against the government's compelling interest in its prosecution, the Court finds it reasonable for the government to retain only the limited information responsive to the search warrant—and nothing more.

How to find that limited information and return the rest to Movants is the harder question.

## C.

The most complicating factor is the possibility that classified national security information may be among the seized material. That possibility distinguishes this case from all the prior-restraint precedents on which Movants rely because "no governmental interest is more compelling than the security of the Nation." *United States v. Sterling*, 724 F.3d 482, 509 (4th Cir. 2013) (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)). "This interest extends to 'protecting both the secrecy of information to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.'" *Id.* (quoting *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008)).

The Court therefore cannot simply order the government to return all devices and permit Movants to unilaterally identify material responsive to the search warrant. An appropriate search process must account for the need to identify and protect classified information before any materials are returned.

But that does not mean that in all cases the government gets to conduct that search.

18

D.

*Baltimore Law Firm* is the foundational circuit authority on government filter teams and the most significant appellate opinion on the topic nationally. In that case, the Fourth Circuit held that a magistrate judge erred by approving a filter team protocol in *ex parte* proceedings, without affording the privilege holder an opportunity to be heard. *Baltimore Law Firm*, 942 F.3d at 175–76. The Fourth Circuit also held that the magistrate judge failed to consider that fewer than one percent of the seized records were responsive to the warrant, meaning the filter team would review tens of thousands of privileged communications unrelated to the investigation. *Id.* at 172, 176. The Fourth Circuit identified the "appearance of unfairness" as an independent concern: reasonable members of the public would find it difficult to believe that filter team agents or prosecutors would ignore privileged information they reviewed. *Id.* at 182–83. Prosecutors must ensure not merely that justice is done, but that it appears to be done. *Id.* at 183. As a remedy, the Fourth Circuit directed that a magistrate judge (rather than a government filter team) perform the privilege review. *Id.* at 179–80. Magistrate judges are judicial officers and neutral arbiters with no stake in the investigation's outcome. *Id.* at 181 n.19.

*Baltimore Law Firm* has several parallels to this case and provides instructive guidance anytime the government seizes a large swath of information unrelated to its investigation and that information includes privileged material (attorney-client communications in *Baltimore Law Firm*; First Amendment and attorney-client communications here).

The government acknowledges that it established probable cause to obtain only a small fraction of the material it seized. (Feb. 20, 2026, Tr. at 28.) Allowing the government to search through the entirety of a reporter's work product—when probable cause exists for only a narrow

subset—would authorize an unlawful general warrant. *See Marron v. United States*, 275 U.S. 192, 196 (1927).

Moreover, the appearance problem identified in *Baltimore Law Firm* is amplified here. Given the documented reporting on government leak investigations and the government's well-chronicled efforts to stop them, allowing the government's filter team to search a reporter's work product—most of which consists of unrelated information from confidential sources—is the equivalent of leaving the government's fox in charge of the Washington Post's henhouse. *See Baltimore Law Firm*, 942 F.3d at 177 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006)). The concern that a filter team may err by neglect, by malice, or by honest difference of opinion is heightened where its institutional interests are so directly at odds with the press freedom values at stake. *See id.* at 178.

At the very least, "the unique facts and circumstances of this case preclude [the government's] Filter Team operating under [the government's] Filter Protocol from reviewing the fruits of this search warrant." *Id.* at 183 (Rushing, J., concurring).

The Court's approach is also consistent with the DOJ's own Statements of Policy governing information requests from news media, found in 28 C.F.R. Part 50. Those regulations require that proposed search warrants directed at the press "be narrowly drawn," 28 C.F.R. § 50.10(c)(4)(vi)–(v), that they "should not be used to obtain peripheral, nonessential, or speculative information," *id.* § 50.10(c)(4)(i)(A), and that "investigators should use search protocols designed to minimize intrusion into potentially protected materials or newsgathering activities unrelated to the investigation, including but not limited to keyword searches (for electronic searches)," *id.* § 50.10(d)(4). Permitting the government's filter team to review all of Movants' data would violate these requirements.

Accordingly, the Court rejects the government's request to conduct an unsupervised, wholesale search of all Movants' seized data using a government filter team. To gather the information the government needs to prosecute its criminal case without authorizing an unrestrained search and violating Movants' First Amendment and attorney-client privileges, the Court will conduct the review itself. *Baltimore Law Firm* mandates this result.

E.

No easy remedy exists here. Movants' First Amendment rights have been restrained. The government seized all of Ms. Natanson's work product, documentary material, and devices, terminating her access to the confidential sources she developed and to all the tools she needs as a working journalist. The government's proposed remedy—that she simply buy a new phone and laptop, set up new accounts, and start from scratch—is unjust and unreasonable.

But the Court takes seriously, as it must, that this case involves top secret national security information. The Court does not know where on the spectrum this information falls and whether its disclosure would "inevitably, directly, and immediately" cause harm. *New York Times Co.*, 403 U.S. at 726–27 (Brennan, J., concurring). The Court takes the government at its word, while acknowledging the well-documented concern that the government has at times overclassified information to avoid embarrassing disclosures rather than to protect genuine secrets. *See, e.g.*, COMM'N ON PROTECTING & REDUCING GOV'T SECRECY, REPORT OF THE COMMISSION ON PROTECTING AND REDUCING GOVERNMENT SECRECY, S. Doc. No. 105-2 (1997), https://perma.cc/N4J4-CBMB; Pub. Interest Declassification Bd., Transforming the Security Classification System: Report to the President (Nov. 2012), https://perma.cc/5WEU-W29N.

The Court's genuine hope is that this search was conducted—as the government contends—to gather evidence of a crime in a single case, not to collect information about

confidential sources from a reporter who has published articles critical of the administration. The Court further hopes the record ultimately bears out the government's representations.

**VI.**

For all these reasons, the Court ORDERS as follows:

1.      The Court GRANTS the Motion to Intervene. (ECF No. 8.)

2.      The Court GRANTS in part and DENIES in part the Motion for Return of Property. The Court GRANTS the motion as to all information outside the limited information authorized by the search warrant. All non-responsive information on Movants' devices must be returned to Movants. The Court DENIES the motion with respect to the limited information authorized by the search warrant. The Court DENIES without prejudice Movants' request for the return of the seized devices. That issue is reserved for future proceedings.

3.      The portion of the search warrant authorizing the government to open, access, review, or otherwise examine any of Movants' seized data is RESCINDED.

4.      The Standstill Order (ECF No. 18) remains in effect.

5.      The Court will conduct an independent judicial review of the seized materials. The Court will develop a process for this review in consultation with counsel for the parties.

6.      A status conference is scheduled for March 4, 2026, at 2:00 p.m., in Courtroom 400.

    Entered this 24th day of February 2026

                                                    _____
                                                    William B. Porter
Alexandria, Virginia                                United States Magistrate Judge