**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

In the Matter of the Search of the Real Property
and Premises of Hannah Natanson

No. 1:26-sw-00054-WBP

**<u>REDACTED</u>**

**THE WASHINGTON POST'S AND HANNAH NATANSON'S RESPONSE TO
OBJECTIONS TO MAGISTRATE JUDGE PORTER'S ORDER ON MOTION FOR
<u>RETURN OF PROPERTY</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ..............................................................................................................1

BACKGROUND ................................................................................................................1

I.      Washington Post Reporter Hannah Natanson Cultivates More than 1,200 Confidential Sources in the Federal Government. ...............................................1

II.      Perez-Lugones Allegedly Discloses a Discrete Volume of Purportedly Classified Information That Is Published in the Newspaper. ..............................................2

III.      The Government Departs from the Prior Prohibition Against Compulsory Process for a Journalist's Newsgathering Materials. .........................................................2

IV.      The Government Seizes All Natanson's Electronic Newsgathering Materials, Nearly All of Which Are Unrelated to Perez-Lugones and Protected by the First Amendment and the PPA. ...................................................................................5

V.      The Government Issues an Overlapping Grand Jury Subpoena to The Post. .......7

VI.      The Government Refuses to Return the Privileged Newsgathering Materials. ...................7

VII.      Magistrate Judge Porter Issues an Order Requiring Judicial Review of the Privileged Newsgathering Materials. ...................................................................7

ARGUMENT .....................................................................................................................9

I.      The Government's Objection to a Judicial Privilege Review Should Be Overruled. ...........9

     A.      The Seized Newsgathering Materials Contain a Large Volume of Non-Responsive Privileged Information and an Infinitesimal Volume of Potentially Responsive Information. ........................................................9

           1.      The non-responsive newsgathering materials are protected by the First Amendment. ...................................................................10

           2.      The non-responsive newsgathering materials are protected by the PPA. ......................................................................................12

           3.      The seized materials include information protected by the attorney-client privilege. ...................................................................13

     B.      The Fourth Circuit Mandates a Judicial Privilege Review in These Circumstances and Other Circuits Are in Accord. ..................................13

     C.      The Government's Proposed Filter Team Review Is Prohibited by Fourth Circuit Precedent and the First Amendment. .........................................16

           1.      *Baltimore Law Firm* ...............................................................17

           2.      Review by government agents and prosecutors would impermissibly chill confidential sources and constitute a prior restraint. ...................................................................................19

i

D.      The Government's Objections to a Judicial Privilege Review Provide No Basis to Depart from Fourth Circuit Precedent........................................................24

II.      To the Extent the Government Objects to Return of the Non-Responsive Newsgathering Materials, that Objection Should Be Overruled. ......................................27

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Alexander v. United States*, 509 U.S. 544 (1993) ............................................................21

*Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000)...............................................10

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ................................................................ 10-12

*Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159 (2d Cir. 1992) ...............16

*Chestnut v. Kincaid*, 2022 WL 350117 (D. Md. Feb. 4, 2022) ......................................10

*Church of Scientology Int'l v. Daniels*, 992 F.2d 1329 (4th Cir. 1993).........................10

*Drive In Theaters, Inc. v. Huskey*, 435 F.2d 228 (4th Cir. 1970) ..................................19

*Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989)..............................................21

*Garcia v. Montgomery County*, 145 F. Supp. 3d 492 (D. Md. 2015)...........................19

*Guest v. Leis*, 255 F.3d 325 (6th Cir. 2001)..............................................................13

*Heller v. New York*, 413 U.S. 484 (1973) .............................................................. 20-22

*Horne v. WTVR, LLC*, 893 F.3d 201 (4th Cir. 2018)..................................................10

*In re Gen. Motors Corp.*, 153 F.3d 714 (8th Cir. 1998) ..............................................16

*In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006)..................................... 17-18

*In re Hoover's Residence*, 2010 WL 7351761 ((N.D. W. Va. Dec. 30, 2010) .............................29

*In re Murphy-Brown, LLC*, 907 F.3d 788 (4th Cir. 2018).............................................23

*In re Sealed Search Warrant and Application*, 11 F.4th 1235 (11th Cir. 2021)...................... 15-16

*In re Search of Elec. Commc'ns*, 802 F.3d 516 (3d Cir. 2015) ...............................15, 25

*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019)
   ("*Baltimore Law Firm*") .......................................................................... *passim*

*In re Shain*, 978 F.2d 850 (4th Cir. 1992)..................................................................12

*In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000) ........................................24

*Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955 (3d Cir. 1984)......................25

*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979) ..................................................25

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ......................................................23

*Meyer v. City of Marion*, 776 F. Supp. 3d 991 (D. Kan. 2025) ...................................................20

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974).........................................................22

*Mr. Lucky Messenger Serv., Inc. v. United States*, 587 F.2d 15 (7th Cir. 1978) ..........................29

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ........................................................... 23-24

*Near v. Minnesota*, 283 U.S. 697 (1931) ..............................................................................19, 22

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ..................................................................19, 23

*NLRB v. Interbake Foods, LLC*, 637 F.3d 492 (4th Cir. 2011) .......................................................8

*Roaden v. Kentucky*, 413 U.S. 496 (1973).................................................................................28

*Robinson v. Fetterman*, 378 F. Supp. 2d 534 (E.D. Pa. 2005)............................................... 19-20

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) ..............................................................16

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983)....................................................................11

*United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013)............................................................11

*United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999) .............................................................29

*United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162
    (9th Cir. 2010) (en banc)....................................................................................................26

*United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980)........................................................11

*United States v. Elbaz*, 396 F. Supp. 3d 583 (D. Md. 2019)........................................................18

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997).............................................................18

*United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991).....................................................18

*United States v. Rayburn House Off. Bldg.*, 497 F.3d 654 (D.C. Cir. 2007) ........................ *passim*

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013)........................................................ 11-12

*United States v. Trs. of Bos. Coll.*, 718 F.3d 13 (1st Cir. 2013) ....................................................11

*United States v. Wash. Post Co.*, 446 F.2d 1327 (D.C. Cir. 1971) (en banc) ......................... 23-24

*United States v. Wilson*, 540 F.2d 1100 (D.C. Cir. 1976)............................................................28

*United States v. Zolin*, 491 U.S. 554 (1989)................................................................................8

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ........................................................13

*Washington v. J-R Distribs., Inc.*, 765 P.2d 281 (Wash. 1988) ............................... 20-21

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ................................................ *passim*

## CONSTITUTION

U.S. Const. amend I ........................................................................................ *passim*

U.S. Const. amend IV ..............................................................................................26

U.S. Const. amend VI ..............................................................................................18

## RULES AND STATUTES

Fed. R. Crim. P. 41 ....................................................................................... *passim*

18 U.S.C. App. 3 §§ 1–16.........................................................................................27

18 U.S.C. § 793(e) .....................................................................................................2

42 U.S.C. § 2000aa(1)..........................................................................................3, 12

## INTRODUCTION

The critical facts are undisputed—the government seized a massive volume of newsgathering materials from Washington Post reporter Hannah Nantanson, virtually all of which is non-responsive to the search warrant and implicates the First Amendment and the Privacy Protection Act ("PPA"), and some of which is protected by the attorney-client privilege. The question for this Court to resolve is narrow: Should Magistrate Judge Porter or a so called "filter team" of government prosecutors and agents perform a privilege review of the seized newsgathering materials to isolate for the "prosecution team" the small set of non-privileged documents that are responsive to the warrant? The Fourth Circuit has already answered this question: When the government seizes a large volume of non-responsive potentially privileged materials, either "the magistrate judge (or an appointed special master)—rather than the Filter Team—must perform the privilege review of the seized materials." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 181 (4th Cir. 2019) ("*Baltimore Law Firm*"). And filter team review is particularly inappropriate here because it would be an unconstitutional prior restraint, chilling Natanson's reporting about her more than 1,200 confidential federal government sources who are entirely irrelevant to this matter. The Court should overrule the objections.

## BACKGROUND

### I.    Washington Post Reporter Hannah Natanson Cultivates More than 1,200 Confidential Sources in the Federal Government.

Natanson is an award-winning investigative journalist at The Post who covers the Trump administration's transformation of the federal government. *See* ECF No. 9-1 (Natanson Decl.) ¶¶ 2-4. She won a Peabody Award in 2024 and was part of a team of Post journalists who won the Pulitzer Prize for Public Service in 2022. *See id.* ¶ 3. Over the past year, Natanson gained more than 1,200 confidential sources—federal employees from more than 120 agencies or

subagencies who requested anonymity because they "fear retribution from the government due to their disclosures." *Id.* ¶¶ 5-6, 39. These sources' contributions resulted in Natanson writing or co-writing "more than 200 articles across roughly twenty news desks." *Id.* ¶ 7.

## II. Perez-Lugones Allegedly Discloses a Discrete Volume of Purportedly Classified Information That Is Published in the Newspaper.

According to the government, Aurelio Luis Perez-Lugones was a government contractor with a Top Secret security clearance. *See* Indictment ¶¶ 1-2, *United States v. Perez-Lugones*, No. 26-cr-30 (D. Md. Jan. 22, 2026), ECF No. 25. The government alleges that within a narrow date range, October 2025 to January 2026, Perez-Lugones disclosed classified information to Natanson, who contributed to five articles that "contained classified information." *Id.* ¶ 4. The government further alleges that Perez-Lugones disclosed five purportedly classified documents and notes of purportedly classified information to Natanson, who allegedly published information from four of the documents and the notes. *Id.* ¶¶ 14-26. On January 8, 2026, the government arrested Perez-Lugones, alleging that he unlawfully mishandled national defense information in violation of 18 U.S.C. § 793(e). *See* ECF No. 9-7 (Perez-Lugones Complaint and Affidavit).

## III. The Government Departs from the Prior Prohibition Against Compulsory Process for a Journalist's Newsgathering Materials.

Searches and seizures of journalists' newsgathering materials are exceedingly rare and have been subject to harsh criticism.[1] Following a police raid of a Stanford University student

---

[1] *See, e.g.*, Katherine Jacobsen, *"This Kind of Behavior Cannot Be Tolerated": Police Raid on Kansas Newspaper Alarms Media, Press Freedom Groups*, Comm. to Protect Journalists (Aug. 14, 2023), https://tinyurl.com/yc35d5as; Caitlin Vogus, *Kansas County Pays $3M for Forgetting the First Amendment*, Freedom of the Press Found. (Nov. 12, 2025), https://tinyurl.com/4ruufb7z; *Justice Search Warrant Relied on "Probable Cause" of Criminal Conduct by Fox News Journalist*, Reps. Comm. for Freedom of the Press (May 22, 2013), https://tinyurl.com/yw95etvz (describing warrant for reporter's personal email as "downright chilling" and "appalling"). Disclosures by confidential government sources have resulted in some of the most consequential investigative journalism in history. Military analyst Daniel Ellsberg leaked portions of the Pentagon Papers to the *New York Times* and The Post, enabling the newspapers to reveal

newspaper, *see Zurcher v. Stanford Daily*, 436 U.S. 547, 551 (1978), Congress enacted the PPA, decrying news media raids for their "chilling effect on the ability of reporters to develop sources and pursue stories." Privacy Protection Act of 1980 Statement on Signing S. 1790 Into Law, The Am. Presidency Project (Oct. 14, 1980), https://tinyurl.com/pjtsvd9t. The PPA, subject to limited exceptions, makes it "unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials" possessed by a person "reasonably believed to have a purpose to disseminate to the public a newspaper." 42 U.S.C. § 2000aa(a).

In 2021, the Attorney General issued a memorandum prohibiting the issuance of compulsory process to members of the news media for newsgathering materials, including "when a member of the news media has, in the course of newsgathering, only possessed or published government information, including classified information." July 19, 2021 Atty. Gen. Mem., https://tinyurl.com/4xajtbex. In April 2025, the Attorney General rescinded the previous administration's prohibition. *See* April 25, 2025 Atty. Gen. Mem., https://tinyurl.com/mrb42msw; 28 C.F.R. § 50.10 (2025). But in doing so, the Attorney General still acknowledged that "investigative techniques relating to newsgathering are an extraordinary measure to be deployed as a last resort when essential to a successful investigation or prosecution." *Id.*

In this case, however, the government sought a search warrant as a first resort, even though,

---

government lies "of a generational scale" about the Vietnam War. Elizabeth Becker, *The Secrets and Lies of the Vietnam War, Exposed in One Epic Document*, N.Y. Times (June 9, 2021), https://tinyurl.com/5b4rphmj; Christopher B. Daly, *Fifty years ago the Pentagon Papers shocked America — and they still matter today*, Wash. Post (June 13, 2021), https://tinyurl.com/2pxx2b8m. And a source by the name Deep Throat, a high-ranking FBI official secretly assisted Bob Woodward and Carl Bernstein in uncovering the Watergate scandal. David Von Drehle, *FBI's No. 2 Was 'Deep Throat': Mark Felt Ends 30-Year Mystery of The Post's Watergate Source*, Wash. Post (June 1, 2005), https://tinyurl.com/4hn6azu2.

accepting its allegations as true, it already appeared to have evidence essential to prosecute Perez-Lugones, including, among other things, ▮▮▮▮▮▮▮▮▮▮, communications showing he transmitted documents marked classified, and a classified document seized from his lunch box. ▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF No. 39 (Redacted Search Warrant Aff.) ¶¶ 15-16, 17. On January 12, despite having allegedly obtained this evidence already, the government applied for a search warrant of Natanson's residence. ECF No. 62 (Order) at 4. Magistrate Judge Porter was "concerned about both the scope of the proposed search warrant and the government's apparent attempt to collect information about Ms. Natanson's confidential sources." *Id.* Magistrate Judge Porter rejected the initial "proposed search warrant and explained [his] concerns to the AUSA and the Principal Deputy Assistant Attorney General of the National Security Division." *Id.*

On January 13, the government submitted another proposed search warrant, which Magistrate Judge Porter "also rejected." *Id.* "Over the next five hours, the Court held multiple in-person and telephone conferences with the AUSA, who presented successive versions of the proposed warrant, until the Court ultimately approved a search warrant . . . ." *Id.* Notwithstanding these "multiple conversations with counsel for the government over the course of two days," the government did not alert Magistrate Judge Porter to the PPA's general prohibition against search warrants for newsgathering materials. Tr. of Feb. 20, 2026 Hearing at 34. Magistrate Judge Porter later ruled that "had the government disclosed the PPA, the Court may well have rejected the search warrant application and directed the government to proceed by subpoena instead." ECF No. 62 at 13.

Despite this record, the government argues that it would violate the separation of powers for Magistrate Judge Porter, having been advised of the PPA by Movants' counsel, to order a

4

judicial review process designed to protect the seized newsgathering materials the government now admits are covered by the PPA. *See* ECF No. 74 (Gov't Objections) at 30 (conceding that the seized data "almost certainly includes PPA-protected materials").

**IV.    The Government Seizes All Natanson's Electronic Newsgathering Materials, Nearly All of Which Are Unrelated to Perez-Lugones and Protected by the First Amendment and the PPA.**

On January 14, at approximately 6:00 AM, FBI agents executed the search warrant at Natanson's residence. *See* ECF No. 9-5 (Search and Seizure Warrant); ECF No. 9-1 ¶ 11. "This is the first time the U.S. Justice Department has raided a journalist's home in connection with a national security leak investigation." Chris Young & Emily Vespa, *The FBI Search of a Washington Post Reporter's Home: What We Know and Why it Matters*, Reps. Comm. for Freedom of the Press (Jan. 16, 2026), https://tinyurl.com/4wfs62db.

The warrant authorized the seizure of "[a]ll digital devices, other electronic storage media, or components of either identified during the searches that are reasonably believed to be used by Natanson." ECF No. 9-5. The FBI agents ultimately seized the following items: (1) a MacBook Pro that is owned by The Post and that Natanson used for work; (2) a second MacBook Pro that Natanson personally owns but also used for work; (3) an iPhone that The Post owns and that Natanson used for work; (4) a portable hard drive; (5) a Garmin watch that Natanson owns; and (6) a voice recorder that The Post owns and that Natanson used for work. ECF No. 9-6 (Receipt for Property); ECF No. 9-1 ¶ 14. The FBI later processed the portable hard drive and recorder, and created a limited image of the first MacBook Pro. ECF No. 35-1 (Rozhavsky Decl.) ¶¶ 37-38. The FBI could not access the iPhone or the second MacBook. *Id.* ¶¶ 35-36.

The government seized six devices, which together are capable of storing multiple terabytes of data. Natanson's devices contain essentially her entire professional universe: more than 30,000 Post emails from the last year alone, confidential information from and about sources

5

(including her sources and her colleagues' sources), recordings of interviews, notes on story concepts and ideas, drafts of potential stories, communications with colleagues about sources and stories, and The Post's content management system that houses all articles in progress. ECF No. 9-1 ¶¶ 8, 16-35. The devices also housed Natanson's encrypted Signal messaging platform that she used to communicate with her more than 1,200 sources. *Id.* ¶ 43. Without her devices, she "literally cannot contact" these sources. *Id.* ¶ 43. Prior to the seizure, she would receive somewhere between dozens and over 100 tips from her sources via Signal *per day*. *Id.* ¶ 39. In short, the devices are critical to her ability both to function as a journalist and to collaborate with her colleagues in the newsroom. *Id.* ¶¶ 40-41. The data also includes privileged communications with Post attorneys, *id.* ¶ 34, and details of Natanson's personal life, "including medical information, financial information, and even information about [her] wedding planning." *Id.* ¶ 25.

The government seized this proverbial haystack in an attempt to locate a needle. The search warrant orders that the government's search of the seized data "must be limited to all records and information . . . from the time period October 1, 2025, to the present, which constitute records received from or relating to Aurelio Luis Perez-Lugones." ECF No. 9-5. Even the government cannot expect to find many records responsive to the warrant in this ocean of data because it alleges that Perez-Lugones disclosed only a small number of documents potentially containing classified information. Meanwhile, Natanson's public reporting encompasses a large body of work that overwhelmingly has nothing to do with the subject matter of these documents and is supported by thousands of communications across her more than 1,200 sources. *See* ECF No. 9-1 ¶ 39. And her devices contain years of data about past and current confidential sources and other unpublished materials. *See id.* ¶¶ 17-18, 20, 32-33, 35; ECF No. 9-2 (Roberson Decl.) ¶¶ 7-9, 11. At best, the

6

government has a legitimate interest in only an infinitesimal fraction of the newsgathering data it has seized. *See* ECF No. 9-1 ¶ 38.

**V.      The Government Issues an Overlapping Grand Jury Subpoena to The Post.**

The same day the FBI raided Natanson's residence, the government issued a grand jury subpoena to The Post seeking substantially the same items as those particularized in the search warrant. *See* ECF No. 9-8 (Grand Jury Subpoena). Nothing prevented the government from issuing a subpoena to Natanson instead of executing a search warrant.

**VI.     The Government Refuses to Return the Privileged Newsgathering Materials.**

The day the FBI raided Natanson's residence, counsel for The Post advised the government that the seized items included privileged materials. *See* ECF No. 9-9 (Email). The parties conferred between January 15 and 20, but the government refused to return any of the newsgathering materials and refused to implement a protocol to protect information covered by the First Amendment and the PPA. ECF No. 9-4 (Latcovich Decl.) ¶¶ 10-15. Undersigned counsel informed the government that they would seek judicial relief within twenty-four hours and asked the government to refrain from beginning its review until the Court could rule, noting that Judge Rushing had previously written in *Baltimore Law Firm* that this was a "sensible procedure." *See id.* ¶ 16 (quoting 942 F.3d at 184 (Rushing, J., concurring)). The government refused. *Id.* ¶ 17.

**VII.    Magistrate Judge Porter Issues an Order Requiring Judicial Review of the Privileged Newsgathering Materials.**

On January 21, The Post and Natanson moved to intervene and for return of property pursuant to Rule 41(g). ECF No. 9 (Br.). Movants argued, first, that all seized materials should be returned because the seizure was an unconstitutional prior restraint. *Id.* at 12-17. In the alternative, they sought return only of the non-responsive newsgathering materials, with judicial oversight of the return process. *Id.* at 17-26. Movants argued that their counsel, with appropriate

security clearances, should conduct the privilege review.  ECF No. 40 (Reply) at 19-20.[2]  The government opposed the motion and argued that a privilege review conducted by a government filter team would adequately protect the privileged information.  ECF No. 35 (Opp.).  To preserve the status quo while the parties briefed the issues, Magistrate Judge Porter granted Movant's request for a standstill order, ordering that the government could preserve "but must not review" the seized materials.  ECF No. 18 (Standstill Order).

On February 24, Magistrate Judge Porter issued an order (the "Order") denying Movant's request for return of all seized materials but granting their alternative request for return of the non-responsive materials.  ECF No. 62 at 22.  Magistrate Judge Porter emphasized that the government's failure to disclose and analyze the PPA in its warrant application "seriously undermined the Court's confidence in the government's disclosures in this proceeding," adding that if it had done so, the Court may have denied the warrant application entirely.  *Id.* at 9, 13.  The Court found that "Movants' First Amendment rights have been restrained."  *Id.* at 21.  By seizing "all of Ms. Natanson's work product, documentary material, and devices," the government terminated "her access to the confidential sources she developed and to all the tools she needs as a working journalist."  *Id.*  Magistrate Judge Porter rejected the government's proposed use of a filter team to conduct a privilege review of the seized newsgathering materials.  Instead of allowing Movant's counsel to conduct that review, the Court selected a middle ground, following *Baltimore Law Firm*, in which "the Fourth Circuit directed that a magistrate judge (rather than a government filter team) perform the privilege review."  *Id.* at 19.

---

[2] They noted that even *in camera* judicial review of potentially privileged materials is not permitted absent a threshold showing that such review is appropriate.  ECF No. 40 at 17 n.9 (citing *United States v. Zolin*, 491 U.S. 554, 570 (1989); and *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 502 (4th Cir. 2011)).  Movants maintain these positions.

## ARGUMENT

**I.      The Government's Objection to a Judicial Privilege Review Should Be Overruled.**

The government objects to the portion of the Order requiring a judicial privilege review, and the government insists that its filter team should conduct the privilege review. This objection is foreclosed by Fourth Circuit precedent, *see Baltimore Law Firm*, 942 F.3d at 181 (holding that "the magistrate judge (or an appointed special master)—rather than the Filter Team—must perform the privilege review of the seized materials"), and by the First Amendment.

**A.      The Seized Newsgathering Materials Contain a Large Volume of Non-Responsive Privileged Information and an Infinitesimal Volume of Potentially Responsive Information.**

Magistrate Judge Porter found, and it is not disputed, that the government "seized the entirety of Ms. Natanson's work product: her active stories, her notes on future investigations, and her background and confidential source material that, once compromised, cannot be replaced" and that the government "established probable cause to obtain only a small fraction of the materials it seized." ECF No. 62 at 16, 19. Because the seized newsgathering materials include a large volume of non-responsive privileged information, the parties agree that an initial privilege review is necessary before any responsive documents are released to the "prosecution team." The government argues that government agents and prosecutors who are part of a so called filter team should conduct that privilege review. Magistrate Judge Porter, following the Fourth Circuit's decision in *Baltimore Law Firm*, held that, in these circumstances, a judicial privilege review is necessary to avoid "violating Movants' First Amendment and attorney-client privileges." ECF No. 62 at 21. Judge Porter wrote that *Baltimore Law Firm* "provides instructive guidance anytime the government seizes a large swath of information unrelated to its investigation and that information includes privileged information (attorney-client communications in *Baltimore Law Firm*; First Amendment and attorney-client communications here)." *Id.* at 19.

9

        **1.**       **The non-responsive newsgathering materials are protected by the First Amendment.**

Magistrate Judge Porter correctly held that the seized devices contain reporting materials subject to a First Amendment privilege. These non-responsive newsgathering materials, which are (by definition) unrelated to the criminal investigation of Perez-Lugones, are privileged.

The Fourth Circuit "recognizes a qualified 'journalist's privilege,'" also known as a reporter's privilege, "that protects the media" from compelled disclosure of confidential sources and unpublished newsgathering materials. *Horne v. WTVR, LLC*, 893 F.3d 201, 212-13 (4th Cir. 2018). Such compelled disclosure "restrain[s]" the "free flow of newsworthy information" and "hamper[s]" the "public's understanding of important issues and events . . . in ways inconsistent with a healthy republic." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000). Courts in this Circuit have repeatedly applied the reporter's privilege to prevent disclosure of the kinds of records at issue here. *See, e.g.*, *Horne*, 893 F.3d at 212-13 (identity of confidential source); *Ashcraft*, 218 F.3d at 287-88 (confidential sources); *Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1335 (4th Cir. 1993) (editors' notes, tapes, and draft articles); *Chestnut v. Kincaid*, 2022 WL 350117, at *1, *3-4 (D. Md. Feb. 4, 2022) ("audio or video recordings" for an article).

Although the reporter's privilege in the Fourth Circuit is not absolute, the government has no plausible argument here that "society's need for the confidential information" that is *not* responsive to the warrant "outweighs the intrusion on the reporter's First Amendment interests." *Ashcraft*, 218 F.3d at 287 (citing *Branzburg v. Hayes*, 408 U.S. 665, 690 (1972) (discussing privilege in criminal context)). In assessing whether the privilege is overcome, the Fourth Circuit considers "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." *Id.* (citation omitted). Any attempt to defeat the reporter's privilege for the non-responsive newsgathering

materials would be stalled at the first prong.  The *non-responsive* newsgathering materials—which include information about Natanson's 1,200 sources, information about her colleagues' sources, conversations with sources, notes, recordings, draft articles, and similar materials—are *by definition irrelevant*, having nothing to do with the government's criminal investigation of Perez-Lugones.

The government argues that under Fourth Circuit law, "reporters have no privilege different from that of any other citizen when asked to provide evidence of crimes to the Government," ECF No. 74 at 21, suggesting, incorrectly, the Magistrate Judge failed to consider *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013).  But the government grossly overreads *Sterling*.  Its argument on the reporter's privilege is wrong for at least two reasons.

First, the Fourth Circuit has not held in *Sterling* or any other criminal case that the government is permitted to trample over a reporter's privilege by reviewing unpublished newsgathering materials and confidential source information that are *irrelevant* to the criminal investigation.  To the contrary, in language the government ignores, the Fourth Circuit in *Sterling* cautioned that journalists cannot be compelled to "give information bearing only a remote and tenuous relationship to the subject of the investigation," or information that "implicates confidential source relationships without a legitimate need."  *Id.* at 498-99 (quoting *Branzburg*, 408 U.S. at 709-10 (Powell, J., concurring)).[3]  That is precisely what the government has taken here with its sweeping seizure of privileged, beyond-the-scope newsgathering materials.  And the Fourth Circuit has further warned that the privilege will protect against efforts to "to disrupt a

---

[3] This is in accord with several other circuits, which hold that a qualified First Amendment privilege generally applies in criminal cases. *See, e.g.*, *United States v. Trs. of Bos. Coll.*, 718 F.3d 13 (1st Cir. 2013); *United States v. Burke*, 700 F.2d 70 (2d Cir. 1983); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980); *United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013).

11

reporter's relationship with his news sources," *id.* at 494 (emphasis omitted) (quoting *Branzburg*, 408 U.S. at 707-08), which must prevent the government from threatening to burn 1,200 confidential government sources because it has indicted one individual.

Second, the government ignores that *Sterling* involved *subpoenaed testimony*, not *seized documents*. *Id.* at 490; *see also In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992) (testimonial subpoena). A subpoena does not allow the government to review non-responsive, privileged newsgathering materials that are irrelevant to the criminal proceeding. To the contrary, the privilege holder, in responding to a subpoena, determines what is responsive and what is privileged, and can be compelled to disclose information claimed to be privileged only after a judicial determination of privilege. Thus, *Sterling* ensured room for judicial review and careful consideration of privilege, which is what Magistrate Judge Porter ordered here.

### 2. The non-responsive newsgathering materials are protected by the PPA.

The government concedes that the seized data "almost certainly includes PPA-protected materials." ECF No. 74 at 30; *see also id.* at 27 n.9 (acknowledging that government review of the data "might implicate material related to Ms. Natanson's journalistic activities and/or material that is expressly protected from search by the PPA"). The PPA makes it "unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials" or "documentary materials." 42 U.S.C. § 2000aa(a)-(b). The PPA exempts searches and seizures of work product or documentary materials related to alleged violations of the Espionage Act. *See, e.g.*, 42 U.S.C. § 2000aa(1). The only data that even arguably could fall into that category would be material related to Perez-Lugones. And even then, the seized work product and documentary material that is outside the scope of the warrant remains protected.

The Sixth Circuit has flagged the risks relating to the search of intermingled information that includes both PPA-protected and non-PPA protected material. *Guest v. Leis*, 255 F.3d 325, 341-42 (6th Cir. 2001). In that case, the court did "not find liability under the PPA for seizure of the PPA-protected materials," but emphasized—in language the government omits, even as it cites *Guest*, *see* ECF No. 74 at 30—"that *police may not then search the PPA-protected materials that were seized incidentally to the criminal evidence.*" *Id.* at 342 (emphasis added). Magistrate Judge Porter's Order prevents law enforcement from doing just that.

> **3.     The seized materials include information protected by the attorney-client privilege.**

It is undisputed that the seized materials also include privileged attorney-client communications, as well as privileged communications between Natanson and her physician. *See* ECF No. 9-1 ¶¶ 25, 34; ECF No. 9-4 ¶¶ 9, 12-14. "[T]he attorney-client privilege is 'the oldest of the privileges for confidential communications known to the common law.'" *Baltimore Law Firm*, 942 F.3d at 172-73 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Law enforcement officials should not be permitted to review the substance of these privileged materials. *See, e.g.*, *id.* at 183 (enjoining post-seizure review protocol that authorized government review of potentially privileged materials because "[f]ederal agents and prosecutors rummaging through law firm materials that are protected by the attorney-client privilege and the work-product doctrine is at odds with the appearance of justice").

> **B.     The Fourth Circuit Mandates a Judicial Privilege Review in These Circumstances and Other Circuits Are in Accord.**

The Fourth Circuit requires a judicial privilege review and return process when the government seizes a significant volume of potentially privileged materials. *See Baltimore Law Firm*, 942 F.3d at 181. Here, as in *Baltimore Law Firm*, it undisputed that the potentially responsive documents constitute a small fraction of the overall data. *Compare* ECF No. 9-1 ¶¶ 16,

37 (Natanson sent and received more than 30,000 emails last year and never emailed with Perez-Lugones), *with Baltimore Law Firm*, 942 F.3d at 168 (116 of 52,000 emails were responsive). And because the government seized data belonging to a newspaper and its journalist, as in the case of a law firm/lawyer seizure, much of the non-responsive data is privileged. *See, e.g.*, ECF No. 9-1 ¶¶ 37, 39 (communications with more than 1,200 irrelevant confidential sources occurring via Signal). The Fourth Circuit held that under these circumstances either "the magistrate judge (or an appointed special master)—rather than the Filter Team—must perform the privilege review of the seized materials." *Baltimore Law Firm*, 942 F.3d at 181.

The only other federal Circuit Court to address the propriety of a government filter team review when the government seizes a large volume of potentially privileged materials similarly rejected the use of a filter team. In *United States v. Rayburn House Office Building*, 497 F.3d 654 (D.C. Cir. 2007), a warrant authorized seizure of documents from a congressional office and provided for government filter team review to determine whether any seized documents "were subject to the Speech or Debate Clause privilege or other privilege." *Id.* at 656-57. The congressman moved for return of property pursuant to Rule 41(g) and opposed the use of a filter team to conduct the privilege review. The D.C. Circuit ordered return and required the congressman and the district court to conduct the privilege review. First, the district court was required to provide "copies of all the seized documents to the Congressman." *Id.* at 658. Thereafter, the district court, "using the copies of computer files[,]" was to "search for the terms listed in the warrant, and provide a list of responsive records to [the] Congressman"; the Congressman then had "an opportunity to review the records and, within two days, to submit, *ex parte*, any claims that specific documents are legislative in nature"; and, finally, the district court

14

was to "review *in camera* any specific documents or records identified as legislative and make findings regarding whether the specific documents or records are legislative in nature." *Id.*

The two Circuit Court cases cited by the government, *see* ECF No. 74 at 26-27, provide no support for the use of a filter team where, as here, the government seizes a large volume of non-responsive potentially privileged documents. If anything, those cases support the judicial review process ordered by Magistrate Judge Porter. The first case cited by the government, *In re Search of Electronic Communications*, 802 F.3d 516 (3d Cir. 2015), did not even approve of the use of a government filter team (sometimes called a taint team) because the privilege holder there did "not argue that the use of a taint team is inappropriate." *Id.* at 530 n.53. The Third Circuit nevertheless noted, sua sponte, that "courts have limited the circumstances in which prosecutors may employ taint teams during criminal investigations." *Id.* And it affirmatively endorsed the privilege review process ordered by Magistrate Judge Porter, writing, "[o]f course, *a court always retains the prerogative to require* a different method of review in any particular case, such as requiring *the use of a special master or reviewing the seized documents* in camera *itself*." *Id.* (emphasis added).

The second case, *In re Sealed Search Warrant and Application*, 11 F.4th 1235 (11th Cir. 2021), meanwhile, expressly noted that the facts there were "unlike in *Baltimore Law Firm*" (or the present case) where "the majority of the seized materials were both privileged and irrelevant to the subject of the investigation." *Id.* at 1251. In any event, that case *did not permit* a government filter team to conduct an initial privilege review like the government insists should happen here. Rather, the process there required the *privilege holders* "to conduct the initial privilege review." *Id.* at 1249.[4]

---

[4] The filter team in that case was only permitted to review items listed on a privilege log in the event of a privilege dispute, *id.* at 1243, but allowing the government to review documents identified on a privilege log prior to a judicial determination of privilege plainly violates the

15

C.    **The Government's Proposed Filter Team Review Is Prohibited by Fourth Circuit Precedent and the First Amendment.**

The government's filter team proposal, if accepted, would impermissibly allow one litigation party to review an opposing party's privileged documents to make privilege determinations in lieu of the Court. *See Baltimore Law Firm*, 942 F.3d at 175-77. Here, the government proposes ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ The government asserts that it is entitled to "open each file on the computer and view its contents" to determine whether it is "related to Perez-Lugones's violations." ECF No. 35 at 10; *see also id.* at 9 ("It is also reasonable and lawful for the Government to search the entirety of the devices . . . .").

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

attorney-client privilege. Other courts have granted mandamus relief blocking such review in similar circumstances. *See Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 166 (2d Cir. 1992) ("[R]equiring a litigant to turn over documents subject to a claim of attorney-client privilege to opposing counsel, without a judicial ruling on the merits of the claim, will undermine the attorney-client privilege."); *In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998) ("Until it is established that the crime/fraud exception applies, the district court may not compel disclosure of allegedly privileged communications to the party opposing the privilege."). That *In re Sealed Search Warrant* involved compelled disclosure to prosecutors as opposed to civil litigants makes no difference because there is no law enforcement exception to the attorney-client privilege. *See Swidler & Berlin v. United States*, 524 U.S. 399, 408-09 (1998) ("[T]here is no case authority for the proposition that the privilege applies differently in criminal and civil cases.").



The government's proposal runs afoul of both the binding principles set forth in *Baltimore Law Firm* and the First Amendment in multiple ways.

### 1.    *Baltimore Law Firm*

*First*, the government's proposal "erroneously authorize[s] the executive branch—that is, the Filter Team—to make decisions on attorney-client privilege and the work-product doctrine," *Baltimore Law Firm*, 942 F.3d at 177, as well as on First Amendment and PPA protections. The resolution of privilege disputes, however, "is a judicial function." *Id.* at 176. "[A] court simply cannot delegate its responsibility to decide privilege issues to another government branch," "especially when the executive branch is an interested party in the pending dispute." *Id.* at 176-77. The proper procedure, particularly where a constitutional privilege is at stake, is to afford the privilege holder "an opportunity to assert the privilege," and obtain a judicial determination of privilege, "prior to disclosure of privileged materials to the Executive." *Rayburn*, 497 F.3d at 663.

*Second*, a filter team cannot be entrusted with this review because filter teams have conflicting interests and lack institutional competence to adjudicate the privileges at stake, and history proves that filter teams do not work. A filter team "possesses a conflicting interest in pursuing the investigation, and . . . some [filter] team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that [filter] teams pose a serious risk to holders of privilege." *Baltimore Law Firm*, 942 F.3d at 177 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006)) (alterations in *Baltimore Law Firm*). Filter team members also "'might

17

have a more restrictive view of privilege' than the subject of the search, given their prosecutorial interests in pursuing the underlying investigations," which could "cause privileged documents to be misclassified and erroneously provided to an investigation or prosecution team." *Id.* (quoting *In re Grand Jury Subpoenas*, 454 F.3d at 523). This point has particular salience here where the government has declined to admit that the First Amendment protection in Ms. Natanson's seized materials should limit its review. ECF No. 74 at 21. The Fourth Circuit further recognized in *Baltimore Law Firm* that filter teams "have been implicated . . . in leaks of confidential information to prosecutors," 942 F.3d at 177 (quoting *In re Grand Jury Subpoenas*, 454 F.3d at 523), and it cited the notorious examples in the *Noriega* and *Elbaz* cases. *Id.* at 177-78 (citing *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991); and *United States v. Elbaz*, 396 F. Supp. 3d 583 (D. Md. 2019)). Filter teams do not work because they leave "the government's fox in charge of guarding the [privilege holder's] henhouse," *id.* at 178—in this case a henhouse populated with hundreds of confidential sources critical of the government's fox.

*Third*, allowing a filter team to review potentially privileged documents disregards the privileges at stake. *Id.* at 179 (allowing "government agents and prosecutors to rummage through" potentially privileged files, many of which were non-responsive, was in "disregard of the attorney-client privilege, the work-product doctrine, and the Sixth Amendment"); *see also United States v. Neill*, 952 F. Supp. 834, 840-41 (D.D.C. 1997) (government agent's reading of materials during execution of a search warrant was a "deliberate and intentional" violation of the attorney-client privilege). "[A]n adverse party's review of privileged materials seriously injures the privilege holder." *Baltimore Law Firm*, 942 F.3d at 175. "And that harm is plainly irreparable, in that the Filter Team's review of those privileged materials cannot be undone." *Id.*

18

### 2.    Review by government agents and prosecutors would impermissibly chill confidential sources and constitute a prior restraint.

Because this is a very public matter, allowing a filter team to review The Post's newsgathering materials will cause an additional significant harm—it will discourage confidential sources from confiding in The Post and in Natanson. *See Baltimore Law Firm*, 942 F.3d at 175 n.16 (stating that "adverse publicity about the search of the Law Firm, the Filter Team, and its Protocol could make potential clients less likely to seek out and retain the Firm. Additionally, potential and current clients might be reluctant to candidly communicate with the Law Firm attorneys because they fear government review of their communications and breaches of confidentiality."). This would constitute an unconstitutional prior restraint because it would needlessly chill Movants' future newsgathering efforts from these sources when there are less restrictive alternatives available, i.e., review by the Court.

The First Amendment's "chief purpose" is "to prevent previous restraints upon publication." *Drive In Theaters, Inc. v. Huskey*, 435 F.2d 228, 229 (4th Cir. 1970) (quoting *Near v. Minnesota*, 283 U.S. 697, 713 (1931)). Because prior restraints "are the most serious and least tolerable infringement on First Amendment rights," they are viewed "with a heavy presumption against [their] constitutional validity." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976) (citation omitted).

Government seizures of newsgathering materials that substantially impair or prevent future publication of news constitute prior restraints. *See, e.g., Garcia v. Montgomery County*, 145 F. Supp. 3d 492, 511 (D. Md. 2015) (seizure of reporter's recording of police activity is an unconstitutional prior restraint); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005) ("[T]o the extent that the troopers were restraining [the plaintiff] from making any future videotapes and from publicizing or publishing what he had filmed, the defendants' conduct clearly

19

amounted to an unlawful prior restraint upon his protected speech"); *Meyer v. City of Marion*, 776 F. Supp. 3d 991, 1037 n.22 (D. Kan. 2025) ("[P]laintiffs have stated a plausible claim that defendants violated their First Amendment rights by physically invading the *Record*'s office and interfering with the *Record*'s ability to gather and publish the news."); *see also, e.g.*, *Washington v. J-R Distribs., Inc.*, 765 P.2d 281, 287-89 (Wash. 1988) (collecting U.S. Supreme Court cases including *Heller v. New York*, 413 U.S. 484 (1973), and holding on return of property motion that mass seizure of allegedly obscene material pursuant to a warrant but without a prior adversarial determination was a prior restraint).[5]

Here, as Magistrate Judge Porter recognized, "Movants' First Amendment rights have been restrained." ECF No. 62 at 21. The government "seized the entirety of Ms. Natanson's work product: her active stories, her notes on future investigations, and her background and confidential source material that, once compromised, cannot be replaced." *Id.* at 16.[6]

---

[5] *See Zurcher*, 436 U.S. at 567 (considering whether a newsroom search created a "realistic threat of prior restraint or of any direct restraint whatsoever on the publication of the [newspaper] or on its communication of ideas"). In *Zurcher*, police conducted a limited search of a student newspaper for "news photographs taken in a public place." *Id.* While the Court contemplated but did not find a prior restraint, the facts were entirely different. Most importantly, there was no seizure at all: "*no materials were removed from the Daily's office*," and the reporters could continue their work. *Id.* at 552 (emphasis added). Notably, there was such widespread criticism of the outcome of the case that Congress subsequently passed the PPA, which generally prohibits such raids.

[6] The undisputed record supports this finding. Natanson no longer has access to her communications with her more than 1,200 confidential sources who have nothing to do with this case, which were primarily housed within her Signal app. ECF No. 9-1 ¶ 43. Prior to the raid, Natanson—a truly prolific reporter—received an average of dozens to over 100 tips per day from these sources. *Id.* ¶ 39. Since the raid, that number has dropped to essentially zero. *Id.* Relatedly, the government's seizure severely hampered Natanson's ability to receive tips about new topics from those sources. *Id.* ¶ 45. These limitations have also hurt The Post, which relies on Natanson's vast and unique sourcing to generate and support news coverage across the newsroom. In the past year alone, Natanson authored or co-authored roughly 200 articles across more than twenty news desks, *see id.* ¶ 7, an exceptionally high number.

20

A process that would allow law enforcement to review Movants' newsgathering materials would constitute a prior restraint because the risk of exposure would needlessly impair their relationships with Natanson's more than 1,200 confidential federal sources. Natanson's confidential sources chose to "communicate via secure messaging services such as Signal *because they fear[ed] retribution from the government due to their disclosures*" and were willing to disclose information based on an expectation of confidentiality. ECF No. 9-1 ¶¶ 39, 46 (emphasis added). If the government is permitted to rummage through the records related to these sources—who indisputably have nothing to do with Perez-Lugones—it will chill or destroy Movants' source relationships, causing enormous "harm to [their] newsgathering efforts." *Id.* ¶¶ 45-46.

The government cannot seriously dispute these uncontested facts. Its efforts to avoid Magistrate Judge Porter's decision fail for multiple reasons.

First, the government asserts that a prior restraint must be a "court order or government action" that either prohibits her "from engaging in any expressive activities in the future" or requires her to "'obtain prior approval for any expressive activities' she wishes to undertake." ECF No. 74 at 25 (quoting *Alexander v. United States*, 509 U.S. 544, 550-51 (1993)).[7] Yet, as detailed *supra*, that is wrong as a matter of law; a prior restraint occurs not only when "official restrictions [are] imposed upon speech or other forms of expression in advance of actual publication," but also when "expression is foreclosed prior to an adequate determination that it is unprotected by the First Amendment." *J-R Distribs., Inc.*, 765 P.2d at 287-89 (collecting cases); *see also, e.g.*, *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63-64 (1989) ("[S]earches for and seizure of First Amendment materials" create "risk of prior restraint"); *Heller*, 413 U.S. at 492-93 (if a seizure of

---

[7] *Alexander* considered whether a *post-conviction forfeiture order* constituted a prior restraint. The Court held that such an order "was not a prior restraint on speech, but a punishment for past criminal conduct." *Id.* at 553. The case is inapposite; no such final adjudication has occurred here.

expressive material, even one pursuant to a valid warrant, prevents First Amendment-protected activity from taking place, the material must be "copied" or "returned" so that the activity may continue pending a judicial, adversarial determination). The Supreme Court contemplated the situation at hand in *Zurcher*, when it considered whether the newsroom search created a "realistic threat of prior restraint or of any direct restraint" on the paper's publication or "communication of ideas." 436 U.S. at 567. The government's constrained definition runs afoul of the Supreme Court's guidance that "[g]overnmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974); *see also Near*, 283 U.S. at 708-09 (evaluating "operation and effect" of restriction to conclude that it was prior restraint).[8]

Second, the government argues that "no channel of communication is foreclosed" to Natanson. ECF No. 74 at 24-25. But the seizure made it impossible for Natanson to complete the stories she was developing when the government seized her devices, to communicate with more than 1,200 sources other than Perez-Lugones, or to publish stories generated by them, at all. ECF No. 9-1 ¶¶ 42-44. And the government's demand that it should be permitted to peruse her materials at its discretion threatens to chill those sources, impairing any prospect of future newsgathering. *Id.* ¶¶ 45-46. While it is true that Natanson has started a new Signal account, it is risible to suggest that a raid and ongoing government scrutiny that could chill 1,200 federal government sources is

---

[8] The government's argument that the seizure was not a prior restraint because it was not based on the content of Natanson's reporting, ECF No. 74 at 25, is wrong, for three reasons. First, the government targeted Natanson specifically because of her reporting related to Perez-Lugones. Second, the unsealed warrant affidavit also highlighted that she had "publicly written about her use of [the devices] to receive information" from "hundreds of Government employees and contractors," ECF No. 39 ¶¶ 24, 27, i.e., confidential federal sources other than Perez-Lugones. Third, in any case, the point is legally irrelevant; the government cites no authority to support its view that it can impose a sweeping First Amendment restraint simply because it claims a criminal interest in some limited material held in a reporter's files.

not a prior restraint simply because Natanson can start over from scratch. As Magistrate Judge Porter recognized, the government fails to appreciate "the realities of modern journalism and the value of confidential relationships cultivated over time." ECF No. 62 at 16.[9]

Because the seizure and threatened review of Natanson's irrelevant files are a prior restraint, the government must overcome the "heavy presumption against its constitutional validity." *Neb. Press Ass'n*, 427 U.S. at 558 (citation omitted). In other words, the restraint is unlawful unless the government can show that the restrained material would have "inevitably, directly, and immediately" caused immense harm to the country. *N.Y. Times Co. v. United States*, 403 U.S. 713, 726-27 (1971) (Brennan, J., concurring). Further, the government's restraint must be narrowly tailored to address the concern of harm. *See, e.g.*, *In re Murphy-Brown, LLC*, 907 F.3d 788, 799 (4th Cir. 2018).

The government does not even try to rebut that heavy presumption here. The government's mere invocation of various arguments based on its belief that the devices contain some small quantity of classified information (at least some of which the government contends is already in the public domain) is insufficient to demonstrate inevitable, direct, and immediate harm. Indeed, the Supreme Court rejected a similar argument when it refused to stop publication of the Pentagon Papers despite the government's protests that they were classified. *N.Y. Times*, 403 U.S. at 714

---

[9] The government's comparisons to protest-buffer-zone cases are inapposite. *See* ECF No. 74 at 24. In those cases, protestors were "not prevented from expressing their message in any one of several different ways; they [were] simply prohibited from expressing it within the 36-foot buffer zone." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 n.2 (1994). In contrast, here, the government has directly restrained Natanson's expression, not merely the manner of her expression. The fact that there are other avenues to speak a different "message" by publishing *other* stories with *different* sources does not lessen the government's restraint on her speech with her *existing* sources and her and the Post's newsgathering activities that otherwise would occur through information generated by contacts with those sources.

23

(affirming *United States v. Wash. Post Co.*, 446 F.2d 1327 (D.C. Cir. 1971) (en banc))). The government makes no effort to establish any risk of requisite harm here.

Even if the government had demonstrated a legitimate need to support a prior restraint, it cannot show that its seizure and search protocol are the least restrictive means of accomplishing it, for at least two reasons. First, the government could have used a subpoena. *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000).[10] Indeed, the government utilized this narrower approach with its grand jury subpoena to The Post. Second, there are less restrictive alternatives available to conduct the review than letting law enforcement agents peruse Movants' highly sensitive source materials, including the judicial review that Judge Porter ordered (or a review by defense counsel, as Movants proposed).

> **D.**     **The Government's Objections to a Judicial Privilege Review Provide No Basis to Depart from Fourth Circuit Precedent.**

The government's three objections to a judicial privilege review provide no basis to depart from *Baltimore Law Firm*.

1.     The government first suggests that ordering judicial privilege review (as opposed to executive privilege review) of seized materials violates the separation of powers. ECF No. 74 at 10-11. The government's position is a startling one that would have potentially sweeping implications for the judicial role in privilege disputes. If anything, the Fourth Circuit held the opposite by prohibiting courts from delegating the resolution of privilege disputes, an inherently judicial function, to an executive branch filter team. *See Baltimore Law Firm*, 942 F.3d at 176-

---

[10] While the government has suggested evidence could have been lost because of expiring Signal messages, the unsealed warrant affidavit reveals that the government determined the retention settings on the chat between Perez-Lugones and Natanson at the time of his arrest on January 8 was 24 hours. ECF No. 39 ¶¶ 14-15, 38. There was thus no good faith basis to suggest that there was *still* an urgent need for a seizure *four days later* on January 12.

24

77. None of the cases the government cites has anything to do with a post-seizure judicial privilege review. The principal case the government cites is so far afield as to underscore the weakness of its position. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979), involved issuance of a warrant that left blank the particular items to be seized with those items being entered in the warrant "after the seizure." *Id.* at 324. Not surprisingly, the property owner moved to suppress, and prevailed, on the grounds that the warrant failed the particularity requirement, which does not permit "open-ended warrants, to be completed while a search is being conducted or after the seizure has been carried out." *Id.* at 325. The present case has nothing to do with an open-ended warrant but rather property owners who requested judicial oversight to protect their privileges. The Fourth Circuit and other courts which have ordered judicial, special master, or privilege holder review plainly agree that judicial oversight is not only constitutionally permissible but sometimes required in circumstances like these. *See, e.g.*, *Baltimore Law Firm*, 942 F.3d at 181; *In re Search of Elec. Commc'ns*, 802 F.3d at 530 n.53 ("Of course, a court always retains the prerogative to require a different method of review in any particular case, such as requiring the use of a special master or reviewing the seized documents *in camera* itself."); *Rayburn*, 497 F.3d at 663 (privilege holder must have "an opportunity to assert the privilege," and obtain judicial review, "prior to disclosure of privileged materials to the Executive"); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3d Cir. 1984) (ordering government to return documents seized from law firm and suggesting appointment of a special master "to examine *in camera* any material that the law firm objects to producing").

The Supreme Court and other circuits recognize the importance of judicial scrutiny, particularly in cases involving seizures of sensitive information or broad seizures of electronic evidence. *See, e.g.*, *Zurcher*, 436 U.S. at 567 (emphasizing, even before the PPA was enacted, that

25

"the hazards of such warrants" implicating the First Amendment "can be avoided by a neutral magistrate carrying out his responsibilities under the Fourth Amendment, for he has ample tools at his disposal to confine warrants to search within reasonable limits"); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc) (per curiam) ("The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect."), *overruled on other grounds by Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17 (2017); Fed. R. Crim. P. 41(g) advisory committee's note to 1989 amendment (Rule 41(g) "contemplates judicial action that will respect both possessory and law enforcement interests").

2.    The government's second objection is a straw man.  The government asserts that "the magistrate judge does not possess" the necessary "expertise nor the authority to determine what material is classified."  ECF No. 74 at 13.  But the Order provides Magistrate Judge Porter *no role* in making classification determinations.  The Court will simply be conducting a privilege review to identify documents responsive to the warrant, and it will conduct that review in consultation with government counsel.  ECF No. 62 at 22; Tr. of Mar. 4, 2026 Hearing at 5-6, 12-13, 18-21, 41-42.  The Court is competent to identify and provide to the government "records received from or relating to" Perez-Lugones, ECF No. 9-5, and does not need to figure out whether any such records are classified because the records would be responsive irrespective of whether they are classified.  The government can later determine whether it believes any record is classified.[11]  Similarly, the government's objection that the judge and court staff lack a need-to-

---

[11] The government claims that judicial review increases the risk that classified information will be disclosed.  ECF No. 74 at 14.  Not only can the Court, working with the DOJ's Litigation Security Group, be trusted to safeguard classified information; in this case, the government claims that most of the classified information was published in The Post already.

26

know is also no barrier to judicial review. Where a judge's access to classified information is a necessary component of its ability to resolve a dispute, the judge and relevant court staff have a need to know. *Cf.* Classified Information Procedures Act, 18 U.S.C. App. 3 §§ 1–16

3.    The government's third objection, that a judicial search might raise "logistical difficulties," ECF No. 74 at 15-16, is both premature and overstated. Magistrate Judge Porter has not yet determined the review logistics and will only do so in consultation with the parties. *See* Tr. of Mar. 4, 2026 Hearing at 18-21. More importantly, the government's proposed filter team review would raise the same potential logistical issues, such as determining "the best place, platform and technology for review." ECF No. 74 at 15. Indeed, under the government's proposed filter review, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Similarly, the government would still have to "image all remaining devices." ECF No. 74 at 16. Finally, the notion that Magistrate Judge Porter will have to testify to lay the foundation for the admission of evidence, *id.* at 11, is absurd. He can implement procedures to ensure that a government technician (rather than the Court) extracts from the review platform any documents identified as responsive.

None of these objections permits or requires the Court to ignore *Baltimore Law Firm* or the First Amendment's prohibition on prior restraints.

## II.    To the Extent the Government Objects to Return of the Non-Responsive Newsgathering Materials, that Objection Should Be Overruled.

Although the government asks this Court to vacate the Order, it is not clear whether the government objects to returning the non-responsive newsgathering materials to The Post and

Natanson. In any event, the government's brief identifies no legitimate interests that would be harmed by such return and, therefore, return is required.

Rule 41(g) permits any "person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to "move for the property's return." Fed. R. Crim. P. 41(g). The rule does not set forth a standard "to govern the determination of whether property should be returned," but the test is one of "reasonableness under all of the circumstances." Fed. R. Crim. P. 41 advisory committee's note to 1989 amendment. "[I]f the United States' *legitimate interests* can be satisfied even if the property is returned, continued retention of the property would become unreasonable." *Rayburn*, 497 F.3d at 663 (quoting Fed. R. Crim. P. 41 advisory committee's note to 1989 amendment) (emphasis in *Rayburn*). Once the need for retaining property has passed, a district court "has both the jurisdiction and the duty to return the contested property . . . regardless and independently of the validity or invalidity of the underlying search and seizure." *United States v. Wilson*, 540 F.2d 1100, 1103-04 (D.C. Cir. 1976).

The government's brief identifies no *legitimate interest* in preventing return of the non-responsive newsgathering materials to The Post and Natanson. There is none. Prompt return of the non-responsive materials is especially important and reasonable here given the nature of the materials and the context of this seizure. As the Supreme Court has acknowledged, what is "reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Zurcher*, 436 U.S. at 564 (quoting *Roaden v. Kentucky*, 413 U.S. 496, 501 (1973)). Here, we are talking about the return of newsgathering materials protected by the PPA and the First Amendment that have nothing to do with the government's investigation, including draft stories, communications with editors and other journalists about draft

28

stories, and materials relating to confidential sources.[12]

The government's only arguably legitimate interests are in preserving the seized data, and retaining and using the narrow set of materials, if any, that are responsive to the warrant. Those interests will be satisfied even if the non-responsive newsgathering materials are returned. The Post and Natanson, from the beginning, agreed that the government could make a preservation copy of the seized materials, *see* ECF No. 9-4 ¶ 11; ECF No. 62 at 5, and the government has preserved much of the data already, ECF No. 35 at 6-7. The Order expressly provides that the government will retain the "information responsive to the search warrant." ECF No. 62 at 18. The Order thus satisfies the government's legitimate interests in preserving potential evidence and retaining and using responsive information. *See United States v. Carey*, 172 F.3d 1268, 1275-76 (10th Cir. 1999) ("Because in Mr. Carey's case, officers had removed the computers from his control, there was no exigent circumstance or practical reason to permit officers to rummage through all of the stored data regardless of its relevance or its relation to the information specified in the warrant." (citation omitted)).

---

[12] The government's brief suggests that a special equitable jurisdiction test applies to a Rule 41(g) motion. ECF No. 74 at 9 (citing *In re Hoover's Residence*, 2010 WL 7351761, at *2 (N.D. W. Va. Dec. 30, 2010)). The Fourth Circuit in an analogous Rule 41(g) case, *Baltimore Law Firm*, either did not require such a test or, sub silentio, held that it was satisfied. Here too, any such test was satisfied, to the extent it applies. As set forth in Movant's opening brief below, "The Post and Natanson have an undeniable interest in, and need for, the seized data. Withholding this data would harm them irreparably, violate their constitutional rights, and constitute an unlawful prior restraint. Return is the only adequate remedy." ECF No. 9 at 26. Even if this test did apply, no showing of callous disregard for constitutional rights should be required because Movants are not seeking suppression. *See Mr. Lucky Messenger Serv., Inc. v. United States*, 587 F.2d 15, 17 (7th Cir. 1978). In any event, the government's actions and insistence that it should review the First Amendment protected materials callously disregard Movants' constitutional rights.

## CONCLUSION

For the reasons set forth above, the government's objections should be overruled. The government should not be permitted to review the seized materials. Any further proceedings should include appropriate participation by Movants and consideration of their privileges.

30

Dated: March 25, 2026

Respectfully submitted,

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)
Sean M. Douglass (VSB No. 83835)
Thomas G. Hentoff (*pro hac vice*)
Tobin J. Romero (*pro hac vice*)
Nicholas G. Gamse (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
slatcovich@wc.com
sdouglass@wc.com
thentoff@wc.com
tromero@wc.com
ngamse@wc.com

*Counsel for Movant The Washington Post*

/s/ Amy Jeffress
Amy Jeffress (VSB No. 36060)
Trisha Anderson (*pro hac vice*)
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
ajeffress@heckerfink.com
tanderson@heckerfink.com

*Counsel for Movant Hannah Natanson*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2026, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Virginia, using the electronic case filing system of the court.

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)

*Counsel for The Washington Post*